**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

CENTRAL DISTRICT OF CALIFORNIA

Case number *(if known)*   2:23-bk-11789-BR    Chapter    11

■ Check if this an amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | | |
|---|---|---|---|
| 1. | Debtor's name | Hawthorne Hangar Operations, L.P. | |
| 2. | All other names debtor used in the last 8 years<br><br>Include any assumed names, trade names and *doing business as* names | | |
| 3. | Debtor's federal Employer Identification Number (EIN) | 27-1035430 | |

**4. Debtor's address**

Principal place of business

**909 E. Green Street**
**Pasadena, CA 91106-2906**
Number, Street, City, State & ZIP Code

**Los Angeles**
County

Mailing address, if different from principal place of business

P.O. Box, Number, Street, City, State & ZIP Code

Location of principal assets, if different from principal place of business

**3507 Jack Northrop Avenue Hawthorne, CA 90250-4433**
Number, Street, City, State & ZIP Code

**5. Debtor's website (URL)**   www.hawthornehangaropsp.com

**6. Type of debtor**

☐ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

■ Partnership (excluding LLP)

☐ Other. Specify:

Debtor   Hawthorne Hangar Operations, L.P.                                  Case number *(if known)*   2:23-bk-11789-BR
         Name

**7.  Describe debtor's business**   A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
   http://www.uscourts.gov/four-digit-national-association-naics-codes.

**8.  Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check **all** that apply*:

  ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

  ☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

  ☐ A plan is being filed with this petition.

  ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

  ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

  ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.  Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

☑ No.
☐ Yes.

| District _____ | When _____ | Case number _____ |
| District _____ | When _____ | Case number _____ |

Debtor    **Hawthorne Hangar Operations, L.P.**    Case number *(if known)*    **2:23-bk-11789-BR**
          Name

**10.  Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☑ No
☐ Yes.

List all cases. If more than 1, attach a separate list

| | | | Relationship | |
|---|---|---|---|---|
| Debtor | _____ | | _____ | |
| District | _____ | When _____ | Case number, if known | _____ |

**11.  Why is the case filed in *this district?***

*Check all that apply:*

☑    Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐    A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12.  Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No
☐ Yes.    Answer below for each property that needs immediate attention. Attach additional sheets if needed.

Why does the property need immediate attention? *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

Where is the property? _____

Number, Street, City, State & ZIP Code

Is the property insured?

☐ No
☐ Yes.    Insurance agency _____
          Contact name _____
          Phone _____

**Statistical and administrative information**

**13.  Debtor's estimation of available funds**

*Check one:*

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14.  Estimated number of creditors**

☑ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than100,000

**15.  Estimated Assets**

☐ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☐ $1,000,001 - $10 million
☑ $10,000,001 - $50  million
☐ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

**16.  Estimated liabilities**

☐ $0 - $50,000

☐ $1,000,001 - $10 million

☐ $500,000,001 - $1 billion

Debtor    **Hawthorne Hangar Operations, L.P.**    Case number (*if known*)    **2:23-bk-11789-BR**
Name

☐ $50,001 - $100,000        ☐ $10,000,001 - $50 million        ☐ $1,000,000,001 - $10 billion
☐ $100,001 - $500,000       ☐ $50,000,001 - $100 million       ☐ $10,000,000,001 - $50 billion
☐ $500,001 - $1 million      ☐ $100,000,001 - $500 million      ☐ More than $50 billion

Debtor   Hawthorne Hangar Operations, L.P.                                    Case number (if known)   2:23-bk-11789-BR
           Name

▓▓▓▓   **Request for Relief, Declaration, and Signatures**

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

17. **Declaration and signature**
    **of authorized**
    **representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   04 05 23
              MM / DD / YYYY

X _____          Dan Wolfe
   Signature of authorized representative of debtor      Printed name

Title   **Principal**

18. **Signature of attorney**   X _____   Date   4-8-23
                                    Signature of attorney for debtor          MM / DD / YYYY

**ROSENDO GONZALEZ**
Printed name

**Gonzalez & Gonzalez Law, P.C.**
Firm name

**530 S Hewitt Street, Suite 148**
**Los Angeles, CA 90013**
Number, Street, City, State & ZIP Code

Contact phone   **(213) 452-0070**   Email address   **rossgonzalez@gonzalezplc.com**

**137352 CA**
Bar number and State

Fill in this information to identify the case:

Debtor name    **Hawthorne Hangar Operations, L.P.**

United States Bankruptcy Court for the:    CENTRAL DISTRICT OF CALIFORNIA

Case number (if known)    **2:23-bk-11789-BR**

■ Check if this is an
amended filing

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

■ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
■ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
■ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
■ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
■ *Schedule H: Codebtors* (Official Form 206H)
■ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
☐ Amended *Schedule* _____
☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
■ Other document that requires a declaration    **Statement of Financial Affairs**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    04/05/23    X _____
                                    Signature of individual signing on behalf of debtor

                                    **Dan Wolfe**
                                    Printed name

                                    **Principal**
                                    Position or relationship to debtor

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | Hawthorne Hangar Operations, L.P. |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA |
| Case number (if known): | 2:23-bk-11789-BR |

■ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Amy Warren 2417 1/2 248th ST Lomita, CA 90717 | | WAGES | | | | $1,572.50 |
| Andre L. Sullens 3743 W 119th ST. Hawthorne, CA 90250 | | WAGES | | | | $2,409.00 |
| AT&T P.O. BOX 5025 C/O Bankruptcy Carol Stream, IL 60197 | | | | | | $7,826.13 |
| Bassco Services, Inc. 9219 Viscount Row Dallas, TX 75247 | | | | | | $6,088.17 |
| Dan Wolfe 390 Patrician Way Pasadena, CA 91105 | | Business Loan | | | | $1,435,000.00 |
| David Wehrly 319 Main Street El Segundo, CA 90245 | | | Disputed | | | $1,300,000.00 |
| First Insurance Funding PO BOX 7000 Carol Stream, IL 60197 | | | | | | $38,493.81 |
| Gonzalo Gutierrez 1131 N Neptune Avenue Wilmington, CA 90744 | | | | | | $3,000.00 |
| James L. Schulte 6526 W Kings Avenue Glendale, AZ 85306 | | Wages | | | | $4,000.00 |

| Debtor | Hawthorne Hangar Operations, L.P. | | Case number *(if known)* | **2:23-bk-11789-BR** | |
|---|---|---|---|---|---|
| | Name | | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Karla Zarate 3415 Cudahy ST. Huntington Park, CA 90255 | | Wages | | | | $1,628.00 |
| Law Offices of Mary E. Gram 38180 Del Webb Blvd #PMB 97 Palm Desert, CA 92211 | | | | | | $33,450.00 |
| LOS ANGELES COUNTY P.O. BOX 54018 Los Angeles, CA 90054 | | | | | | $42,152.25 |
| Mark C. Brown, P.C. 301 E Colorado Blvd Ste 301 Pasadena, CA 91101 | | | | | | $1,781.06 |
| Matthew R. Schulte 2419 248th St Lomita, CA 90717 | | WAGES | | | | $2,994.13 |
| Messina & Hankin LLP C/O Martin 160 Newport Center Drive #110 Newport Beach, CA 92660 | | | | | | $325,687.22 |
| Messina & Hankin LLP 24910 Las Brisas Rd Ste 102 Murrieta, CA 92562 | | | Disputed | | | $318,433.18 |
| Mobile Mini Storage Solutions PO Box 650882 Dallas, TX 75265 | | | | | | $980.98 |
| Steinberg Law 13412 Ventura Blvd Ste 380 Sherman Oaks, CA 91423 | | | Disputed | | | $325,091.61 |
| Tait & Associates 701 Parkcenter Dr Maria Figueroa Santa Ana, CA 92705 | | | | | | $16,141.73 |
| Tri-Pacific Heating LP 2116 E Walnut Ave Fullerton, CA 92831 | | | | | | $1,280.00 |

# United States Bankruptcy Court
## Central District of California

In re    Hawthorne Hangar Operations, L.P.       Case No.    2:23-bk-11789-BR

Debtor(s)       Chapter    11

## LIST OF EQUITY SECURITY HOLDERS - AMENDED

Following is the list of the Debtor's equity security holders which is prepared in accordance with rule 1007(a)(3) for filing in this Chapter 11 Case

| Name and last known address or place of business of holder | Security Class | Number of Securities | Kind of Interest |
| --- | --- | --- | --- |
| -NONE- | | | |

## DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR PARTNERSHIP

     I, the **Principal** of the partnership named as the debtor in this case, declare under penalty of perjury that I have read the foregoing List of Equity Security Holders and that it is true and correct to the best of my information and belief.

Date    _04/08/23_        Signature _/s/ Dan Wolfe_

                                          **Dan Wolfe**

*Penalty for making a false statement of concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

Sheet 1 of 1 in List of Equity Security Holders

**AMENDED**
## STATEMENT OF RELATED CASES
### INFORMATION REQUIRED BY LBR 1015-2
### UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA

1. A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, his/her spouse, his or her current or former domestic partner, an affiliate of the debtor, any copartnership or joint venture of which debtor is or formerly was a general or limited partner, or member, or any corporation of which the debtor is a director, officer, or person in control, as follows: (Set forth the complete number and title of each such of prior proceeding, date filed, nature thereof, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

**None**

2. (If petitioner is a partnership or joint venture) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor or an affiliate of the debtor, or a general partner in the debtor, a relative of the general partner, general partner of, or person in control of the debtor, partnership in which the debtor is a general partner, general partner of the debtor, or person in control of the debtor as follows: (Set forth the complete number and title of each such prior proceeding, date filed, nature of the proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

**None**

3. (If petitioner is a corporation) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, or any of its affiliates or subsidiaries, a director of the debtor, an officer of the debtor, a person in control of the debtor, a partnership in which the debtor is general partner, a general partner of the debtor, a relative of the general partner, director, officer, or person in control of the debtor, or any persons, firms or corporations owning 20% or more of its voting stock as follows: (Set forth the complete number and title of each such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

**None**

4. (If petitioner is an individual) A petition under the Bankruptcy Reform Act of 1978, including amendments thereof, has been filed by or against the debtor within the last 180 days: (Set forth the complete number and title of each such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

**None**

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed at _____Los Angeles_____ , California.

Date: _____04/08/23_____

_____
**Dan Wolfe**
Signature of Debtor 1

_____
Signature of Debtor 2

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

October 2018                                        Page 1        **F 1015-2.1.STMT.RELATED.CASES**

**Fill in this information to identify the case:**

Debtor name **Hawthorne Hangar Operations, L.P.**

United States Bankruptcy Court for the: **CENTRAL DISTRICT OF CALIFORNIA**

Case number (if known) **2:23-bk-11789-BR**

■ Check if this is an amended filing

## Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals                    12/15

**Part 1:   Summary of Assets**

1.   *Schedule A/B: Assets-Real and Personal Property* (Official Form 206A/B)

   1a. **Real property:**
      Copy line 88 from *Schedule A/B*...................................................................................   $      **19,000,000.00**

   1b. **Total personal property:**
      Copy line 91A from *Schedule A/B*.................................................................................   $      **5,529,138.49**

   1c. **Total of all property:**
      Copy line 92 from *Schedule A/B*...................................................................................   $      **24,529,138.49**

**Part 2:   Summary of Liabilities**

2.   *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
      Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D*...................................   $      **8,600,000.00**

3.   *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
      Copy the total claims from Part 1 from line 5a of *Schedule E/F*...................................................   $      **42,152.25**

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
      Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*...............................   +$      **3,827,075.02**

4.   Total liabilities ...........................................................................................................
      Lines 2 + 3a + 3b                                                                                 $      **12,469,227.27**

**Fill in this information to identify the case:**

Debtor name   **Hawthorne Hangar Operations, L.P.**

United States Bankruptcy Court for the:   CENTRAL DISTRICT OF CALIFORNIA

Case number (if known)   **2:23-bk-11789-BR**

■ Check if this is an
amended filing

## Official Form 206A/B
## Schedule A/B: Assets - Real and Personal Property
12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

| Part 1: | Cash and cash equivalents |
|---|---|

**1. Does the debtor have any cash or cash equivalents?**

☐ No. Go to Part 2.
■ Yes Fill in the information below.

All cash or cash equivalents owned or controlled by the debtor

Current value of
debtor's interest

**2.     Cash on hand**                                                                                          **$0.00**

**3.     Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|---|
| 3.1. | Comerica | CHECKING | 5431 | $35,192.35 |
| 3.2. | Comerica | Fuel | 5464 | $102,266.08 |
| 3.3. | First Foundation Bank | CHECKING | 9724 | $5,289.92 |
| 3.4. | First Foundation Bank | Fuel | 0817 | $5,282.82 |
| 3.5. | First Foundation Bank | CHECKING | 9732 | $1,000.00 |
| 3.6. | California Bank & Trust | CHECKING | 3933 | $5,000.00 |

| Debtor | Hawthorne Hangar Operations, L.P. | Case number *(if known)* | 2:23-bk-11789-BR |
|---|---|---|---|
| | Name | | |

**4.    Other cash equivalents** *(Identify all)*

**5.    Total of Part 1.**

Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

$154,031.17

---

**Part 2:    Deposits and Prepayments**

**6. Does the debtor have any deposits or prepayments?**

☒ No.  Go to Part 3.
☐ Yes Fill in the information below.

---

**Part 3:    Accounts receivable**

**10. Does the debtor have any accounts receivable?**

☐ No.  Go to Part 4.
☒ Yes Fill in the information below.

**11.    Accounts receivable**

11b. Over 90 days old:   26,700.00   -   0.00   =....   $26,700.00
                         face amount      doubtful or uncollectible accounts

**12.    Total of Part 3.**

Current value on lines 11a + 11b = line 12.  Copy the total to line 82.

$26,700.00

---

**Part 4:    Investments**

**13. Does the debtor own any investments?**

☒ No.  Go to Part 5.
☐ Yes Fill in the information below.

---

**Part 5:    Inventory, excluding agriculture assets**

**18. Does the debtor own any inventory (excluding agriculture assets)?**

☐ No.  Go to Part 6.
☒ Yes Fill in the information below.

| | General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|---|
| 19. | Raw materials<br>Fuel-Avgas | 4/05/2023 | $7,257.45 | | $11,113.96 |
| | Jet A Fuel | 04/05/23 | $77,421.68 | | $191,184.36 |

**20.    Work in progress**

**21.    Finished goods, including goods held for resale**

**22.    Other inventory or supplies**

**23.    Total of Part 5.**

Add lines 19 through 22.  Copy the total to line 84.

$202,298.32

---

Official Form 206A/B                  Schedule A/B Assets - Real and Personal Property                  page 2

| Debtor | Hawthorne Hangar Operations, L.P. | Case number *(If known)* | 2:23-bk-11789-BR |
|---|---|---|---|
| | Name | | |

24.      **Is any of the property listed in Part 5 perishable?**
       ■ No
       ☐ Yes

25.      **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**
       ■ No
       ☐ Yes. Book value _____ Valuation method _____ Current Value _____

26.      **Has any of the property listed in Part 5 been appraised by a professional within the last year?**
       ■ No
       ☐ Yes

**Part 6:**     **Farming and fishing-related assets (other than titled motor vehicles and land)**

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

       ■ No. Go to Part 7.
       ☐ Yes Fill in the information below.

**Part 7:**     **Office furniture, fixtures, and equipment; and collectibles**

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

       ☐ No. Go to Part 8.
       ■ Yes Fill in the information below.

| | General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 39. | Office furniture<br>Fixtures | $42,450.00 | | $42,450.00 |
| 40. | Office fixtures | | | |
| 41. | Office equipment, including all computer equipment and communication systems equipment and software<br>Machine | $498,659.00 | | $498,659.00 |
| 42. | Collectibles *Examples*: Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |

43.      **Total of Part 7.**
       Add lines 39 through 42. Copy the total to line 86.           **$541,109.00**

44.      **Is a depreciation schedule available for any of the property listed in Part 7?**
       ■ No
       ☐ Yes

45.      **Has any of the property listed in Part 7 been appraised by a professional within the last year?**
       ■ No
       ☐ Yes

**Part 8:**     **Machinery, equipment, and vehicles**

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

       ■ No. Go to Part 9.
       ☐ Yes Fill in the information below.

| Debtor | Hawthorne Hangar Operations, L.P. | Case number *(If known)* | 2:23-bk-11789-BR |
|---|---|---|---|
| | Name | | |

## Part 9:    Real property

**54. Does the debtor own or lease any real property?**

☐ No.  Go to Part 10.

■ Yes Fill in the information below.

55.    Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building, if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1.    3507 Jack Northrop Avenue, Hawthorne California 90250 | 100% | $19,000,000.00 | Broker | $19,000,000.00 |

56.    **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets.
Copy the total to line 88.

| $19,000,000.00 |
|---|

57.    **Is a depreciation schedule available for any of the property listed in Part 9?**

■ No

☐ Yes

58.    **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

■ No

☐ Yes

## Part 10:    Intangibles and intellectual property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☐ No.  Go to Part 11.

■ Yes Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60.    **Patents, copyrights, trademarks, and trade secrets** | | | |
| 61.    **Internet domain names and websites**<br>www.hawthornehangarops.com | Unknown | | Unknown |
| 62.    **Licenses, franchises, and royalties**<br>Business/waste measure | Unknown | | Unknown |
| 63.    **Customer lists, mailing lists, or other compilations**<br>Customer list | Unknown | | Unknown |
| 64.    **Other intangibles, or intellectual property** | | | |

| Debtor | Hawthorne Hangar Operations, L.P. | Case number *(if known)* | 2:23-bk-11789-BR |
|---|---|---|---|
| | Name | | |

65. Goodwill

66. **Total of Part 10.**
Add lines 60 through 65. Copy the total to line 89.

|  |
|---|
| $0.00 |

67. **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C.§§ 101(41A) and 107?
☑ No
☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
☑ No
☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
☑ No
☐ Yes

---

**Part 11:    All other assets**

70. **Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No.  Go to Part 12.
☑ Yes Fill in the information below.

| | | | Current value of debtor's interest |
|---|---|---|---|
| 71. | **Notes receivable**<br>Description (include name of obligor) | | |
| 72. | **Tax refunds and unused net operating losses (NOLs)**<br>Description (for example, federal, state, local) | | |
| | Sales tax overpayment 2020-2022 | Tax year | $105,000.00 |
| 73. | **Interests in insurance policies or annuities** | | |
| 74. | **Causes of action against third parties (whether or not a lawsuit has been filed)** | | |
| | Various Lawsuits- See Attachments No. 2 | | $4,500,000.00 |
| | Nature of claim    Various | | |
| | Amount requested    $4,500,000.00 | | |
| 75. | **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**<br>Keven Steinberg Potential Claim for Unpaid Rent Against Wolfe Air (Subject to Set Off) | | Unknown |
| | Nature of claim    Legal Malpratice | | |
| | Amount requested    $0.00 | | |
| 76. | **Trusts, equitable or future interests in property** | | |
| 77. | **Other property of any kind not already listed** *Examples:* Season tickets, country club membership | | |

| Debtor | **Hawthorne Hangar Operations, L.P.** | Case number *(if known)* | **2:23-bk-11789-BR** |
|---|---|---|---|
| | Name | | |

**Potential claim against Wolfe Air for usage of Hangar
[subjcet to set off)**

**Potential claim against Top Gun usage of Hangar
(subject to set off)**                                                                    **Unknown**

---

78.  **Total of Part 11.**                                                            **$4,605,000.00**

Add lines 71 through 77. Copy the total to line 90.

79.  **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

☑ No

☐ Yes

Debtor    __Hawthorne Hangar Operations, L.P.__                    Case number *(if known)*  __2:23-bk-11789-BR__
　　　　　　　Name

| Part 12: | Summary |

In Part 12 copy all of the totals from the earlier parts of the form

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1* | $154,031.17 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $26,700.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $202,298.32 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $541,109.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $0.00 | |
| 88. **Real property.** *Copy line 56, Part 9.*..........................................................> | | $19,000,000.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $4,605,000.00 | |
| 91. **Total.** Add lines 80 through 90 for each column | $5,529,138.49 | + 91b. $19,000,000.00 |
| 92. **Total of all property on Schedule A/B.** Add lines 91a+91b=92 | | $24,529,138.49 |

**Fill in this information to identify the case:**

Debtor name **Hawthorne Hangar Operations, L.P.**

United States Bankruptcy Court for the: CENTRAL DISTRICT OF CALIFORNIA

Case number (if known) **2:23-bk-11789-BR**

■ Check if this is an amended filing

Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

■ Yes. Fill in all of the information below.

**Part 1:    List Creditors Who Have Secured Claims**

**2. List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | **Column A**<br>Amount of claim<br>Do not deduct the value of collateral. | **Column B**<br>Value of collateral that supports this claim |
|---|---|---|

| 2.1 | **David Wehrly**<br>Creditor's Name | | |
|---|---|---|---|

**David Wehrly**
Creditor's Name

**319 Main Street
El Segundo, CA 90245**
Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred
10-1-2021**
Last 4 digits of account number

Do multiple creditors have an interest in the same property?
■ No
☐ Yes. Specify each creditor, including this creditor and its relative priority.

Describe debtor's property that is subject to a lien
**3507 Jail
Hawthorne, CA 90250**

Describe the lien
**Judgement**
Is the creditor an insider or related party?
■ No
☐ Yes
Is anyone else liable on this claim?
■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

As of the petition filing date, the claim is:
Check all that apply
■ Contingent
■ Unliquidated
■ Disputed

Amount of claim: **$1,300,000.00**
Value of collateral: **$19,000,000.00**

---

**Grand Pacific Financial**
Creditor's Name
**901
Drive #300
Monterey Park, CA 91754**
Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**

**Last 4 digits of account number**

Do multiple creditors have an interest in the same property?

Describe debtor's property that is subject to a lien
**3507 Jack
Hawthorne, CA 90250**

Describe the lien
**Loan**
Is the creditor an insider or related party?
■ No
☐ Yes
Is anyone else liable on this claim?
■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

As of the petition filing date, the claim is:
Check all that apply

Amount of claim: **$7,300,000.00**
Value of collateral: **$19,000,000.00**

Debtor    **Hawthorne Hangar Operations, L.P.**                              Case number (if known)    **2:23-bk-11789-BR**
          Name

■ No
☐ Yes. Specify each creditor,
including this creditor and its relative
priority.

■ Contingent
■ Unliquidated
■ Disputed

| 2.3 | **Mary G. Gram ESQ** | Describe debtor's property that is subject to a lien | | $0.00 | $400,000.00 |
| | Creditor's Name | **3507 Jack** | | | |

**38180**
**Palm Desert, CA 92211**
Creditor's mailing address

Describe the lien
**Judgement**
Is the creditor an insider or related party?

■ No
☐ Yes
Creditor's email address, if known

Is anyone else liable on this claim?

■ No
**Date debt was incurred**

☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

**Last 4 digits of account number**

**Do multiple creditors have an
interest in the same property?**

As of the petition filing date, the claim is:
Check all that apply

■ No
☐ Yes. Specify each creditor,
including this creditor and its relative
priority.

■ Contingent
■ Unliquidated
■ Disputed

3507 Jack
Hawthorne, CA 90250

---

3. Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.    $8,600,000.00

**Part 2:    List Others to Be Notified for a Debt Already Listed in Part 1**

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name  and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
| --- | --- | --- |

---

Official Form 206D    Additional Page of **Schedule D: Creditors Who Have Claims Secured by Property**    page 2 of 2

| Fill in this information to identify the case: |
|---|

Debtor name    **Hawthorne Hangar Operations, L.P.**

United States Bankruptcy Court for the:    CENTRAL DISTRICT OF CALIFORNIA

Case number (if known)    **2:23-bk-11789-BR**

■ Check if this is an amended filing

## Official Form 206E/F
# Schedule E/F: Creditors Who Have Unsecured Claims

12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims.
List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

| Part 1: | List All Creditors with PRIORITY Unsecured Claims |
|---|---|

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).

   ☐ No. Go to Part 2.

   ■ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

| | | | Total claim | Priority amount |
|---|---|---|---|---|
| 2.1 | Priority creditor's name and mailing address<br>**EMPLOYMENT DEVELOPMENT DEPT.**<br>**P.O. BOX 826880 MIC 28**<br>**Sacramento, CA 94280** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $0.00 | $0.00 |
| | Date or dates debt was incurred | Basis for the claim: | | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |

| | | | Total claim | Priority amount |
|---|---|---|---|---|
| 2.2 | Priority creditor's name and mailing address<br>**FRANCHISE TAX BOARD**<br>**P.O. BOX 2952**<br>**Sacramento, CA 95812-2952** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $0.00 | $0.00 |
| | Date or dates debt was incurred | Basis for the claim: | | |
| | Last 4 digits of account number<br>Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (8) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |

| Debtor | Hawthorne Hangar Operations, L.P. | Case number (if known) | 2:23-bk-11789-BR |
|---|---|---|---|
| | Name | | |

---

| 2.3 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $0.00 | $0.00 |
|---|---|---|---|---|

**IRS**
**24000 Avila Road**
**Mail Stop 5916**
**Laguna Niguel, CA 92677**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number

Is the claim subject to offset?
☑ No
☐ Yes

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (8)

---

| 2.4 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $42,152.25 | $42,152.25 |
|---|---|---|---|---|

**LOS ANGELES COUNTY**
**P.O. BOX 54018**
**Los Angeles, CA 90054**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number

Is the claim subject to offset?
☑ No
☐ Yes

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (8)

---

## Part 2:    List All Creditors with NONPRIORITY Unsecured Claims

3. List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill
   out and attach the Additional Page of Part 2.

Amount of claim

| 3.1 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $1,572.50 |
|---|---|---|---|

**Amy Warren**
**2417 1/2 248th ST**
**Lomita, CA 90717**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Basis for the claim:  WAGES

Last 4 digits of account number __

Is the claim subject to offset?  ☑ No  ☐ Yes

---

| 3.2 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $2,409.00 |
|---|---|---|---|

**Andre L. Sullens**
**3743 W 119th ST.**
**Hawthorne, CA 90250**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Basis for the claim:  WAGES

Last 4 digits of account number __

Is the claim subject to offset?  ☑ No  ☐ Yes

---

| 3.3 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $7,826.13 |
|---|---|---|---|

**AT&T**
**P.O. BOX 5025**
**C/O Bankruptcy**
**Carol Stream, IL 60197**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Basis for the claim: __

Last 4 digits of account number __

Is the claim subject to offset?  ☑ No  ☐ Yes

---

| Debtor | Hawthorne Hangar Operations, L.P. | | Case number (if known) | 2:23-bk-11789-BR |
|---|---|---|---|---|
| | Name | | | |

**3.4** Nonpriority creditor's name and mailing address
Bassco Services, Inc.
9219 Viscount Row
Dallas, TX 75247

Date(s) debt was incurred _
Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$6,088.17**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

**3.5** Nonpriority creditor's name and mailing address
Cesar E. De Leon
1459 W 151st ST
Gardena, CA 90247

Date(s) debt was incurred _
Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$640.00**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: __WAGES__

Is the claim subject to offset? ■ No ☐ Yes

---

**3.6** Nonpriority creditor's name and mailing address
Dan Wolfe
390 Patrician Way
Pasadena, CA 91105

Date(s) debt was incurred _
Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$1,435,000.00**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: __Business Loan__

Is the claim subject to offset? ■ No ☐ Yes

---

**3.7** Nonpriority creditor's name and mailing address
David Wehrly
319 Main Street
El Segundo, CA 90245

Date(s) debt was incurred _
Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$1,300,000.00**
☐ Contingent
☐ Unliquidated
■ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

**3.8** Nonpriority creditor's name and mailing address
First Insurance Funding
PO BOX 7000
Carol Stream, IL 60197

Date(s) debt was incurred _
Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$38,493.81**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

**3.9** Nonpriority creditor's name and mailing address
Gonzalo Gutierrez
1131 N Neptune Avenue
Wilmington, CA 90744

Date(s) debt was incurred _
Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$3,000.00**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

**3.10** Nonpriority creditor's name and mailing address
James L. Schulte
6526 W Kings Avenue
Glendale, AZ 85306

Date(s) debt was incurred _
Last 4 digits of account number _

As of the petition filing date, the claim is: *Check all that apply.*  **$4,000.00**
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: __Wages__

Is the claim subject to offset? ■ No ☐ Yes

---

| Debtor | Hawthorne Hangar Operations, L.P. | | Case number (if known) | **2:23-bk-11789-BR** |
|---|---|---|---|---|
| | Name | | | |

| 3.11 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $1,628.00 |
|---|---|---|---|

Karla Zarate
3415 Cudahy ST.
Huntington Park, CA 90255

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: **Wages**

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.12 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $33,450.00 |
|---|---|---|---|

Law Offices of Mary E. Gram
38180 Del Webb Blvd #PMB 97
Palm Desert, CA 92211

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.13 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $1,781.06 |
|---|---|---|---|

Mark C. Brown, P.C.
301 E Colorado Blvd Ste 301
Pasadena, CA 91101

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.14 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $2,994.13 |
|---|---|---|---|

Matthew R. Schulte
2419 248th St
Lomita, CA 90717

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: **WAGES**

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.15 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $318,433.18 |
|---|---|---|---|

Messina & Hankin LLP
24910 Las Brisas Rd Ste 102
Murrieta, CA 92562

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
■ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.16 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $325,687.22 |
|---|---|---|---|

Messina & Hankin LLP
C/O Martin
160 Newport Center Drive #110
Newport Beach, CA 92660

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.17 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $577.50 |
|---|---|---|---|

Micah Jones
1724 W 105th Street
Los Angeles, CA 90047

Date(s) debt was incurred _
Last 4 digits of account number _

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: **Wages**

Is the claim subject to offset? ■ No ☐ Yes

---

| Debtor | Hawthorne Hangar Operations, L.P. | Case number (if known) | 2:23-bk-11789-BR |
|---|---|---|---|
| | Name | | |

| 3.18 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $980.98 |
|---|---|---|---|

**Mobile Mini Storage Solutions**
PO Box 650882
Dallas, TX 75265

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.19 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $325,091.61 |
|---|---|---|---|

**Steinberg Law**
13412 Ventura Blvd Ste 380
Sherman Oaks, CA 91423

☐ Contingent
☐ Unliquidated
■ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.20 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown |
|---|---|---|---|

**Steinberg Law**
C/O Michael McCarthy, ESQ.
16255 Ventura Blvd #300
Encino, CA 91436

■ Contingent
■ Unliquidated
■ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.21 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $16,141.73 |
|---|---|---|---|

**Tait & Associates**
701 Parkcenter Dr
Maria Figueroa
Santa Ana, CA 92705

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

| 3.22 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $1,280.00 |
|---|---|---|---|

**Tri-Pacific Heating LP**
2116 E Walnut Ave
Fullerton, CA 92831

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _

Last 4 digits of account number _

Basis for the claim: _

Is the claim subject to offset? ■ No ☐ Yes

---

**Part 3:    List Others to Be Notified About Unsecured Claims**

4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|

**Part 4:    Total Amounts of the Priority and Nonpriority Unsecured Claims**

5. Add the amounts of priority and nonpriority unsecured claims.

| | | | Total of claim amounts |
|---|---|---|---|
| 5a. Total claims from Part 1 | 5a. | $ | 42,152.25 |
| 5b. Total claims from Part 2 | 5b. + | $ | 3,827,075.02 |
| 5c. Total of Parts 1 and 2<br>Lines 5a + 5b = 5c. | 5c. | $ | 3,869,227.27 |

**Fill in this information to identify the case:**

Debtor name    **Hawthorne Hangar Operations, L.P.**

United States Bankruptcy Court for the:    CENTRAL DISTRICT OF CALIFORNIA

Case number (if known)    **2:23-bk-11789-BR**

■ Check if this is an
amended filing

## Official Form 206G
## Schedule G: Executory Contracts and Unexpired Leases                12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, number the entries consecutively.

1.    **Does the debtor have any executory contracts or unexpired leases?**
     ☐ No. Check this box and file this form with the debtor's other schedules.  There is nothing else to report on this form.
     ■ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B: Assets - Real and Personal*        *Property*
(Official Form 206A/B).

**2. List all contracts and unexpired leases**                State the name and mailing address for all other parties with
                                                              whom the debtor has an executory contract or unexpired
                                                              lease

2.1.    State what the contract or        **See Attachment "4"**
        lease is for and the nature of
        the debtor's interest

        State the term remaining

        List the contract number of any                        **See Attachment "4"**
        government contract

**Fill in this information to identify the case:**

Debtor name  **Hawthorne Hangar Operations, L.P.**

United States Bankruptcy Court for the:   CENTRAL DISTRICT OF CALIFORNIA

Case number (if known)   **2:23-bk-11789-BR**

☐ Check if this is an
amended filing

Official Form 206H
# Schedule H: Your Codebtors

12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

**1. Do you have any codebtors?**

☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

■ Yes

**2. In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, Schedules D-G. Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.**

*Column 1: Codebtor*                         *Column 2: Creditor*

| | Name | Mailing Address | Name | Check all schedules that apply: |
|---|---|---|---|---|
| 2.1 | **Parties in Pending Lawsuits** | **See Attachment No. 2** | | ☐ D _____ <br> ☐ E/F _____ <br> ☐ G _____ |

**Fill in this information to identify the case:**

Debtor name    **Hawthorne Hangar Operations, L.P.**

United States Bankruptcy Court for the:    **CENTRAL DISTRICT OF CALIFORNIA**

Case number (if known)    **2:23-bk-11789-BR**

☐ Check if this is an amended filing

## Official Form 207
## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy
04/22

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

### Part 1: Income

1. **Gross revenue from business**

   ☐ None.

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
|---|---|---|
| **From the beginning of the fiscal year to filing date:**<br>From  **1/01/2023** to **Filing Date** | ■ Operating a business<br>☐ Other | **$453,279.00** |
| **For prior year:**<br>From  **1/01/2022** to **12/31/2022** | ■ Operating a business<br>☐ Other | **$850,187.41** |
| **For year before that:**<br>From  **1/01/2021** to **12/31/2021** | ■ Operating a business<br>☐ Other | **$1,020,833.50** |

2. **Non-business revenue**
   Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

   ■ None.

| | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
|---|---|---|

### Part 2:  List Certain Transfers Made Before Filing for Bankruptcy

3. **Certain payments or transfers to creditors within 90 days before filing for bankruptcy**
   List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

   ☐ None.

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>Check all that apply |
|---|---|---|---|

Debtor    Hawthorne Hangar Operations, L.P.                    Case number (if known)  2:23-bk-11789-BR

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>*Check all that apply* |
|---|---|---|---|
| 3.1.   See Attachment No "1" | | $0.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other___ |

---

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**
   List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

   ☐ None.

| Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.1.   See Attachment No "1" | | $0.00 | |

5. **Repossessions, foreclosures, and returns**
   List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

   ■ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

6. **Setoffs**
   List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

   ■ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

---

**Part 3:   Legal Actions or Assignments**

7. **Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**
   List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

   ☐ None.

| Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| 7.1.   See Attachment No " 2" | | | ☐ Pending<br>☐ On appeal<br>☐ Concluded |

8. **Assignments and receivership**
   List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

   ■ None

---

**Part 4:   Certain Gifts and Charitable Contributions**

Debtor    Hawthorne Hangar Operations, L.P.           Case number *(if known)*   2:23-bk-11789-BR

9. List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000

◼ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|

## Part 5:    Certain Losses

10. All losses from fire, theft, or other casualty within 1 year before filing this case.

◼ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss | Dates of loss | Value of property lost |
|---|---|---|---|
| | If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received. | | |
| | List unpaid claims on Official Form 106A/B *(Schedule A/B: Assets – Real and Personal Property).* | | |

## Part 6:    Certain Payments or Transfers

11. Payments related to bankruptcy
List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None.

| Who was paid or who received the transfer? Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|
| 11.1.   Richard Baun<br>Law Offices of Richard Baun<br>11500 W. Olympic Blvd, #400<br>Los Angeles, CA 90064 | | 3-21-2023 | $70,000.00 |
|     Email or website address | | | |
|     Who made the payment, if not debtor? | | | |
| 11.2.   Rosendo Gonzalez<br>Gonzalez & Gonzalez Law<br>530 S Hewitt Street, Suite 148<br>Los Angeles, CA 90013 | Attorney Fees | 03-30-2023 | $45,550.00 |
|     Email or website address<br>    rossgonzalez@gonzalezplc.com | | | |
|     Who made the payment, if not debtor? | | | |

12. Self-settled trusts of which the debtor is a beneficiary
List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

◼ None.

| Debtor | Hawthorne Hangar Operations, L.P. | | Case number *(if known)* | 2:23-bk-11789-BR |

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|

**13. Transfers not already listed on this statement**
List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

■ None.

| Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|

**Part 7:    Previous Locations**

**14. Previous addresses**
List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

■ Does not apply

| Address | Dates of occupancy From-To |
|---|---|

**Part 8:    Health Care Bankruptcies**

**15. Health Care bankruptcies**
Is the debtor primarily engaged in offering services and facilities for:
- diagnosing or treating injury, deformity, or disease, or
- providing any surgical, psychiatric, drug treatment, or obstetric care?

■ No. Go to Part 9.
☐ Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|

**Part 9:    Personally Identifiable Information**

**16. Does the debtor collect and retain personally identifiable information of customers?**

☐ No.
■ Yes. State the nature of the information collected and retained.

Tail number of aircrafts

Does the debtor have a privacy policy about that information?
■ No
☐ Yes

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

■ No. Go to Part 10.
☐ Yes. Does the debtor serve as plan administrator?

**Part 10:    Certain Financial Accounts, Safe Deposit Boxes, and Storage Units**

Debtor    Hawthorne Hangar Operations, L.P.                    Case number *(if known)*   **2:23-bk-11789-BR**

18. **Closed financial accounts**
Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

■ None

| Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
| --- | --- | --- | --- | --- |

19. **Safe deposit boxes**
List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

■ None

| Depository institution name and address | Names of anyone with access to it Address | Description of the contents | Does debtor still have it? |
| --- | --- | --- | --- |

20. **Off-premises storage**
List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

■ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
| --- | --- | --- | --- |

**Part 11:   Property the Debtor Holds or Controls That the Debtor Does Not Own**

21. **Property held for another**
List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☐ None

| Owner's name and address | Location of the property | Describe the property | Value |
| --- | --- | --- | --- |
| Dan Wolfe<br>390 Patrician Way<br>Pasadena, CA 91105 | Debtor's Premises | Camera Equipment and Aircrafts | $3,000,000.00 |

**Part 12:   Details About Environment Information**

For the purpose of Part 12, the following definitions apply:
*Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

*Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

*Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

22. **Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

■ No.
☐ Yes. Provide details below.

Debtor    Hawthorne Hangar Operations, L.P.                              Case number (if known)   2:23-bk-11789-BR

| Case title | Court or agency name and | Nature of the case | Status of case |
| Case number | address | | |

23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |

24. Has the debtor notified any governmental unit of any release of hazardous material?

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |

**Part 13:    Details About the Debtor's Business or Connections to Any Business**

25. Other businesses in which the debtor has or has had an interest
List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

■ None

| Business name address | Describe the nature of the business | Employer Identification number |
| | | Do not include Social Security number or ITIN. |
| | | |
| | | Dates business existed |

26. Books, records, and financial statements
26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.
☐ None

| Name and address | Date of service From-To |
| 26a.1.    **Phillips of Company** **909 East** **Pasadena, CA 91106** | **Present** |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

■ None

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| Name and address | If any books of account and records are unavailable, explain why |
| 26c.1.    **Dan Wolfe** **390 Patrician Way** **Pasadena, CA 91105** | |

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

■ None

Name and address

Debtor    **Hawthorne Hangar Operations, L.P.**                          Case number *(if known)*    **2:23-bk-11789-BR**

---

**27. Inventories**
Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No
☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|

**28. List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| **Attachment No. 3** | | | |

**29. Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☑ No
☐ Yes. Identify below.

**30. Payments, distributions, or withdrawals credited or given to insiders**
Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☐ No
☑ Yes. Identify below.

| | Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|---|
| 30.1 | **Top Gun**<br>**4640 Admiralty Way Pl 5**<br>**Marina Del Rey, CA 90292** | $5000 | 2022-2023 | fuel |
| | **Relationship to debtor**<br>**Partner** | | | |

**31. Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No
☐ Yes. Identify below.

| Name of the parent corporation | Employer Identification number of the parent corporation |
|---|---|

**32. Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No
☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the pension fund |
|---|---|

---

Debtor    Hawthorne Hangar Operations, L.P.    Case number (if known)  2:23-bk-11789-BR

---

**Part 14:    Signature and Declaration**

**WARNING** -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    04/05/23

_____    **Dan Wolfe**
Signature of individual signing on behalf of the debtor    Printed name

Position or relationship to debtor    **Principal**

Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?
■ No
☐ Yes

Official Form 207    Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy    page 8

B2030 (Form 2030) (12/15)

# United States Bankruptcy Court
## Central District of California

In re    Hawthorne Hangar Operations, L.P.                    Case No.    2:23-bk-11789-BR
_____                  Chapter    11
                            Debtor(s)

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S) - AMENDED

1. Pursuant to 11 U.S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

   For legal services, I have agreed to accept _____    $        45,500.00
   Prior to the filing of this statement I have received _____    $              0.00
   Balance Due _____     $        45,500.00

2. The source of the compensation paid to me was:

   ■ Debtor    ☐ Other (specify):

3. The source of compensation to be paid to me is:

   ■ Debtor    ☐ Other (specify):

4. ■ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

   ☐ I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation is attached.

5. In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

   a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
   b. Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
   c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
   d. [Other provisions as needed]
      **Negotiations with secured creditors to reduce to market value; exemption planning; preparation and filing of reaffirmation agreements and applications as needed; preparation and filing of motions pursuant to 11 USC 522(f)(2)(A) for avoidance of liens on household goods.**

6. By agreement with the debtor(s), the above-disclosed fee does not include the following service:
   **Representation of the debtors in any dischargeability actions, judicial lien avoidances, relief from stay actions or any other adversary proceeding.**

---

### CERTIFICATION

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

4-8-27
_____
Date

ROSENDO GONZALEZ
*Signature of Attorney*
**Gonzalez & Gonzalez Law, P.C.**
**530 S Hewitt Street, Suite 148**
**Los Angeles, CA 90013**
**(213) 452-0070   Fax: (213) 452-0080**
**rossgonzalez@gonzalezplc.com**
*Name of law firm*

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| **ROSENDO GONZALEZ**<br>**530 S Hewitt Street, Suite 148**<br>**Los Angeles, CA 90013**<br>**(213) 452-0070 Fax: (213) 452-0080**<br>California State Bar Number: 137352 CA<br>rossgonzalez@gonzalezplc.com | |
| ☐  *Debtor(s) appearing without an attorney*<br>■  *Attorney for Debtor* | |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA

| In re:<br><br>    **Hawthorne Hangar Operations, L.P.**<br><br><br><br><br><br>Debtor(s). | CASE NO.: **2:23-bk-11789-BR**<br>CHAPTER: **11**<br><br>### VERIFICATION OF MASTER<br>### MAILING LIST OF CREDITORS<br>### [LBR 1007-1(a)] |
|---|---|

Pursuant to LBR 1007-1(a), the Debtor, or the Debtor's attorney if applicable, certifies under penalty of perjury that the master mailing list of creditors filed in this bankruptcy case, consisting of __4__ sheet(s) is complete, correct, and consistent with the Debtor's schedules and I/we assume all responsibility for errors and omissions.

'Date: _____04/08/23_____                             _____
                                                    Signature of Debtor 1

Date: _____                   _____
                                                    Signature of Debtor 2 (joint debtor) ) (if applicable)

Date: _____                   _____
                                                    Signature of Attorney for Debtor (if applicable)

---

This form is optional. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

Hawthorne Hangar Operations, L.P.
909 E. Green Street
Pasadena, CA 91106-2906


ROSENDO GONZALEZ
Gonzalez & Gonzalez Law, P.C.
530 S Hewitt Street, Suite 148
Los Angeles, CA 90013


Amy Warren
2417 1/2 248th ST
Lomita, CA 90717


Andre L. Sullens
3743 W 119th ST.
Hawthorne, CA 90250


AT&T
P.O. BOX 5025
C/O Bankruptcy
Carol Stream, IL 60197


Bassco Services, Inc.
9219 Viscount Row
Dallas, TX 75247


Cesar E. De Leon
1459 W 151st ST
Gardena, CA 90247


Dan Wolfe
390 Patrician Way
Pasadena, CA 91105

David Wehrly
319 Main Street
El Segundo, CA 90245


David Wehrly
319 Main Street
El Segundo, CA 90245


EMPLOYMENT DEVELOPMENT DEPT.
P.O. BOX 826880 MIC 28
Sacramento, CA 94280


First Insurance Funding
PO BOX 7000
Carol Stream, IL 60197


FRANCHISE TAX BOARD
P.O. BOX 2952
Sacramento, CA 95812-2952


Gonzalo Gutierrez
1131 N Neptune Avenue
Wilmington, CA 90744


Grand Pacific Financial
901
Drive #300
Monterey Park, CA 91754


IRS
24000 Avila Road
Mail Stop 5916
Laguna Niguel, CA 92677

James L. Schulte
6526 W Kings Avenue
Glendale, AZ 85306


Karla Zarate
3415 Cudahy ST.
Huntington Park, CA 90255


Law Offices of Mary E. Gram
38180 Del Webb Blvd #PMB 97
Palm Desert, CA 92211


LOS ANGELES COUNTY
P.O. BOX 54018
Los Angeles, CA 90054


Mark C. Brown, P.C.
301 E Colorado Blvd Ste 301
Pasadena, CA 91101


Mary G. Gram ESQ
38180
Palm Desert, CA 92211


Matthew R. Schulte
2419 248th St
Lomita, CA 90717


Messina & Hankin LLP
24910 Las Brisas Rd Ste 102
Murrieta, CA 92562

Messina & Hankin LLP
C/O Martin
160 Newport Center Drive #110
Newport Beach, CA 92660


Micah Jones
1724 W 105th Street
Los Angeles, CA 90047


Mobile Mini Storage Solutions
PO Box 650882
Dallas, TX 75265


Parties in Pending Lawsuits


Steinberg Law
13412 Ventura Blvd Ste 380
Sherman Oaks, CA 91423


Steinberg Law
C/O Michael McCarthy, ESQ.
16255 Ventura Blvd #300
Encino, CA 91436


Tait & Associates
701 Parkcenter Dr
Maria Figueroa
Santa Ana, CA 92705


Tri-Pacific Heating LP
2116 E Walnut Ave
Fullerton, CA 92831

# ATTACHMENT NO. 1

80998

HAWTHORNE HANGAR OPERATIONS LP
C/O PHILLIPS & COMPANY
909 EAST GREEN STREET
PASADENA CA 91106

## *Basic Business Checking* statement

**December 1, 2022** to **December 31, 2022**
Account number

## Account summary

| | |
|---|---|
| **Beginning balance** **on December 1, 2022** | **$30,880.95** |
| Plus deposits | |
| Electronic deposits | $25,133.51 |
| Paper deposits | $992.23 |
| Transfers from other accounts | $50,000.00 |
| | |
| Less withdrawals | |
| Checks | -$60,525.65 |
| Electronic (EFT) withdrawals | -$17,284.88 |
| Fees and service charges | -$28.00 |
| | |
| **Ending balance** **on December 31, 2022** | **$29,168.16** |

### To contact us

**Call**
(800) 522-2265
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
824 FAIR OAKS AVE
SOUTH PASADENA CA 91030-4590

### Important information

The Account Balance Fee for this statement period for this account is $0.00/$1,000. Effective 1/1/23, the following fee change will be in effect: $10/each Foreign Check Processing Fee. The following Sweep fees will apply to all balances: $175 per account/month Sweep to Investment Only, $250 per account/month Sweep to Loan Only and $300 per account/month Sweep to Investment and Loan.

### Thank you

*Basic Business Checking* statement
December 1, 2022 to December 31, 2022

# *Basic Business Checking* account details: ~~1005535131~~

## Electronic deposits this statement period

| | | | Reference numbers | |
|---|---|---|---|---|
| Date | Amount | Activity | Customer | Bank |
| Dec 01 | 4,006.84 | Ampaire Inc Ab-tua4gdk 221201 982658 | | 9488255933 |
| Dec 01 | 3,536.15 | Wire # 015556 Org Big Wednesday  Fed # 006507 | | 9485002004 |
| Dec 05 | 15,290.52 | Ampaire Inc Ab-ayl0lfn 221203 989986 | | 9488185457 |
| Dec 19 | 2,300.00 | Wire # 000966 Org Kramer Laplant Fed # 000797 | | 9485002011 |

**Total Electronic Deposits: $25,133.51**
**Total Number of Electronic Deposits: 4**

## Paper deposits this statement period

| | | Reference numbers | |
|---|---|---|---|
| Date | Amount ($) | Customer | Bank |
| Dec 09 | 992.23 | | 0330351393 |

**Total Paper Deposits: $992.23**
**Total Number of Paper Deposits: 1**

## Transfer from other accounts this statement period

| Date | Amount | Activity | | Bank reference number |
|---|---|---|---|---|
| Dec 07 | 50,000.00 | Web Funds Transfer From Account | Xxxxxx5464 | WB11204918 |

**Total Transferred from Other Accounts: $50,000.00**
**Total Number of Transfers from Other Accounts: 1**

## Checks paid this statement period

\* Symbol indicates a break in check number sequence
# Symbol indicates an original item not enclosed
@ Symbol indicates a break in check number sequence and an original item not enclosed

| Check Number | Amount | Date Paid | Bank Reference Number | Check Number | Amount | Date Paid | Bank Reference Number |
|---|---|---|---|---|---|---|---|
| #3102 | -1,500.00 | Dec 09 | 0970014581 | #3126 | -9,255.80 | Dec 07 | 0970567101 |
| @3116 | -149.12 | Dec 08 | 0970063240 | #3127 | -13,869.36 | Dec 13 | 0970114269 |
| #3117 | -3,666.36 | Dec 07 | 0970013922 | #3128 | -996.19 | Dec 12 | 0970161808 |
| #3118 | -863.33 | Dec 05 | 0970802624 | #3129 | -149.12 | Dec 12 | 0970159228 |
| #3119 | -600.00 | Dec 06 | 0970765907 | @3133 | -16,494.76 | Dec 22 | 0970705338 |
| #3120 | -500.00 | Dec 14 | 0970012973 | #3134 | -749.58 | Dec 23 | 0970389305 |
| #3121 | -2,083.33 | Dec 14 | 0970631863 | #3135 | -533.57 | Dec 23 | 0970389303 |
| @3124 | -3,500.00 | Dec 02 | 0970800772 | #3136 | -149.09 | Dec 28 | 0970563909 |
| #3125 | -5,075.72 | Dec 07 | 0970567102 | @3138 | -390.32 | Dec 27 | 0970076370 |

**Total checks paid this statement period: -$60,525.65**
**Total number of checks paid this statement period: 18**

## Electronic withdrawals this statement period

| | | | Reference numbers | |
|---|---|---|---|---|
| Date | Amount ($) | Activity | Customer | Bank |
| Dec 06 | -3,016.64 | IRS  Usataxpymt 120622 270274065629344 | | 9488087620 |
| Dec 13 | -7,500.00 | CA Dept Tax Fee Cdtfa Epmt 221212 12980669 | | 9488242372 |

*Basic Business Checking* statement
**December 1, 2022 to December 31, 2022**

# Basic Business Checking: ▮▮▮▮▮▮▮▮

## Electronic withdrawals this statement period (continued)

| | | | Reference numbers | |
|---|---|---|---|---|
| Date | Amount ($) | Activity | Customer | Bank |
| Dec 21 | -3,101.88 | IRS  Usataxpymt 122122 270275540094615 | | 9488200684 |
| Dec 23 | -3,666.36 | First Insurance Insurance 900-96018569 | | 9488812089 |

**Total Electronic Withdrawals: -$17,284.88**
**Total Number of Electronic Withdrawals: 4**

## Fees and service charges this statement period

| Date | Amount ($) | Activity | Bank reference number |
|---|---|---|---|
| Dec 13 | -28.00 | Service Charge | 0000037205 |

**Total Fees and Service Charges: -$28.00**
**Total Number of Fees and Service Charges: 1**

### $ Lowest daily balance

Your lowest daily balance this statement period was **$29,168.16** on **December 28, 2022**.

***Basic Business Checking* statement**
**December 1, 2022 to December 31, 2022**

# Basic Business Checking: ~~1XXXXXXXXX~~

**PLEASE EXAMINE THIS STATEMENT PROMPTLY**
<u>Reporting Errors and Unauthorized Transactions</u>
**Personal Accounts:** *Electronic Funds Transfers:* In Case of Errors (including unauthorized electronic transactions) or Questions About Your Electronic Transfers: Call us at the telephone number printed on the first page of this statement or write us at the address printed on the first page of this statement as soon as you can, if you think this statement or your receipt is wrong or if you need more information about a transfer on the statement or receipt. For pre-authorized transfers (e.g., insurance payments, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. We must hear from you no later than 60 days after we sent you the FIRST statement on which the Error or problem appeared.

When reporting the Error: (1) tell us your name and account number (if any); (2) describe the Error (an Error includes an unauthorized electronic funds transfer) or the electronic transfer you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error or the transaction you question.

We will investigate your complaint and will correct any Error promptly. If we take more than 10 business days (20 business days for new accounts) to do this, we will credit your account for the amount you think is in Error so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not provide provisional credit to your account.

*Comerica Check Card Transactions:* Notwithstanding the above information, if your account was debited for a transaction resulting from the use of your Comerica Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated), you may have additional rights and protections. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Funds Transfer Transactions:* If you need a copy of a check or additional information about a transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic funds transfer transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Comerica Business and Personal Deposit Contract for further details.

**Business Accounts:** *Electronic Transactions:* If you think this statement shows an Error (an Error includes an unauthorized electronic transaction) or an ATM receipt you received is wrong or if you need more information about an electronic transaction listed on the statement, call or write us as soon as possible at the telephone number or address printed on the first page but always within 30 days of when we first made the information available to you regarding the transaction. For pre-authorized transfers (e.g., insurance payment, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Business Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. For all claims related to an electronic transaction, we must hear from you no later than 30 days after we first made the information available to you regarding the transaction otherwise you may waive your right to recover for the loss you incurred. Call or write us as soon as possible at the telephone number or address printed on the first page and (1) tell us your name and account number; (2) describe the Error or transaction you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error. We reserve the right to require that you complete an affidavit regarding claims of unauthorized transactions. If we timely receive your claim, we will investigate your claim and correct any Errors within the time frame required by law. If the claim is for an unauthorized electronic transaction and we find your claim genuine, we will process your claim in accordance with ACH rules or other applicable electronic clearinghouse rules. To the extent we recover we will refund to you the recovery. If an electronic transaction, including wire transfer was conducted in accordance with the terms of an electronic service you agreed to obtain from us, the terms of that agreement will govern whether the transaction in question is authorized or not.

*Comerica Business Check Card Transactions:* If your account was debited for a transaction resulting from the use of your Comerica Business Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated) or if your claim is related to an electronic debit transaction resulting from the use of your Comerica Check Card or Check Card number, you may have rights and protections in addition to those described above. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Transactions:* If you need a copy of a check or additional information about a non-electronic transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Business and Personal Deposit Contract for further details. You should keep this statement for your records.

**Balancing Your Account:** For assistance on how to balance your account, please call us at the phone number listed on your account statement or visit your local Comerica banking center.

 Equal Opportunity Lender   Rev. 05-17                                        MEMBER FDIC

80998

Ilıliııuıllıılllluıllııullıl
HAWTHORNE HANGAR OPERATIONS LP
C/O PHILLIPS & COMPANY
909 EAST GREEN STREET
PASADENA CA 91106

### *Basic Business Checking* statement

January 1, 2023 to January 31, 2023
Account number

## Account summary

| | |
|---|---|
| **Beginning balance** on January 1, 2023 | **$29,168.16** |
| Plus deposits | |
| Electronic deposits | $55,582.10 |
| Paper deposits | $992.23 |
| Less withdrawals | |
| Checks | -$35,267.48 |
| Electronic (EFT) withdrawals | -$8,076.14 |
| Fees and service charges | -$28.00 |
| **Ending balance** on January 31, 2023 | **$42,370.87** |

**To contact us**

**Call**
(800) 522-2265
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
824 FAIR OAKS AVE
SOUTH PASADENA CA 91030-4590

**Important information**

The Account Balance Fee for this statement period for this account is $0.00/$1,000.

**Thank you**

*Basic Business Checking* statement
January 1, 2023 to January 31, 2023

## *Basic Business Checking* account details: ▉▉▉▉▉▉▉▉

### Electronic deposits this statement period

| Date | Amount | Activity | Reference numbers Customer | Bank |
|------|--------|----------|------|------|
| Jan 03 | 3,536.15 | Wire # 013391 Org Big Wednesday  Fed # 003790 | | 9485001837 |
| Jan 09 | 15,290.52 | Ampaire Inc Ab-t6bbzhs 230107 1092257 | | 9488852591 |
| Jan 09 | 4,006.84 | Ampaire Inc Ab-tmsint5 230107 1092259 | | 9488852593 |
| Jan 17 | 7,769.32 | Tesla, Inc. Edi Pymnts App001492133 | | 9488615179 |
| Jan 19 | 2,300.00 | Wire # 000933 Org Kramer Laplant Fed # 000850 | | 9485001855 |
| Jan 27 | 22,679.27 | Tesla, Inc. Edi Pymnts App001500954 | | 9488417202 |

**Total Electronic Deposits: $55,582.10**
**Total Number of Electronic Deposits: 6**

### Paper deposits this statement period

| Date | Amount ($) | Reference numbers Customer | Bank |
|------|-----------|------|------|
| Jan 03 | 992.23 | | 0330691389 |

**Total Paper Deposits: $992.23**
**Total Number of Paper Deposits: 1**

### Checks paid this statement period

\* Symbol indicates a break in check number sequence
\# Symbol indicates an original item not enclosed
@ Symbol indicates a break in check number sequence and an original item not enclosed

| Check Number | Amount | Date Paid | Bank Reference Number | Check Number | Amount | Date Paid | Bank Reference Number |
|------|--------|------|------|------|--------|------|------|
| #3123 | -500.00 | Jan 31 | 0970017576 | #3143 | -1,034.04 | Jan 17 | 0970209703 |
| @3130 | -1,500.00 | Jan 20 | 0970009530 | #3144 | -390.32 | Jan 17 | 0970125258 |
| #3131 | -284.40 | Jan 23 | 0970797552 | #3145 | -490.00 | Jan 30 | 0971033539 |
| #3132 | -144.40 | Jan 23 | 0970797551 | #3146 | -479.58 | Jan 17 | 0970938367 |
| @3139 | -1,071.85 | Jan 04 | 0970439625 | #3147 | -149.94 | Jan 19 | 0970047107 |
| #3140 | -1,119.51 | Jan 03 | 0971339351 | #3148 | -12,850.23 | Jan 20 | 0970066267 |
| #3141 | -509.11 | Jan 04 | 0970439658 | #3149 | -2,413.28 | Jan 23 | 0970827087 |
| #3142 | -3,500.00 | Jan 05 | 0970682831 | @3151 | -3,162.00 | Jan 31 | 0970656485 |
| | | | | #3152 | -5,668.82 | Jan 25 | 0970514432 |

**Total checks paid this statement period: -$35,267.48**
**Total number of checks paid this statement period: 17**

### Electronic withdrawals this statement period

| Date | Amount ($) | Activity | Reference numbers Customer | Bank |
|------|-----------|----------|------|------|
| Jan 06 | -3,163.66 | IRS  Usataxpymt 010623 270340695326755 | | 9488114475 |
| Jan 06 | -82.93 | IRS  Usataxpymt 010623 270340663079914 | | 9488114474 |
| Jan 23 | -3,292.14 | IRS  Usataxpymt 012323 270342352419235 | | 9488694508 |
| Jan 23 | -77.69 | IRS  Usataxpymt 012323 270342381512236 | | 9488694506 |
| Jan 23 | -41.72 | IRS  Usataxpymt 012323 270342394587883 | | 9488694507 |
| Jan 24 | -1,418.00 | CA Dept Tax Fee Cdtfa Epmt 230123 13444938 | | 9488544251 |

**Total Electronic Withdrawals: -$8,076.14**
**Total Number of Electronic Withdrawals: 6**

*Basic Business Checking* statement
January 1, 2023 to January 31, 2023

# Basic Business Checking: ~~◄888888484►~~

## Fees and service charges this statement period

| Date | Amount ($) | Activity | Bank reference number |
|------|-----------|----------|----------------------|
| Jan 13 | -28.00 | Service Charge | 0000037916 |

**Total Fees and Service Charges: -$28.00**
**Total Number of Fees and Service Charges: 1**

 **Lowest daily balance**

Your lowest daily balance this statement period was **$23,843.60** on **January 25, 2023**.

*Basic Business Checking* **statement**
**January 1, 2023 to January 31, 2023**

# Basic Business Checking: 1~~295559131~~

**PLEASE EXAMINE THIS STATEMENT PROMPTLY**
<u>Reporting Errors and Unauthorized Transactions</u>
**Personal Accounts:** *Electronic Funds Transfers:* In Case of Errors (including unauthorized electronic transactions) or Questions About Your Electronic Transfers: Call us at the telephone number printed on the first page of this statement or write us at the address printed on the first page of this statement as soon as you can, if you think this statement or your receipt is wrong or if you need more information about a transfer on the statement or receipt. For pre-authorized transfers (e.g., insurance payments, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. We must hear from you no later than 60 days after we sent you the FIRST statement on which the Error or problem appeared.

When reporting the Error: (1) tell us your name and account number (if any); (2) describe the Error (an Error includes an unauthorized electronic funds transfer) or the electronic transfer you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error or the transaction you question.

We will investigate your complaint and will correct any Error promptly.  If we take more than 10 business days (20 business days for new accounts) to do this, we will credit your account for the amount you think is in Error so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not provide provisional credit to your account.

*Comerica Check Card Transactions:* Notwithstanding the above information, if your account was debited for a transaction resulting from the use of your Comerica Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated), you may have additional rights and protections. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Funds Transfer Transactions:* If you need a copy of a check or additional information about a transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic funds transfer transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Comerica Business and Personal Deposit Contract for further details.

**Business Accounts:**  *Electronic Transactions:* If you think this statement shows an Error (an Error includes an unauthorized electronic transaction) or an ATM receipt you received is wrong or if you need more information about an electronic transaction listed on the statement, call or write us as soon as possible at the telephone number or address printed on the first page but always within 30 days of when we first made the information available to you regarding the transaction. For pre-authorized transfers (e.g., insurance payment, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn:  Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Business Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. For all claims related to an electronic transaction, we must hear from you no later than 30 days after we first made the information available to you regarding the transaction otherwise you may waive your right to recover for the loss you incurred. Call or write us as soon as possible at the telephone number or address printed on the first page and (1) tell us your name and account number; (2) describe the Error or transaction you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error. We reserve the right to require that you complete an affidavit regarding claims of unauthorized transactions. If we timely receive your claim, we will investigate your claim and correct any Errors within the time frame required by law. If the claim is for an unauthorized electronic transaction and we find your claim genuine, we will process your claim in accordance with ACH rules or other applicable electronic clearinghouse rules. To the extent we recover we will refund to you the recovery. If an electronic transaction, including wire transfer was conducted in accordance with the terms of an electronic service you agreed to obtain from us, the terms of that agreement will govern whether the transaction in question is authorized or not.

*Comerica Business Check Card Transactions:* If your account was debited for a transaction resulting from the use of your Comerica Business Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated) or if your claim is related to an electronic debit transaction resulting from the use of your Comerica Check Card or Check Card number, you may have rights and protections in addition to those described above. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Transactions:* If you need a copy of a check or additional information about a non-electronic transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you.  See the Business and Personal Deposit Contract for further details. You should keep this statement for your records.

**Balancing Your Account:** For assistance on how to balance your account, please call us at the phone number listed on your account statement or visit your local Comerica banking center.

 Equal Opportunity Lender    Rev. 05-17                                                  MEMBER FDIC

www.comerica.com

80998

HAWTHORNE HANGAR OPERATIONS LP
C/O PHILLIPS & COMPANY
909 EAST GREEN STREET
PASADENA CA 91106

### *Basic Business Checking* statement

February 1, 2023 to February 28, 2023
Account number 

## Account summary

| | |
|---|---|
| **Beginning balance on February 1, 2023** | **$42,370.87** |
| Plus deposits | |
| Electronic deposits | $60,086.92 |
| Paper deposits | $1,275.00 |
| Less withdrawals | |
| Checks | -$56,514.25 |
| Electronic (EFT) withdrawals | -$14,246.58 |
| Fees and service charges | -$28.00 |
| **Ending balance on February 28, 2023** | **$32,943.96** |

**To contact us**

**Call**
(800) 522-2265
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
824 FAIR OAKS AVE
SOUTH PASADENA CA 91030-4590

**Important information**

The Account Balance Fee for this statement period for this account is $0.00/$1,000.

**Thank you**

***Basic Business Checking* statement**
**February 1, 2023 to February 28, 2023**

# *Basic Business Checking* account details: 1◼◼◼◼◼◼◼◼◼

## Electronic deposits this statement period

|  |  |  | Reference numbers | |
| Date | Amount | Activity | Customer | Bank |
|---|---|---|---|---|
| Feb 01 | 3,536.15 | Wire # 012741 Org Big Wednesday Fed # 005050 | | 9485001788 |
| Feb 03 | 4,006.84 | Ampaire Inc Ab-tqx9zsb 230203 1166202 | | 9488559757 |
| Feb 06 | 12,274.14 | Tesla, Inc. Edi Pymnts App001511540 | | 9488732331 |
| Feb 07 | 15,290.52 | Ampaire Inc Ab-amajvnf 230207 1175870 | | 9488811058 |
| Feb 17 | 2,300.00 | Wire # 000847 Org Kramer Laplant Fed # 001110 | | 9485002111 |
| Feb 22 | 22,679.27 | Tesla, Inc. Edi Pymnts App001528618 | | 9488342773 |

**Total Electronic Deposits: $60,086.92**
**Total Number of Electronic Deposits: 6**

## Paper deposits this statement period

|  |  | Reference numbers | |
| Date | Amount ($) | Customer | Bank |
|---|---|---|---|
| Feb 13 | 1,275.00 | | 0330570355 |

**Total Paper Deposits: $1,275.00**
**Total Number of Paper Deposits: 1**

## Checks paid this statement period

\* Symbol indicates a break in check number sequence
\# Symbol indicates an original item not enclosed
@ Symbol indicates a break in check number sequence and an original item not enclosed

| Check Number | Amount | Date Paid | Bank Reference Number | Check Number | Amount | Date Paid | Bank Reference Number |
|---|---|---|---|---|---|---|---|
| #3150 | -1,500.00 | Feb 10 | 0970009111 | #3167 | -162.24 | Feb 13 | 0970815473 |
| @3153 | -13,305.76 | Feb 03 | 0970419303 | #3168 | -245.00 | Feb 13 | 0971147519 |
| @3155 | -2,473.66 | Feb 02 | 0970014911 | #3169 | -390.32 | Feb 15 | 0970312652 |
| #3156 | -381.16 | Feb 13 | 0970190918 | #3170 | -470.99 | Feb 14 | 0970072340 |
| #3157 | -500.00 | Feb 17 | 0970008896 | #3171 | -342.00 | Feb 15 | 0970013746 |
| #3158 | -1,423.83 | Feb 15 | 0970323676 | #3172 | -426.00 | Feb 13 | 0970873371 |
| #3159 | -1,450.85 | Feb 06 | 0971003230 | #3173 | -270.00 | Feb 16 | 0970355168 |
| #3160 | -2,282.16 | Feb 03 | 0970759472 | #3174 | -196.53 | Feb 21 | 0970876842 |
| #3161 | -1,427.90 | Feb 03 | 0970426162 | #3175 | -51.67 | Feb 23 | 0970057313 |
| #3162 | -1,476.62 | Feb 03 | 0970420158 | #3176 | -1,310.12 | Feb 21 | 0971352956 |
| #3163 | -1,419.47 | Feb 06 | 0970989943 | #3177 | -2,065.78 | Feb 17 | 0970671898 |
| #3164 | -1,005.90 | Feb 08 | 0970028793 | #3178 | -1,322.10 | Feb 17 | 0970673678 |
| #3165 | -749.58 | Feb 13 | 0971139560 | #3179 | -1,382.02 | Feb 17 | 0970345541 |
| #3166 | -17,000.00 | Feb 08 | 0970497859 | #3180 | -1,482.59 | Feb 21 | 0971339767 |

**Total checks paid this statement period: -$56,514.25**
**Total number of checks paid this statement period: 28**

## Electronic withdrawals this statement period

|  |  |  | Reference numbers | |
| Date | Amount ($) | Activity | Customer | Bank |
|---|---|---|---|---|
| Feb 07 | -3,300.46 | IRS Usataxpymt 020723 270343803668822 | | 9488825480 |
| Feb 07 | -1,013.86 | Employment Devel Edd Eftpmt 020623 565536160 | | 9488717866 |
| Feb 07 | -50.89 | IRS Usataxpymt 020723 270343830755694 | | 9488825479 |
| Feb 21 | -2,964.88 | IRS Usataxpymt 022123 270345212654593 | | 9488627303 |
| Feb 21 | -671.12 | Employment Devel Edd Eftpmt 021723 1451947424 | | 9488650252 |
| Feb 21 | -28.54 | IRS Usataxpymt 022123 270345283568160 | | 9488627304 |

*Basic Business Checking* statement
February 1, 2023 to February 28, 2023

## Basic Business Checking: ~~XXXXXXXXX~~

### Electronic withdrawals this statement period (continued)

| | | | Reference numbers | |
| Date | Amount ($) | Activity | Customer | Bank |
|------|-----------|----------|----------|------|
| Feb 24 | -216.83 | Safeguard Busine Edi/ach 17052000008750 | | 9488157435 |
| Feb 27 | -6,000.00 | CA Dept Tax Fee Cdtfa Epmt 230224 14068288 | | 9488676351 |

**Total Electronic Withdrawals: -$14,246.58**
**Total Number of Electronic Withdrawals: 8**

### Fees and service charges this statement period

| Date | Amount ($) | Activity | Bank reference number |
|------|-----------|----------|-----------------------|
| Feb 13 | -28.00 | Service Charge | 0000037191 |

**Total Fees and Service Charges: -$28.00**
**Total Number of Fees and Service Charges: 1**

### 💲 Lowest daily balance

Your lowest daily balance this statement period was **$16,533.19**
on **February 21, 2023**.

***Basic Business Checking* statement**
**February 1, 2023 to February 28, 2023**

# Basic Business Checking: ~~4000000184~~

**PLEASE EXAMINE THIS STATEMENT PROMPTLY**
<u>Reporting Errors and Unauthorized Transactions</u>
**Personal Accounts:** *Electronic Funds Transfers:* In Case of Errors (including unauthorized electronic transactions) or Questions About Your Electronic Transfers: Call us at the telephone number printed on the first page of this statement or write us at the address printed on the first page of this statement as soon as you can, if you think this statement or your receipt is wrong or if you need more information about a transfer on the statement or receipt. For pre-authorized transfers (e.g., insurance payments, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. We must hear from you no later than 60 days after we sent you the FIRST statement on which the Error or problem appeared.

When reporting the Error: (1) tell us your name and account number (if any); (2) describe the Error (an Error includes an unauthorized electronic funds transfer) or the electronic transfer you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error or the transaction you question.

We will investigate your complaint and will correct any Error promptly. If we take more than 10 business days (20 business days for new accounts) to do this, we will credit your account for the amount you think is in Error so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not provide provisional credit to your account.

*Comerica Check Card Transactions:* Notwithstanding the above information, if your account was debited for a transaction resulting from the use of your Comerica Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated), you may have additional rights and protections. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Funds Transfer Transactions:* If you need a copy of a check or additional information about a transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic funds transfer transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Comerica Business and Personal Deposit Contract for further details.

**Business Accounts:** *Electronic Transactions:* If you think this statement shows an Error (an Error includes an unauthorized electronic transaction) or an ATM receipt you received is wrong or if you need more information about an electronic transaction listed on the statement, call or write us as soon as possible at the telephone number or address printed on the first page but always within 30 days of when we first made the information available to you regarding the transaction. For pre-authorized transfers (e.g., insurance payment, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Business Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. For all claims related to an electronic transaction, we must hear from you no later than 30 days after we first made the information available to you regarding the transaction otherwise you may waive your right to recover for the loss you incurred. Call or write us as soon as possible at the telephone number or address printed on the first page and (1) tell us your name and account number; (2) describe the Error or transaction you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error. We reserve the right to require that you complete an affidavit regarding claims of unauthorized transactions. If we timely receive your claim, we will investigate your claim and correct any Errors within the time frame required by law. If the claim is for an unauthorized electronic transaction and we find your claim genuine, we will process your claim in accordance with ACH rules or other applicable electronic clearinghouse rules. To the extent we recover we will refund to you the recovery. If an electronic transaction, including wire transfer was conducted in accordance with the terms of an electronic service you agreed to obtain from us, the terms of that agreement will govern whether the transaction in question is authorized or not.

*Comerica Business Check Card Transactions:* If your account was debited for a transaction resulting from the use of your Comerica Business Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated) or if your claim is related to an electronic debit transaction resulting from the use of your Comerica Check Card or Check Card number, you may have rights and protections in addition to those described above. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Transactions:* If you need a copy of a check or additional information about a non-electronic transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Business and Personal Deposit Contract for further details. You should keep this statement for your records.

**Balancing Your Account:** For assistance on how to balance your account, please call us at the phone number listed on your account statement or visit your local Comerica banking center.

 Equal Opportunity Lender   Rev. 05-17                                                                    MEMBER FDIC

80998

HAWTHORNE HANGAR OPERATIONS LP
C/O PHILLIPS & COMPANY
909 EAST GREEN STREET
PASADENA CA 91106

*Basic Business Checking*
**statement**

**March 1, 2023** to **March 31, 2023**
**Account number**

## Account summary

| | |
|---|---:|
| **Beginning balance on March 1, 2023** | **$32,943.96** |
| Plus deposits | |
| Electronic deposits | $34,494.49 |
| Paper deposits | $71,984.46 |
| Other deposits | $70,000.00 |
| Transfers from other accounts | $75,000.00 |
| | |
| Less withdrawals | |
| Checks | -$159,051.82 |
| Electronic (EFT) withdrawals | -$57,013.09 |
| Other withdrawals | -$20,000.00 |
| Fees and service charges | -$158.00 |
| | |
| **Ending balance on March 31, 2023** | **$48,200.00** |

**To contact us**

**Call**
(800) 522-2265
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
824 FAIR OAKS AVE
SOUTH PASADENA CA 91030-4590

**Important information**

The Account Balance Fee for this statement period for this account is $0.00/$1,000.

**Thank you**

*Basic Business Checking* statement
March 1, 2023 to March 31, 2023

# *Basic Business Checking* account details: ~~XXXXXXXXX~~

## Electronic deposits this statement period

| | | | Reference numbers | |
|---|---|---|---|---|
| Date | Amount | Activity | Customer | Bank |
| Mar 01 | 3,536.15 | Wire # 011635 Org Big Wednesday  Fed # 003788 | | 9485002024 |
| Mar 16 | 5,901.07 | Tesla, Inc. Edi Pymnts App001550685 | | 9488952234 |
| Mar 17 | 2,300.00 | Wire # 000837 Org Kramer Laplant Fed # 000759 | | 9485002097 |
| Mar 22 | 78.00 | Overdraft Fee Refund | | ST12305149 |
| Mar 24 | 22,679.27 | Tesla, Inc. Edi Pymnts App001564149 | | 9488705030 |

**Total Electronic Deposits: $34,494.49**
**Total Number of Electronic Deposits: 5**

## Paper deposits this statement period

| | | Reference numbers | | | | Reference numbers | |
|---|---|---|---|---|---|---|---|
| Date | Amount ($) | Customer | Bank | Date | Amount ($) | Customer | Bank |
| Mar 09 | 992.23 | | 0330296603 | Mar 21 | 20,000.00 | | 0330314551 |
| Mar 21 | 50,000.00 | | 0330314740 | Mar 30 | 992.23 | | 0330266512 |

**Total Paper Deposits: $71,984.46**
**Total Number of Paper Deposits: 4**

## Other deposits this statement period

| | | | Reference numbers | |
|---|---|---|---|---|
| Date | Amount ($) | Activity | Customer | Bank |
| Mar 14 | 20,000.00 | Phone Funds Transfer Credit | | 0330362801 |
| Mar 23 | 50,000.00 | Phone Funds Transfer Credit | | 0330271412 |

**Total Other Deposits: $70,000.00**
**Total Number of Other Deposits: 2**

## Transfer from other accounts this statement period

| | | | | Bank reference number |
|---|---|---|---|---|
| Date | Amount | Activity | | |
| Mar 01 | 40,000.00 | Web Funds Transfer From Account | Xxxxxx5464 | WB10305835 |
| Mar 24 | 35,000.00 | Web Funds Transfer From Account | Xxxxxx5464 | WB10306318 |

**Total Transferred from Other Accounts: $75,000.00**
**Total Number of Transfers from Other Accounts: 2**

## Checks paid this statement period

* Symbol indicates a break in check number sequence
# Symbol indicates an original item not enclosed
@ Symbol indicates a break in check number sequence and an original item not enclosed

| Check Number | Amount | Date Paid | Bank Reference Number | Check Number | Amount | Date Paid | Bank Reference Number |
|---|---|---|---|---|---|---|---|
| #3181 | -1,500.00 | Mar 15 | 0970013713 | #3187 | -2,005.53 | Mar 03 | 0970784628 |
| #3182 | -1,585.35 | Mar 02 | 0970045920 | #3188 | -1,086.44 | Mar 06 | 0970041327 |
| #3183 | -14,995.28 | Mar 03 | 0970077918 | @3190 | -1,137.12 | Mar 03 | 0970078065 |
| #3184 | -500.00 | Mar 08 | 0970011763 | #3191 | -1,582.56 | Mar 07 | 0970448964 |
| #3185 | -7,243.95 | Mar 16 | 0970479788 | @3194 | -3,500.00 | Mar 03 | 0970782098 |
| #3186 | -1,154.02 | Mar 09 | 0970338534 | #3195 | -15,000.00 | Mar 01 | 0970618777 |

*Basic Business Checking* statement
March 1, 2023 to March 31, 2023

# Basic Business Checking: ~~100000000~~

## Checks paid this statement period (continued)

\* Symbol indicates a break in check number sequence

\# Symbol indicates an original item not enclosed

@ Symbol indicates a break in check number sequence and an original item not enclosed

| Check Number | Amount | Date Paid | Bank Reference Number | Check Number | Amount | Date Paid | Bank Reference Number |
|---|---|---|---|---|---|---|---|
| @3197 | -162.24 | Mar 10 | 0970041522 | #3209 | -2,107.99 | Mar 20 | 0971092187 |
| #3198 | -4,277.09 | Mar 10 | 0970010815 | #3210 | -1,314.70 | Mar 21 | 0970011464 |
| #3199 | -390.32 | Mar 29 | 0970321581 | @3212 | -1,371.80 | Mar 20 | 0970800931 |
| #3200 | -420.19 | Mar 20 | 0970155504 | #3213 | -1,869.04 | Mar 20 | 0971082814 |
| #3201 | -749.58 | Mar 13 | 0970664827 | @3217 | -2,000.00 | Mar 21 | 0970655513 |
| #3202 | -2,125.00 | Mar 17 | 0970318034 | #3218 | -50,000.00 | Mar 22 | 0970556632 |
| #3203 | -116.99 | Mar 22 | 0970063603 | #3219 | -4,277.09 | Mar 28 | 0970021028 |
| @3207 | -20,000.00 | Mar 15 | 0970320555 | #3220 | -15,000.00 | Mar 24 | 0970690293 |
| #3208 | -1,355.54 | Mar 22 | 0970469446 | @3223 | -224.00 | Mar 30 | 0970046713 |

**Total checks paid this statement period:** -$159,051.82

**Total number of checks paid this statement period: 30**

## Electronic withdrawals this statement period

| | | | Reference numbers | | |
|---|---|---|---|---|---|
| Date | Amount ($) | Activity | Customer | Bank |
| Mar 06 | -2,808.58 | IRS  Usataxpymt 030623 270346521494141 | | 9488632476 |
| Mar 06 | -539.37 | Employment Devel Edd Eftpmt 030323 1616342432 | | 9488777634 |
| Mar 06 | -11.44 | IRS  Usataxpymt 030623 270346562715396 | | 9488632477 |
| Mar 21 | -3,112.92 | IRS  Usataxpymt 032123 270348000620527 | | 9488169533 |
| Mar 21 | -536.80 | Employment Devel Eftpmt 032023 1058586016 | | 9488187705 |
| Mar 21 | -3.98 | IRS  Usataxpymt 032123 270348064642123 | | 9488169532 |
| Mar 23 | -50,000.00 | Return Item Chargeback 230323 000000000000000 | | 9488471685 |

**Total Electronic Withdrawals:** -$57,013.09

**Total Number of Electronic Withdrawals: 7**

## Other withdrawals this statement period

| Date | Amount ($) | Activity | Bank reference number |
|---|---|---|---|
| Mar20 | -20,000.00 | Withdrawal | 0330521346 |

**Total Other Withdrawals:** -$20,000.00

**Total Number of Other Withdrawals: 1**

## Fees and service charges this statement period

| Date | Amount ($) | Activity | Bank reference number |
|---|---|---|---|
| Mar 13 | -28.00 | Service Charge | 0000036353 |
| Mar 21 | -26.00 | Fee - Returned Item | 0971093086 |
| Mar 21 | -26.00 | Fee - Returned Item | 0971094696 |
| Mar 21 | -26.00 | Fee - Overdraft | 0970155504 |
| Mar 21 | -26.00 | Fee - Overdraft | 0970800931 |
| Mar 21 | -26.00 | Fee - Overdraft | 0971082814 |

**Total Fees and Service Charges:** -$158.00

**Total Number of Fees and Service Charges: 6**

*Basic Business Checking* statement
March 1, 2023 to March 31, 2023

# Basic Business Checking: ~~█████████~~

## 💲 Lowest daily balance

Your lowest daily balance this statement period was **$-2,087.16**
on **March 20, 2023**.

**Basic Business Checking statement**
**March 1, 2023 to March 31, 2023**

# Basic Business Checking: ▪▪▪▪▪▪▪▪▪

**PLEASE EXAMINE THIS STATEMENT PROMPTLY**
<u>**Reporting Errors and Unauthorized Transactions**</u>
**Personal Accounts:** *Electronic Funds Transfers:* In Case of Errors (including unauthorized electronic transactions) or Questions About Your Electronic Transfers: Call us at the telephone number printed on the first page of this statement or write us at the address printed on the first page of this statement as soon as you can, if you think this statement or your receipt is wrong or if you need more information about a transfer on the statement or receipt. For pre-authorized transfers (e.g., insurance payments, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. We must hear from you no later than 60 days after we sent you the FIRST statement on which the Error or problem appeared.

When reporting the Error: (1) tell us your name and account number (if any); (2) describe the Error (an Error includes an unauthorized electronic funds transfer) or the electronic transfer you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error or the transaction you question.

We will investigate your complaint and will correct any Error promptly. If we take more than 10 business days (20 business days for new accounts) to do this, we will credit your account for the amount you think is in Error so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not provide provisional credit to your account.

*Comerica Check Card Transactions:* Notwithstanding the above information, if your account was debited for a transaction resulting from the use of your Comerica Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated), you may have additional rights and protections. See the Comerica Business and Personal Deposit Contract for specific information.

*Checks and Other Non-Electronic Funds Transfer Transactions:* If you need a copy of a check or additional information about a transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic funds transfer transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Comerica Business and Personal Deposit Contract for further details.

**Business Accounts:** *Electronic Transactions:* If you think this statement shows an Error (an Error includes an unauthorized electronic transaction) or an ATM receipt you received is wrong or if you need more information about an electronic transaction listed on the statement, call or write us as soon as possible at the telephone number or address printed on the first page but always within 30 days of when we first made the information available to you regarding the transaction. For pre-authorized transfers (e.g., insurance payment, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Business Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. For all claims related to an electronic transaction, we must hear from you no later than 30 days after we first made the information available to you regarding the transaction otherwise you may waive your right to recover for the loss you incurred. Call or write us as soon as possible at the telephone number or address printed on the first page and (1) tell us your name and account number; (2) describe the Error or transaction you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error. We reserve the right to require that you complete an affidavit regarding claims of unauthorized transactions. If we timely receive your claim, we will investigate your claim and correct any Errors within the time frame required by law. If the claim is for an unauthorized electronic transaction and we find your claim genuine, we will process your claim in accordance with ACH rules or other applicable electronic clearinghouse rules. To the extent we recover we will refund to you the recovery. If an electronic transaction, including wire transfer was conducted in accordance with the terms of an electronic service you agreed to obtain from us, the terms of that agreement will govern whether the transaction in question is authorized or not.

*Comerica Business Check Card Transactions:* If your account was debited for a transaction resulting from the use of your Comerica Business Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated) or if your claim is related to an electronic debit transaction resulting from the use of your Comerica Check Card or Check Card number, you may have rights and protections in addition to those described above. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Transactions:* If you need a copy of a check or additional information about a non-electronic transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Business and Personal Deposit Contract for further details. You should keep this statement for your records.

**Balancing Your Account:** For assistance on how to balance your account, please call us at the phone number listed on your account statement or visit your local Comerica banking center.

 Equal Opportunity Lender   Rev. 05-17                                          MEMBER FDIC

www.comerica.com

80998

HAWTHORNE HANGAR OPERATIONS LP
"FUEL ACCOUNT"
C/O PHILLIPS & COMPANY
909 EAST GREEN STREET
PASADENA CA 91106

## *Basic Business Checking* statement

December 1, 2022 to December 31, 2022
Account number ~~████████~~

## Account summary

| | |
|---|---|
| **Beginning balance** on December 1, 2022 | **$143,715.26** |
| Plus deposits | |
| Electronic deposits | $154,660.34 |
| Less withdrawals | |
| Electronic (EFT) withdrawals | -$121,032.43 |
| Transfers to other accounts | -$50,000.00 |
| **Ending balance** on December 31, 2022 | **$127,343.17** |

**To contact us**

**Call**
(800) 522-2265
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
824 FAIR OAKS AVE
SOUTH PASADENA CA 91030-4590

**Important information**

The Account Balance Fee for this statement
period for this account is $0.00/$1,000.
Effective 1/1/23, the following fee change will be
in effect: $10/each Foreign Check Processing
Fee. The following Sweep fees will apply to all
balances: $175 per account/month Sweep to
Investment Only, $250 per account/month Sweep
to Loan Only and $300 per account/month
Sweep to Investment and Loan.

**Thank you**

**Basic Business Checking** statement
December 1, 2022 to December 31, 2022

—— —— ——
——

## Basic Business Checking account details: ~~XXXXXXXXXX~~

### Electronic deposits this statement period

| Date | Amount | Activity | Reference numbers Customer | Bank |
|------|--------|----------|----------|------|
| Dec 02 | 12,625.77 | Avfuel3023 Cctransfer Hho | | 9488907856 |
| Dec 06 | 17,504.45 | Avfuel3023 Cctransfer Hho | | 9488055622 |
| Dec 07 | 14,277.24 | Avfuel3023 Cftransfer Hho1 | | 9488330389 |
| Dec 09 | 15,918.80 | Avfuel3023 Cctransfer Hho | | 9488824723 |
| Dec 09 | 205.59 | Avfuel3023 Cftransfer Hho1 | | 9488825220 |
| Dec 13 | 22,460.46 | Avfuel3023 Cctransfer Hho | | 9488816007 |
| Dec 14 | 2,762.30 | Avfuel3023 Cftransfer Hho1 | | 9488954717 |
| Dec 16 | 11,390.33 | Avfuel3023 Cctransfer Hho | | 9488673661 |
| Dec 20 | 15,950.26 | Avfuel3023 Cctransfer Hho | | 9488648258 |
| Dec 21 | 2,417.47 | Avfuel3023 Cftransfer Hho1 | | 9488792406 |
| Dec 23 | 11,362.32 | Avfuel3023 Cctransfer Hho | | 9488398995 |
| Dec 23 | 5,286.36 | Avfuel3023 Cftransfer Hho1 | | 9488399486 |
| Dec 28 | 5,792.02 | Avfuel3023 Cctransfer Hho | | 9488776566 |
| Dec 30 | 15,550.84 | Avfuel3023 Cctransfer Hho | | 9488428181 |
| Dec 30 | 1,156.13 | Avfuel3023 Cftransfer Hho1 | | 9488427815 |

**Total Electronic Deposits: $154,660.34**
**Total Number of Electronic Deposits: 15**

### Electronic withdrawals this statement period

| Date | Amount ($) | Activity | Reference numbers Customer | Bank |
|------|-----------|----------|----------|------|
| Dec 02 | -2,249.10 | Avfuel3252 Efttransfe Wolfebt | | 9488919159 |
| Dec 08 | -792.00 | Avfuel3252 Efttransfe Wolfebt | | 9488600890 |
| Dec 09 | -29,934.17 | Avfuel3252 Efttransfe Wolfebt | | 9488837813 |
| Dec 16 | -28,885.36 | Avfuel3252 Efttransfe Wolfebt | | 9488687122 |
| Dec 23 | -29,561.83 | Avfuel3252 Efttransfe Wolfebt | | 9488409456 |
| Dec 29 | -27,360.87 | Avfuel3252 Efttransfe Wolfebt | | 9488945877 |
| Dec 30 | -2,249.10 | Avfuel3252 Efttransfe Wolfebt | | 9488438249 |

**Total Electronic Withdrawals: -$121,032.43**
**Total Number of Electronic Withdrawals: 7**

### Transfers to other accounts this statement period

| Date | Amount ($) | Activity | | Bank reference number |
|------|-----------|----------|------|------|
| Dec 07 | -50,000.00 | Web Funds Transfer To Account | Xxxxxx5431 | WB11204918 |

**Total Transferred to Other Accounts: -$50,000.00**
**Total Number of Transfers to Other Accounts: 1**

### $ Lowest daily balance

Your lowest daily balance this statement period was **$112,885.30**
on **December 29, 2022**.

***Basic Business Checking* statement**
**December 1, 2022 to December 31, 2022**

# Basic Business Checking: 1■■■■■■■■■■

**PLEASE EXAMINE THIS STATEMENT PROMPTLY**

**Reporting Errors and Unauthorized Transactions**

**Personal Accounts:** *Electronic Funds Transfers:* In Case of Errors (including unauthorized electronic transactions) or Questions About Your Electronic Transfers: Call us at the telephone number printed on the first page of this statement or write us at the address printed on the first page of this statement as soon as you can, if you think this statement or your receipt is wrong or if you need more information about a transfer on the statement or receipt. For pre-authorized transfers (e.g., insurance payments, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. We must hear from you no later than 60 days after we sent you the FIRST statement on which the Error or problem appeared.

When reporting the Error: (1) tell us your name and account number (if any); (2) describe the Error (an Error includes an unauthorized electronic funds transfer) or the electronic transfer you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error or the transaction you question.

We will investigate your complaint and will correct any Error promptly. If we take more than 10 business days (20 business days for new accounts) to do this, we will credit your account for the amount you think is in Error so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not provide provisional credit to your account.

*Comerica Check Card Transactions:* Notwithstanding the above information, if your account was debited for a transaction resulting from the use of your Comerica Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated), you may have additional rights and protections. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Funds Transfer Transactions:* If you need a copy of a check or additional information about a transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic funds transfer transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Comerica Business and Personal Deposit Contract for further details.

**Business Accounts:** *Electronic Transactions:* If you think this statement shows an Error (an Error includes an unauthorized electronic transaction) or an ATM receipt you received is wrong or if you need more information about an electronic transaction listed on the statement, call or write us as soon as possible at the telephone number or address printed on the first page but always within 30 days of when we first made the information available to you regarding the transaction. For pre-authorized transfers (e.g., insurance payment, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Business Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. For all claims related to an electronic transaction, we must hear from you no later than 30 days after we first made the information available to you regarding the transaction otherwise you may waive your right to recover for the loss you incurred. Call or write us as soon as possible at the telephone number or address printed on the first page and (1) tell us your name and account number; (2) describe the Error or transaction you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error. We reserve the right to require that you complete an affidavit regarding claims of unauthorized transactions. If we timely receive your claim, we will investigate your claim and correct any Errors within the time frame required by law. If the claim is for an unauthorized electronic transaction and we find your claim genuine, we will process your claim in accordance with ACH rules or other applicable electronic clearinghouse rules. To the extent we recover we will refund to you the recovery. If an electronic transaction, including wire transfer was conducted in accordance with the terms of an electronic service you agreed to obtain from us, the terms of that agreement will govern whether the transaction in question is authorized or not.

*Comerica Business Check Card Transactions:* If your account was debited for a transaction resulting from the use of your Comerica Business Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated) or if your claim is related to an electronic debit transaction resulting from the use of your Comerica Check Card or Check Card number, you may have rights and protections in addition to those described above. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Transactions:* If you need a copy of a check or additional information about a non-electronic transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Business and Personal Deposit Contract for further details. You should keep this statement for your records.

**Balancing Your Account:** For assistance on how to balance your account, please call us at the phone number listed on your account statement or visit your local Comerica banking center.

 Equal Opportunity Lender   Rev. 05-17                                          MEMBER FDIC

80998

IIlIlumulIullIllImllImlIhl
HAWTHORNE HANGAR OPERATIONS LP
"FUEL ACCOUNT"
C/O PHILLIPS & COMPANY
909 EAST GREEN STREET
PASADENA CA 91106

## *Basic Business Checking* statement

January 1, 2023 to January 31, 2023
Account number ⬛⬛⬛⬛⬛⬛⬛

## Account summary

| | |
|---|---|
| **Beginning balance** on January 1, 2023 | **$127,343.17** |
| Plus deposits | |
| Electronic deposits | $125,848.18 |
| Less withdrawals | |
| Electronic (EFT) withdrawals | -$99,440.40 |
| **Ending balance** on January 31, 2023 | **$153,750.95** |

### To contact us

**Call**
(800) 522-2265
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
824 FAIR OAKS AVE
SOUTH PASADENA CA 91030-4590

### Important information

The Account Balance Fee for this statement period for this account is $0.00/$1,000.

### Thank you

*Basic Business Checking* **statement**
**January 1, 2023 to January 31, 2023**

## *Basic Business Checking* account details: ~~185585484~~

### Electronic deposits this statement period

| Date | Amount | Activity | Reference numbers | |
|------|--------|----------|-------------------|--|
| | | | Customer | Bank |
| Jan 04 | 6,319.11 | Avfuel3023 Cctransfer Hho | | 9488750054 |
| Jan 04 | 840.63 | Avfuel3023 Cftransfer Hho1 | | 9488750499 |
| Jan 06 | 20,201.31 | Avfuel3023 Cctransfer Hho | | 9488575945 |
| Jan 10 | 11,960.71 | Avfuel3023 Cctransfer Hho | | 9488576466 |
| Jan 13 | 23,121.87 | Avfuel3023 Cctransfer Hho | | 9488215491 |
| Jan 13 | 769.98 | Avfuel3023 Cftransfer Hho1 | | 9488215974 |
| Jan 18 | 8,758.74 | Avfuel3023 Cctransfer Hho | | 9488648254 |
| Jan 18 | 1,245.90 | Avfuel3023 Cftransfer Hho1 | | 9488440323 |
| Jan 20 | 3,119.16 | Avfuel3023 Cctransfer Hho | | 9488994014 |
| Jan 24 | 25,264.65 | Avfuel3023 Cctransfer Hho | | 9488156352 |
| Jan 27 | 10,616.64 | Avfuel3023 Cctransfer Hho | | 9488129234 |
| Jan 31 | 13,629.48 | Avfuel3023 Cctransfer Hho | | 9488573946 |

**Total Electronic Deposits: $125,848.18**
**Total Number of Electronic Deposits: 12**

### Electronic withdrawals this statement period

| Date | Amount ($) | Activity | Reference numbers | |
|------|-----------|----------|-------------------|--|
| | | | Customer | Bank |
| Jan 03 | -5,975.04 | Avfuel3252 Efttransfe Wolfebt | | 9488566111 |
| Jan 09 | -30,452.18 | Avfuel3252 Efttransfe Wolfebt | | 9488987740 |
| Jan 13 | -32,509.88 | Avfuel3252 Efttransfe Wolfebt | | 9488227558 |
| Jan 23 | -30,345.81 | Avfuel3252 Efttransfe Wolfebt | | 9488286387 |
| Jan 27 | -95.00 | Avfuel3252 Efttransfe Wolfebt | | 9488139212 |
| Jan 30 | -62.49 | Avfuel3252 Efttransfe Wolfebt | | 9488249849 |

**Total Electronic Withdrawals: -$99,440.40**
**Total Number of Electronic Withdrawals: 6**

### 💲 Lowest daily balance

Your lowest daily balance this statement period was **$104,397.67**
on **January 23, 2023**.

**Basic Business Checking statement**
**January 1, 2023 to January 31, 2023**

## Basic Business Checking: ████████████

### PLEASE EXAMINE THIS STATEMENT PROMPTLY
**Reporting Errors and Unauthorized Transactions**

**Personal Accounts:** *Electronic Funds Transfers:* In Case of Errors (including unauthorized electronic transactions) or Questions About Your Electronic Transfers: Call us at the telephone number printed on the first page of this statement or write us at the address printed on the first page of this statement as soon as you can, if you think this statement or your receipt is wrong or if you need more information about a transfer on the statement or receipt. For pre-authorized transfers (e.g., insurance payments, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. We must hear from you no later than 60 days after we sent you the FIRST statement on which the Error or problem appeared.

When reporting the Error: (1) tell us your name and account number (if any); (2) describe the Error (an Error includes an unauthorized electronic funds transfer) or the electronic transfer you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error or the transaction you question.

We will investigate your complaint and will correct any Error promptly. If we take more than 10 business days (20 business days for new accounts) to do this, we will credit your account for the amount you think is in Error so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not provide provisional credit to your account.

*Comerica Check Card Transactions:* Notwithstanding the above information, if your account was debited for a transaction resulting from the use of your Comerica Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated), you may have additional rights and protections. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Funds Transfer Transactions:* If you need a copy of a check or additional information about a transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic funds transfer transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Comerica Business and Personal Deposit Contract for further details.

**Business Accounts:** *Electronic Transactions:* If you think this statement shows an Error (an Error includes an unauthorized electronic transaction) or an ATM receipt you received is wrong or if you need more information about an electronic transaction listed on the statement, call or write us as soon as possible at the telephone number or address printed on the first page but always within 30 days of when we first made the information available to you regarding the transaction. For pre-authorized transfers (e.g., insurance payment, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Business Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. For all claims related to an electronic transaction, we must hear from you no later than 30 days after we first made the information available to you regarding the transaction otherwise you may waive your right to recover for the loss you incurred. Call or write us as soon as possible at the telephone number or address printed on the first page and (1) tell us your name and account number; (2) describe the Error or transaction you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error. We reserve the right to require that you complete an affidavit regarding claims of unauthorized transactions. If we timely receive your claim, we will investigate your claim and correct any Errors within the time frame required by law. If the claim is for an unauthorized electronic transaction and we find your claim genuine, we will process your claim in accordance with ACH rules or other applicable electronic clearinghouse rules. To the extent we recover we will refund to you the recovery. If an electronic transaction, including wire transfer was conducted in accordance with the terms of an electronic service you agreed to obtain from us, the terms of that agreement will govern whether the transaction in question is authorized or not.

*Comerica Business Check Card Transactions:* If your account was debited for a transaction resulting from the use of your Comerica Business Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated) or if your claim is related to an electronic debit transaction resulting from the use of your Comerica Check Card or Check Card number, you may have rights and protections in addition to those described above. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Transactions:* If you need a copy of a check or additional information about a non-electronic transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Business and Personal Deposit Contract for further details. You should keep this statement for your records.

**Balancing Your Account:** For assistance on how to balance your account, please call us at the phone number listed on your account statement or visit your local Comerica banking center.

 Equal Opportunity Lender   Rev. 05-17                              MEMBER FDIC

80998

||||||||||||||||||||||||||||||

HAWTHORNE HANGAR OPERATIONS LP
"FUEL ACCOUNT"
C/O PHILLIPS & COMPANY
909 EAST GREEN STREET
PASADENA CA 91106

### *Basic Business Checking* statement

**February 1, 2023** to **February 28, 2023**
**Account number** ▓▓▓▓▓▓▓▓

## Account summary

| | |
|---|---|
| **Beginning balance** on February 1, 2023 | **$153,750.95** |
| Plus deposits | |
| Electronic deposits | $117,337.09 |
| Less withdrawals | |
| Electronic (EFT) withdrawals | -$72,270.34 |
| **Ending balance** on February 28, 2023 | **$198,817.70** |

**To contact us**

**Call**
(800) 522-2265
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
824 FAIR OAKS AVE
SOUTH PASADENA CA 91030-4590

**Important information**

The Account Balance Fee for this statement period for this account is $0.00/$1,000.

**Thank you**

*Basic Business Checking* **statement**
**February 1, 2023 to February 28, 2023**

# *Basic Business Checking* account details:

## Electronic deposits this statement period

| | | | Reference numbers | |
| Date | Amount | Activity | Customer | Bank |
| --- | --- | --- | --- | --- |
| Feb 01 | 770.64 | Avfuel3023 Cftransfer Hho1 | | 9488223412 |
| Feb 03 | 8,984.72 | Avfuel3023 Cctransfer Hho | | 9488892832 |
| Feb 03 | 1,309.46 | Avfuel3023 Cftransfer Hho1 | | 9488893283 |
| Feb 07 | 4,463.04 | Avfuel3023 Cctransfer Hho | | 9488205945 |
| Feb 10 | 11,074.88 | Avfuel3023 Cctransfer Hho | | 9488884655 |
| Feb 10 | 774.59 | Avfuel3023 Cftransfer Hho1 | | 9488885150 |
| Feb 14 | 5,204.55 | Avfuel3023 Cctransfer Hho | | 9488828433 |
| Feb 15 | 27,293.10 | Avfuel3023 Cftransfer Hho1 | | 9488143727 |
| Feb 17 | 12,703.43 | Avfuel3023 Cctransfer Hho | | 9488971478 |
| Feb 22 | 16,296.45 | Avfuel3023 Cctransfer Hho | | 9488486904 |
| Feb 22 | 2,473.98 | Avfuel3023 Cftransfer Hho1 | | 9488219994 |
| Feb 24 | 15,096.34 | Avfuel3023 Cctransfer Hho | | 9488864460 |
| Feb 28 | 10,891.91 | Avfuel3023 Cctransfer Hho | | 9488476403 |

**Total Electronic Deposits: $117,337.09**
**Total Number of Electronic Deposits: 13**

## Electronic withdrawals this statement period

| | | | Reference numbers | |
| Date | Amount ($) | Activity | Customer | Bank |
| --- | --- | --- | --- | --- |
| Feb 03 | -2,249.10 | Avfuel3252 Efttransfe Wolfebt | | 9488902552 |
| Feb 10 | -35,707.50 | Avfuel3252 Efttransfe Wolfebt | | 9488900055 |
| Feb 17 | -34,223.74 | Avfuel3252 Efttransfe Wolfebt | | 9488983649 |
| Feb 21 | -90.00 | Avfuel3252 Efttransfe Wolfebt | | 9488205512 |

**Total Electronic Withdrawals: -$72,270.34**
**Total Number of Electronic Withdrawals: 4**

## 💲 Lowest daily balance

Your lowest daily balance this statement period was **$143,171.68**
on **February 10, 2023**.

**Basic Business Checking statement**
**February 1, 2023 to February 28, 2023**

# Basic Business Checking: ~~XXXXXXXX~~

**PLEASE EXAMINE THIS STATEMENT PROMPTLY**

**Reporting Errors and Unauthorized Transactions**

**Personal Accounts:** *Electronic Funds Transfers:* In Case of Errors (including unauthorized electronic transactions) or Questions About Your Electronic Transfers: Call us at the telephone number printed on the first page of this statement or write us at the address printed on the first page of this statement as soon as you can, if you think this statement or your receipt is wrong or if you need more information about a transfer on the statement or receipt. For pre-authorized transfers (e.g., insurance payments, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. We must hear from you no later than 60 days after we sent you the FIRST statement on which the Error or problem appeared.

When reporting the Error: (1) tell us your name and account number (if any); (2) describe the Error (an Error includes an unauthorized electronic funds transfer) or the electronic transfer you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error or the transaction you question.

We will investigate your complaint and will correct any Error promptly. If we take more than 10 business days (20 business days for new accounts) to do this, we will credit your account for the amount you think is in Error so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not provide provisional credit to your account.

*Comerica Check Card Transactions:* Notwithstanding the above information, if your account was debited for a transaction resulting from the use of your Comerica Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated), you may have additional rights and protections. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Funds Transfer Transactions:* If you need a copy of a check or additional information about a transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic funds transfer transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Comerica Business and Personal Deposit Contract for further details.

**Business Accounts:** *Electronic Transactions:* If you think this statement shows an Error (an Error includes an unauthorized electronic transaction) or an ATM receipt you received is wrong or if you need more information about an electronic transaction listed on the statement, call or write us as soon as possible at the telephone number or address printed on the first page but always within 30 days of when we first made the information available to you regarding the transaction. For pre-authorized transfers (e.g., insurance payment, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Business Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. For all claims related to an electronic transaction, we must hear from you no later than 30 days after we first made the information available to you regarding the transaction otherwise you may waive your right to recover for the loss you incurred. Call or write us as soon as possible at the telephone number or address printed on the first page and (1) tell us your name and account number; (2) describe the Error or transaction you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error. We reserve the right to require that you complete an affidavit regarding claims of unauthorized transactions. If we timely receive your claim, we will investigate your claim and correct any Errors within the time frame required by law. If the claim is for an unauthorized electronic transaction and we find your claim genuine, we will process your claim in accordance with ACH rules or other applicable electronic clearinghouse rules. To the extent we recover we will refund to you the recovery. If an electronic transaction, including wire transfer was conducted in accordance with the terms of an electronic service you agreed to obtain from us, the terms of that agreement will govern whether the transaction in question is authorized or not.

*Comerica Business Check Card Transactions:* If your account was debited for a transaction resulting from the use of your Comerica Business Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated) or if your claim is related to an electronic debit transaction resulting from the use of your Comerica Check Card or Check Card number, you may have rights and protections in addition to those described above. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Transactions:* If you need a copy of a check or additional information about a non-electronic transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Business and Personal Deposit Contract for further details. You should keep this statement for your records.

**Balancing Your Account:** For assistance on how to balance your account, please call us at the phone number listed on your account statement or visit your local Comerica banking center.

 Equal Opportunity Lender   Rev. 05-17                                    MEMBER FDIC

80998

 Il|lᵤₙᵢₗ|lₙₙlll|ₕₙₗₗₙₗₗₗ|ₗI

HAWTHORNE HANGAR OPERATIONS LP
"FUEL ACCOUNT"
C/O PHILLIPS & COMPANY
909 EAST GREEN STREET
PASADENA CA 91106

## *Basic Business Checking* statement

**March 1, 2023** to **March 31, 2023**
**Account number** ~~488888181~~

## Account summary

| | |
|---|---|
| **Beginning balance** on March 1, 2023 | **$198,817.70** |
| Plus deposits | |
| Electronic deposits | $104,265.47 |
| Less withdrawals | |
| Electronic (EFT) withdrawals | -$132,037.18 |
| Transfers to other accounts | -$75,000.00 |
| **Ending balance** on March 31, 2023 | **$96,045.99** |

**To contact us**

**Call**
(800) 522-2265
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
824 FAIR OAKS AVE
SOUTH PASADENA CA 91030-4590

**Important information**

The Account Balance Fee for this statement period for this account is $0.00/$1,000.

**Thank you**

*Basic Business Checking* **statement**
**March 1, 2023 to March 31, 2023**

# *Basic Business Checking* account details: ~~9955254~~

## Electronic deposits this statement period

| Date | Amount | Activity | Customer | Bank |
|---|---|---|---|---|
| | | | Reference numbers | |
| Mar 03 | 8,663.31 | Avfuel3023 Cctransfer Hho | | 9488399794 |
| Mar 07 | 9,190.93 | Avfuel3023 Cctransfer Hho | | 9488990100 |
| Mar 08 | 4,710.16 | Avfuel3023 Cftransfer Hho1 | | 9488232421 |
| Mar 10 | 19,222.43 | Avfuel3023 Cctransfer Hho | | 9488820394 |
| Mar 10 | 824.24 | Avfuel3023 Cftransfer Hho1 | | 9488820877 |
| Mar 14 | 6,207.21 | Avfuel3023 Cctransfer Hho | | 9488968536 |
| Mar 15 | 6,108.30 | Avfuel3023 Cftransfer Hho1 | | 9488246144 |
| Mar 17 | 4,580.35 | Avfuel3023 Cctransfer Hho | | 9488788194 |
| Mar 17 | 552.98 | Avfuel3023 Cftransfer Hho1 | | 9488788678 |
| Mar 21 | 6,842.06 | Avfuel3023 Cctransfer Hho | | 9488753351 |
| Mar 22 | 1,677.83 | Avfuel3023 Cftransfer Hho1 | | 9488816342 |
| Mar 24 | 11,016.15 | Avfuel3023 Cctransfer Hho | | 9488427810 |
| Mar 28 | 13,365.43 | Avfuel3023 Cctransfer Hho | | 9488823353 |
| Mar 29 | 2,153.06 | Avfuel3023 Cftransfer Hho1 | | 9488970509 |
| Mar 31 | 9,074.67 | Avfuel3023 Cctransfer Hho | | 9488502287 |
| Mar 31 | 76.36 | Avfuel3023 Cftransfer Hho1 | | 9488502784 |

**Total Electronic Deposits: $104,265.47**
**Total Number of Electronic Deposits: 16**

## Electronic withdrawals this statement period

| Date | Amount ($) | Activity | Customer | Bank |
|---|---|---|---|---|
| | | | Reference numbers | |
| Mar 06 | -31,686.53 | Avfuel3252 Efttransfe Wolfebt | | 9488162135 |
| Mar 13 | -28,203.57 | Avfuel3252 Efttransfe Wolfebt | | 9488377662 |
| Mar 20 | -11,113.96 | Avfuel3252 Efttransfe Wolfebt | | 9488225592 |
| Mar 21 | -792.00 | Avfuel3252 Efttransfe Wolfebt | | 9488757833 |
| Mar 22 | -30,000.00 | Wire # 015408 Bnf Avfuel Corporation | | 9485004230 |
| Mar 24 | -5,000.00 | CA Dept Tax Fee Cdtfa Epmt 230323 13932891 | | 9488845605 |
| Mar 29 | -25,241.12 | Wire # 015142 Bnf Avfuel Corporation | | 9485005054 |

**Total Electronic Withdrawals: -$132,037.18**
**Total Number of Electronic Withdrawals: 7**

## Transfers to other accounts this statement period

| Date | Amount ($) | Activity | | Bank reference number |
|---|---|---|---|---|
| Mar 01 | -40,000.00 | Web Funds Transfer To Account | Xxxxxx5431 | WB10305835 |
| Mar 24 | -35,000.00 | Web Funds Transfer To Account | Xxxxxx5431 | WB10306318 |

**Total Transferred to Other Accounts: -$75,000.00**
**Total Number of Transfers to Other Accounts: 2**

 ## Lowest daily balance

Your lowest daily balance this statement period was **$86,894.96**
on **March 29, 2023**.

**Basic Business Checking statement**
**March 1, 2023 to March 31, 2023**

# Basic Business Checking: ~~00053519~~

**PLEASE EXAMINE THIS STATEMENT PROMPTLY**

**Reporting Errors and Unauthorized Transactions**

**Personal Accounts:** *Electronic Funds Transfers:* In Case of Errors (including unauthorized electronic transactions) or Questions About Your Electronic Transfers: Call us at the telephone number printed on the first page of this statement or write us at the address printed on the first page of this statement as soon as you can, if you think this statement or your receipt is wrong or if you need more information about a transfer on the statement or receipt. For pre-authorized transfers (e.g., insurance payments, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. We must hear from you no later than 60 days after we sent you the FIRST statement on which the Error or problem appeared.

When reporting the Error: (1) tell us your name and account number (if any); (2) describe the Error (an Error includes an unauthorized electronic funds transfer) or the electronic transfer you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error or the transaction you question.

We will investigate your complaint and will correct any Error promptly.  If we take more than 10 business days (20 business days for new accounts) to do this, we will credit your account for the amount you think is in Error so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not provide provisional credit to your account.

*Comerica Check Card Transactions:* Notwithstanding the above information, if your account was debited for a transaction resulting from the use of your Comerica Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated), you may have additional rights and protections. See the Comerica Business and Personal Deposit Contract for specific information.

*Checks and Other Non-Electronic Funds Transfer Transactions:* If you need a copy of a check or additional information about a transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic funds transfer transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you. See the Comerica Business and Personal Deposit Contract for further details.

**Business Accounts:** *Electronic Transactions:* If you think this statement shows an Error (an Error includes an unauthorized electronic transaction) or an ATM receipt you received is wrong or if you need more information about an electronic transaction listed on the statement, call or write us as soon as possible at the telephone number or address printed on the first page but always within 30 days of when we first made the information available to you regarding the transaction. For pre-authorized transfers (e.g., insurance payment, etc.), call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Services Department, Attn: Research, P.O. Box 75000, Detroit, Michigan 48275-7570. For Comerica ATM Card or Comerica Business Check Card transactions, call us at the telephone number printed on the first page or write us at Comerica Bank – Electronic Processing, P.O. Box 75000, Detroit, Michigan 48275-7584. For all claims related to an electronic transaction, we must hear from you no later than 30 days after we first made the information available to you regarding the transaction otherwise you may waive your right to recover for the loss you incurred. Call or write us as soon as possible at the telephone number or address printed on the first page and (1) tell us your name and account number; (2) describe the Error or transaction you are unsure about, and explain as clearly as you can why you believe it is an Error or why you need more information; and (3) tell us the dollar amount of the suspected Error. We reserve the right to require that you complete an affidavit regarding claims of unauthorized transactions. If we timely receive your claim, we will investigate your claim and correct any Errors within the time frame required by law. If the claim is for an unauthorized electronic transaction and we find your claim genuine, we will process your claim in accordance with ACH rules or other applicable electronic clearinghouse rules. To the extent we recover we will refund to you the recovery. If an electronic transaction, including wire transfer was conducted in accordance with the terms of an electronic service you agreed to obtain from us, the terms of that agreement will govern whether the transaction in question is authorized or not.

*Comerica Business Check Card Transactions:* If your account was debited for a transaction resulting from the use of your Comerica Business Check Card or Check Card number (does not apply to ATM Cards or Visa Check Cards that are not activated) or if your claim is related to an electronic debit transaction resulting from the use of your Comerica Check Card or Check Card number, you may have rights and protections in addition to those described above. See the Comerica Business and Personal Deposit Account Contract for specific information.

*Checks and Other Non-Electronic Transactions:* If you need a copy of a check or additional information about a non-electronic transaction, you can call us at the telephone number on the first page of this statement. State law and the terms of the Business and Personal Deposit Contract govern your liability and the Bank's for fraudulent checks and non electronic transactions. The best way to limit your possible loss is to report any unauthorized activity involving your account as soon as possible but always within 30 days of when we sent the statement to you or otherwise made the information available to you.  See the Business and Personal Deposit Contract for further details. You should keep this statement for your records.

**Balancing Your Account:** For assistance on how to balance your account, please call us at the phone number listed on your account statement or visit your local Comerica banking center.

 Equal Opportunity Lender   Rev. 05-17                                          MEMBER FDIC

# FIRST FOUNDATION BANK

18101 Von Karman Avenue
Suite 750
Irvine, CA 92612

**ADDRESS SERVICE REQUESTED**

HAWTHORNE HANGAR OPERATIONS LP
909 E GREEN ST
PASADENA CA 91106-2906

**Statement Ending 03/31/2023**

Page 1 of 2

## Managing Your Accounts

Toll-Free:    (888) 405-4332

Online:       www.firstfoundationinc.com

Mailing:      4A Peninsula Center
              Rolling Hills Estates, CA
              90274

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Business Checking | XXXXXXXX9724 | $5,289.92 |

## Business Checking-XXXXXXXX9724

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 03/01/2023 | Beginning Balance | $11,060.09 | Earnings Balance | $0.00 |
| | 0 Credit(s) This Period | $0.00 | | |
| | 3 Debit(s) This Period | $5,770.17 | | |
| 03/31/2023 | Ending Balance | $5,289.92 | | |

### Other Debits

| Date | Description | Amount |
|---|---|---|
| 03/03/2023 | Domestic Wire Out James L Schulte Wires | $2,868.19 |
| 03/10/2023 | Analysis Charge | $33.79 |
| 03/20/2023 | Domestic Wire Out James L. Schulte Wires | $2,868.19 |

### Daily Balances

| Date | Amount | Date | Amount |
|---|---|---|---|
| 03/01/2023 | $11,060.09 | 03/10/2023 | $8,158.11 |
| 03/03/2023 | $8,191.90 | 03/20/2023 | $5,289.92 |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date |
|---|---|---|
| **Total Overdraft Fees** | $0.00 | $0.00 |
| **Total Returned Item Fees** | $0.00 | $0.00 |



Member
FDIC



EQUAL HOUSING LENDER

| CHECKS OUTSTANDING – (CHECKS WRITTEN BUT NOT SHOWN) | | | | | BANK BALANCE SHOWN ON THIS STATEMENT | $_____ |
|---|---|---|---|---|---|---|
| CHECK NO. | AMOUNT | CHECK NO. | AMOUNT | | **ADD +** DEPOSITS AND OTHER AMOUNTS NOT CREDITED ON THIS STATEMENT (IF ANY) | $_____ |
| | | | | | | $_____ |
| | | | | | **TOTAL** | $_____ |
| | | | | | **SUBTRACT —** | $_____ |
| | | | | | CHECKS OUTSTANDING | $_____ |
| | | | | | **BALANCE ☆** | $_____ |

☆ SHOULD AGREE WITH YOUR CHECKBOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) ON THIS STATEMENT.

## DEPOSIT ACCOUNT INFORMATION

### (Disregard if you have a Commercial Account)

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Please call or write us at the phone number or address on the front side of this statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Tell us the dollar amount of the suspected error.
3. Describe the error or the transfer you are unsure about and explain, as clearly as you can, why you believe it is an error or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes to complete our investigation.

## LINE OF CREDIT INFORMATION

### (Disregard if you do not have a Line of Credit)

#### HOW INTEREST CHARGES ARE COMPUTED

DAILY BALANCE METHOD (including current transactions).
To get the daily balances we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid INTEREST CHARGES. This gives us the daily balance. Then, we multiply the daily balance each day of the statement period (excluding the last statement date but including the current statement date) by the appropriate daily periodic rates. We then add up all of these interest charges to get your total interest charge. Daily periodic rates may vary.

#### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, send your inquiry in writing, on a separate sheet, to the address shown on your statement as soon as possible. We must hear from you no later than 60 days after the bill was mailed to you. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error, and
3. A description of the error and why (to the extent you can explain) you believe it is an error. If you need more information, describe the item you are unsure about.

If you have authorized the Bank to automatically pay your bill from your checking or savings account, you can stop payment on any amount you think is wrong by mailing your notice so that the Bank receives it three (3) business days before the payment is scheduled to occur.

You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amount in dispute during the time the Bank is resolving the dispute. During that same time, the Bank may not take action to collect disputed amounts or report disputed amounts as delinquent.

# FIRST FOUNDATION BANK

**Statement Ending 02/28/2023**

*Page 1 of 4*

18101 Von Karman Avenue
Suite 750
Irvine, CA 92612

ADDRESS SERVICE REQUESTED

HAWTHORNE HANGAR OPERATIONS LP
909 E GREEN ST
PASADENA CA 91106-2906

## Managing Your Accounts

| | | |
|---|---|---|
| Toll-Free: | (888) 405-4332 | |
| Online: | www.firstfoundationinc.com | |
| Mailing: | 4A Peninsula Center Rolling Hills Estates, CA 90274 | |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Business Checking | XXXXXXXX9724 | $11,060.09 |

## Business Checking-XXXXXXXX9724

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 02/01/2023 | Beginning Balance | $20,277.86 | Earnings Balance | $0.00 |
| | 0 Credit(s) This Period | $0.00 | | |
| | 3 Debit(s) This Period | $9,217.77 | | |
| 02/28/2023 | Ending Balance | $11,060.09 | | |

### Other Debits

| Date | Description | Amount |
|---|---|---|
| 02/01/2023 | Domestic Wire Out JAMES L. SCHULTE Wires | $2,825.58 |
| 02/17/2023 | Domestic Wire Out James L. Schulte Wires | $2,892.19 |

### Checks Cleared

| Check Nbr | Date | Amount |
|---|---|---|
| 4635 | 02/03/2023 | $3,500.00 |

* Indicates skipped check number

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 02/01/2023 | $17,452.28 | 02/03/2023 | $13,952.28 | 02/17/2023 | $11,060.09 |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date | Previous year-to-date |
|---|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 | $0.00 |



Member
FDIC



EQUAL HOUSING LENDER

| CHECKS OUTSTANDING –<br>(CHECKS WRITTEN BUT NOT SHOWN) | | | | BANK BALANCE SHOWN<br>ON THIS STATEMENT | $_____ |
|---|---|---|---|---|---|
| CHECK NO. | AMOUNT | CHECK NO. | AMOUNT | **ADD +**<br>DEPOSITS AND OTHER | $_____ |
| | | | | AMOUNTS NOT CREDITED<br>ON THIS STATEMENT<br>*(IF ANY)* | $_____ |
| | | | | TOTAL | $_____ |
| | | | | **SUBTRACT —** | $_____ |
| | | | | CHECKS<br>OUTSTANDING | $_____ |
| | | | | **BALANCE ☆** | $_____ |

☆ SHOULD AGREE WITH YOUR CHECKBOOK
BALANCE AFTER DEDUCTING SERVICE
CHARGE (IF ANY) ON THIS STATEMENT.

## DEPOSIT ACCOUNT INFORMATION

### (Disregard if you have a Commercial Account)

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Please call or write us at the phone number or address on the front side of this statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Tell us the dollar amount of the suspected error.
3. Describe the error or the transfer you are unsure about and explain, as clearly as you can, why you believe it is an error or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes to complete our investigation.

## LINE OF CREDIT INFORMATION

### (Disregard if you do not have a Line of Credit)

#### HOW INTEREST CHARGES ARE COMPUTED

DAILY BALANCE METHOD (including current transactions).
To get the daily balances we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid INTEREST CHARGES. This gives us the daily balance. Then, we multiply the daily balance each day of the statement period (excluding the last statement date but including the current statement date) by the appropriate daily periodic rates. We then add up all of these daily interest charges to get your total interest charge. Daily periodic rates may vary.

#### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, send your inquiry in writing, on a separate sheet, to the address shown on your statement as soon as possible. We must hear from you no later than 60 days after the bill was mailed to you. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error, and
3. A description of the error and why (to the extent you can explain) you believe it is an error. If you need more information, describe the item you are unsure about.

If you have authorized the Bank to automatically pay your bill from your checking or savings account, you can stop payment on any amount you think is wrong by mailing your notice so that the Bank receives it three (3) business days before the payment is scheduled to occur.

You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amount in dispute during the time the Bank is resolving the dispute. During that same time, the Bank may not take action to collect disputed amounts or report disputed amounts as delinquent.



**FIRST FOUNDATION BANK**

*Statement Ending 02/28/2023*

*Page 3 of 4*

#4635        02/03/2023        $3,500.00

#4635        02/03/2023        $3,500.00

**FIRST FOUNDATION
BANK**

THIS PAGE LEFT INTENTIONALLY BLANK

# FIRST FOUNDATION BANK

**Statement Ending 12/31/2022**

Page 1 of 6

18101 Von Karman Avenue
Suite 750
Irvine, CA 92612

ADDRESS SERVICE REQUESTED

HAWTHORNE HANGAR OPERATIONS LP
909 E GREEN ST
PASADENA CA 91106-2906

### Managing Your Accounts

| | | |
|---|---|---|
| Toll-Free: | (888) 405-4332 | |
| Online: | www.firstfoundationinc.com | |
| Mailing: | 4A Peninsula Center Rolling Hills Estates, CA 90274 | |

### Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Business Checking | XXXXXXXX9724 | $47,677.74 |

## Business Checking-XXXXXXXX9724

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 12/01/2022 | Beginning Balance | $44,797.55 | Earnings Balance | $0.00 |
| | 2 Credit(s) This Period | $31,125.77 | | |
| | 16 Debit(s) This Period | $28,245.58 | | |
| 12/31/2022 | Ending Balance | $47,677.74 | | |

### Electronic Credits

| Date | Description | Amount |
|---|---|---|
| 12/20/2022 | ACH Deposit Tesla, Inc. EDI PYMNTS | $8,446.50 |
| 12/20/2022 | ACH Deposit Tesla, Inc. EDI PYMNTS | $22,679.27 |

### Electronic Debits

| Date | Description | Amount |
|---|---|---|
| 12/06/2022 | ACH Payment EMPLOYMENT DEVEL EDD EFTPMT | $553.20 |
| 12/21/2022 | ACH Payment EMPLOYMENT DEVEL EDD EFTPMT | $570.87 |

### Other Debits

| Date | Description | Amount |
|---|---|---|
| 12/05/2022 | Domestic Wire Out James L. Schulte Wires | $2,825.58 |
| 12/07/2022 | Domestic Wire Out Signature Resolution, LLC Wires | $4,700.00 |
| 12/19/2022 | Domestic Wire Out James L. Schulte Wires | $2,825.58 |

### Checks Cleared

| Check Nbr | Date | Amount | Check Nbr | Date | Amount | Check Nbr | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 4597 | 12/22/2022 | $1,500.00 | 4602 | 12/06/2022 | $2,165.25 | 4611* | 12/21/2022 | $1,384.53 |
| 4598 | 12/09/2022 | $1,120.93 | 4603 | 12/06/2022 | $1,051.59 | 4612 | 12/22/2022 | $2,321.77 |
| 4599 | 12/06/2022 | $1,740.59 | 4608* | 12/21/2022 | $1,342.99 | 4613 | 12/21/2022 | $1,051.61 |
| 4601* | 12/06/2022 | $1,362.82 | 4609 | 12/21/2022 | $1,728.27 | | | |

* Indicates skipped check number



Member FDIC



EQUAL HOUSING LENDER

| CHECKS OUTSTANDING – (CHECKS WRITTEN BUT NOT SHOWN) | | | |
|---|---|---|---|
| CHECK NO. | AMOUNT | CHECK NO. | AMOUNT |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

| | |
|---|---|
| BANK BALANCE SHOWN ON THIS STATEMENT | $_____ |
| **ADD +** DEPOSITS AND OTHER AMOUNTS NOT CREDITED ON THIS STATEMENT (IF ANY) | $_____ $_____ |
| **TOTAL** | $_____ |
| **SUBTRACT —** CHECKS OUTSTANDING | $_____ $_____ |
| **BALANCE ☆** | $_____ |

☆ SHOULD AGREE WITH YOUR CHECKBOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) ON THIS STATEMENT.

## DEPOSIT ACCOUNT INFORMATION

### (Disregard if you have a Commercial Account)

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Please call or write us at the phone number or address on the front side of this statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Tell us the dollar amount of the suspected error.
3. Describe the error or the transfer you are unsure about and explain, as clearly as you can, why you believe it is an error or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes to complete our investigation.

## LINE OF CREDIT INFORMATION

### (Disregard if you do not have a Line of Credit)

#### HOW INTEREST CHARGES ARE COMPUTED

DAILY BALANCE METHOD (including current transactions).
To get the daily balances we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid INTEREST CHARGES. This gives us the daily balance. Then, we multiply the daily balance each day of the statement period (excluding the last statement date but including the current statement date) by the appropriate daily periodic rates. We then add up all of these daily interest charges to get your total interest charge. Daily periodic rates may vary.

#### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, send your inquiry in writing, on a separate sheet, to the address shown on your statement as soon as possible. We must hear from you no later than 60 days after the bill was mailed to you. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error, and
3. A description of the error and why (to the extent you can explain) you believe it is an error. If you need more information, describe the item you are unsure about.

If you have authorized the Bank to automatically pay your bill from your checking or savings account, you can stop payment on any amount you think is wrong by mailing your notice so that the Bank receives it three (3) business days before the payment is scheduled to occur.

You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amount in dispute during the time the Bank is resolving the dispute. During that same time, the Bank may not take action to collect disputed amounts or report disputed amounts as delinquent.

**FIRST FOUNDATION BANK**

## Business Checking-XXXXXXXX9724 (continued)

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 12/01/2022 | $44,797.55 | 12/07/2022 | $30,398.52 | 12/20/2022 | $57,577.78 |
| 12/05/2022 | $41,971.97 | 12/09/2022 | $29,277.59 | 12/21/2022 | $51,499.51 |
| 12/06/2022 | $35,098.52 | 12/19/2022 | $26,452.01 | 12/22/2022 | $47,677.74 |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date |
|------|-----------------------|--------------------|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

# FIRST FOUNDATION
# BANK



| #4597 | 12/22/2022 | $1,500.00 | #4597 | 12/22/2022 | $1,500.00 |
| #4598 | 12/09/2022 | $1,120.93 | #4598 | 12/09/2022 | $1,120.93 |
| #4599 | 12/06/2022 | $1,740.59 | #4599 | 12/06/2022 | $1,740.59 |
| #4601 | 12/06/2022 | $1,362.82 | #4601 | 12/06/2022 | $1,362.82 |
| #4602 | 12/06/2022 | $2,165.25 | #4602 | 12/06/2022 | $2,165.25 |
| #4603 | 12/06/2022 | $1,051.59 | #4603 | 12/06/2022 | $1,051.59 |

# FIRST FOUNDATION
## BANK



| #4608 | 12/21/2022 | $1,342.99 |
| #4609 | 12/21/2022 | $1,728.27 |
| #4611 | 12/21/2022 | $1,384.53 |
| #4612 | 12/22/2022 | $2,321.77 |
| #4613 | 12/21/2022 | $1,051.61 |

**FIRST FOUNDATION**
**BANK**

THIS PAGE LEFT INTENTIONALLY BLANK

# FIRST FOUNDATION
# BANK

18101 Von Karman Avenue
Suite 750
Irvine, CA 92612

ADDRESS SERVICE REQUESTED

HAWTHORNE HANGAR OPERATIONS LP
909 E GREEN ST
PASADENA CA 91106-2906

**Statement Ending 01/31/2023**

*Page 1 of 6*

## Managing Your Accounts

| | | |
|---|---|---|
| Toll-Free: | (888) 405-4332 | |
| Online: | www.firstfoundationinc.com | |
| Mailing: | 4A Peninsula Center Rolling Hills Estates, CA 90274 | |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Business Checking | XXXXXXXX9724 | $20,277.86 |

## Business Checking-XXXXXXXX9724

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 01/01/2023 | Beginning Balance | $47,677.74 | Earnings Balance | $0.00 |
| | 1 Credit(s) This Period | $2,682.75 | | |
| | 17 Debit(s) This Period | $30,082.63 | | |
| 01/31/2023 | Ending Balance | $20,277.86 | | |

### Electronic Credits

| Date | Description | Amount |
|---|---|---|
| 01/05/2023 | Domestic Wire In HAWTHORNE HANGAR OPERATIONS LP Wires | $2,682.75 |

### Electronic Debits

| Date | Description | Amount |
|---|---|---|
| 01/06/2023 | ACH Payment EMPLOYMENT DEVEL EDD EFTPMT | $1,359.18 |
| 01/23/2023 | ACH Payment EMPLOYMENT DEVEL EDD EFTPMT | $1,286.59 |

### Other Debits

| Date | Description | Amount |
|---|---|---|
| 01/05/2023 | Domestic Wire Out James L. Schulte Wires | $2,682.75 |
| 01/05/2023 | Domestic Wire Out James L. Schulte Wires | $2,682.75 |
| 01/19/2023 | Domestic Wire Out JAMES L SCHULTE Wires | $2,825.58 |

### Checks Cleared

| Check Nbr | Date | Amount | Check Nbr | Date | Amount | Check Nbr | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 4616 | 01/06/2023 | $1,301.79 | 4621 | 01/06/2023 | $2,765.68 | 4627 | 01/23/2023 | $1,328.19 |
| 4617 | 01/06/2023 | $1,925.14 | 4622 | 01/09/2023 | $522.97 | 4629* | 01/23/2023 | $1,419.73 |
| 4618 | 01/06/2023 | $683.22 | 4625* | 01/26/2023 | $1,357.07 | 4630 | 01/23/2023 | $2,042.33 |
| 4620* | 01/06/2023 | $1,362.81 | 4626 | 01/23/2023 | $2,223.46 | 4633* | 01/24/2023 | $2,313.39 |

* Indicates skipped check number

Member
FDIC



| CHECKS OUTSTANDING –<br>(CHECKS WRITTEN BUT NOT SHOWN) | | | |
|---|---|---|---|
| CHECK NO. | AMOUNT | CHECK NO. | AMOUNT |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | |
|---|---|---|
| BANK BALANCE SHOWN ON THIS STATEMENT | $ | |
| **ADD +**<br>DEPOSITS AND OTHER AMOUNTS NOT CREDITED ON THIS STATEMENT *(IF ANY)* | $ | |
| | $ | |
| **TOTAL** | $ | |
| **SUBTRACT —** | $ | |
| CHECKS OUTSTANDING | $ | |
| **BALANCE ☆** | $ | |

☆ SHOULD AGREE WITH YOUR CHECKBOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) ON THIS STATEMENT.

## DEPOSIT ACCOUNT INFORMATION

### (Disregard if you have a Commercial Account)

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Please call or write us at the phone number or address on the front side of this statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Tell us the dollar amount of the suspected error.
3. Describe the error or the transfer you are unsure about and explain, as clearly as you can, why you believe it is an error or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes to complete our investigation.

## LINE OF CREDIT INFORMATION

### (Disregard if you do not have a Line of Credit)

#### HOW INTEREST CHARGES ARE COMPUTED

DAILY BALANCE METHOD (including current transactions).
To get the daily balances we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid INTEREST CHARGES. This gives us the daily balance. Then, we multiply the daily balance each day of the statement period (excluding the last statement date but including the current statement date) by the appropriate daily periodic rates. We then add up all of these daily interest charges to get your total interest charge. Daily periodic rates may vary.

#### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, send your inquiry in writing, on a separate sheet, to the address shown on your statement as soon as possible. We must hear from you no later than 60 days after the bill was mailed to you. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error, and
3. A description of the error and why (to the extent you can explain) you believe it is an error. If you need more information, describe the item you are unsure about.

If you have authorized the Bank to automatically pay your bill from your checking or savings account, you can stop payment on any amount you think is wrong by mailing your notice so that the Bank receives it three (3) business days before the payment is scheduled to occur.

You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amount in dispute during the time the Bank is resolving the dispute. During that same time, the Bank may not take action to collect disputed amounts or report disputed amounts as delinquent.

**FIRST FOUNDATION BANK**

## Business Checking-XXXXXXXX9724 (continued)

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 01/01/2023 | $47,677.74 | 01/09/2023 | $35,074.20 | 01/24/2023 | $21,634.93 |
| 01/05/2023 | $44,994.99 | 01/19/2023 | $32,248.62 | 01/26/2023 | $20,277.86 |
| 01/06/2023 | $35,597.17 | 01/23/2023 | $23,948.32 | | |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date | Previous year-to-date |
|------|---|---|---|
| **Total Overdraft Fees** | $0.00 | $0.00 | $0.00 |
| **Total Returned Item Fees** | $0.00 | $0.00 | $0.00 |

# FIRST FOUNDATION BANK

## Statement Ending 01/31/2023

Page 4 of 6



| #4616 | 01/06/2023 | $1,301.79 |
| #4617 | 01/06/2023 | $1,925.14 |
| #4618 | 01/06/2023 | $683.22 |
| #4620 | 01/06/2023 | $1,362.81 |
| #4621 | 01/06/2023 | $2,765.68 |
| #4622 | 01/09/2023 | $522.97 |

**FIRST FOUNDATION BANK**

*Statement Ending 01/31/2023*



| #4625 | 01/26/2023 | $1,357.07 |
| #4625 | 01/26/2023 | $1,357.07 |
| #4626 | 01/23/2023 | $2,223.46 |
| #4626 | 01/23/2023 | $2,223.46 |
| #4627 | 01/23/2023 | $1,328.19 |
| #4627 | 01/23/2023 | $1,328.19 |
| #4629 | 01/23/2023 | $1,419.73 |
| #4629 | 01/23/2023 | $1,419.73 |
| #4630 | 01/23/2023 | $2,042.33 |
| #4630 | 01/23/2023 | $2,042.33 |
| #4633 | 01/24/2023 | $2,313.39 |
| #4633 | 01/24/2023 | $2,313.39 |

FIRST FOUNDATION
BANK

**Statement Ending 01/31/2023**

THIS PAGE LEFT INTENTIONALLY BLANK

# FIRST FOUNDATION BANK

**Statement Ending 12/31/2022**

*Page 1 of 2*

18101 Von Karman Avenue
Suite 750
Irvine, CA 92612

**ADDRESS SERVICE REQUESTED**

HAWTHORNE HANGAR OPERATIONS LP
MASTER FUEL ACCOUNT
909 E GREEN ST
PASADENA CA 91106-2906

## Managing Your Accounts

| | | |
|---|---|---|
| Toll-Free: | (888) 405-4332 | |
| Online: | www.firstfoundationinc.com | |
| Mailing: | 4A Peninsula Center Rolling Hills Estates,  CA 90274 | |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Business Checking | XXXXXXXX0817 | $5,282.82 |

## Business Checking-XXXXXXXX0817

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 12/01/2022 | Beginning Balance | $5,282.82 | Earnings Balance | $0.00 |
| | 0 Credit(s) This Period | $0.00 | | |
| | 0 Debit(s) This Period | $0.00 | | |
| 12/31/2022 | Ending Balance | $5,282.82 | | |

### Daily Balances

| Date | Amount |
|---|---|
| 12/01/2022 | $5,282.82 |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |



Member
FDIC



| CHECKS OUTSTANDING – (CHECKS WRITTEN BUT NOT SHOWN) | | | | | |
|---|---|---|---|---|---|
| CHECK NO. | AMOUNT | | CHECK NO. | AMOUNT | |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

| | |
|---|---|
| BANK BALANCE SHOWN ON THIS STATEMENT | $_____ |
| **ADD +** DEPOSITS AND OTHER AMOUNTS NOT CREDITED ON THIS STATEMENT *(IF ANY)* | $_____ |
|  | $_____ |
| **TOTAL** | $_____ |
| **SUBTRACT --** CHECKS OUTSTANDING | $_____ |
|  | $_____ |
| **BALANCE ☆** | $_____ |

☆ SHOULD AGREE WITH YOUR CHECKBOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) ON THIS STATEMENT.

## DEPOSIT ACCOUNT INFORMATION

### (Disregard if you have a Commercial Account)

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Please call or write us at the phone number or address on the front side of this statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Tell us the dollar amount of the suspected error.
3. Describe the error or the transfer you are unsure about and explain, as clearly as you can, why you believe it is an error or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes to complete our investigation.

## LINE OF CREDIT INFORMATION

### (Disregard if you do not have a Line of Credit)

#### HOW INTEREST CHARGES ARE COMPUTED

DAILY BALANCE METHOD (including current transactions).
To get the daily balances we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid INTEREST CHARGES. This gives us the daily balance. Then, we multiply the daily balance each day of the statement period (excluding the last statement date but including the current statement date) by the appropriate daily periodic rates. We then add up all of these interest charges to get your total interest charge. Daily periodic rates may vary.

#### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, send your inquiry in writing, on a separate sheet, to the address shown on your statement as soon as possible. We must hear from you no later than 60 days after the bill was mailed to you. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error, and
3. A description of the error and why (to the extent you can explain) you believe it is an error. If you need more information, describe the item you are unsure about.

If you have authorized the Bank to automatically pay your bill from your checking or savings account, you can stop payment on any amount you think is wrong by mailing your notice so that the Bank receives it three (3) business days before the payment is scheduled to occur.

You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amount in dispute during the time the Bank is resolving the dispute. During that same time, the Bank may not take action to collect disputed amounts or report disputed amounts as delinquent.

# FIRST FOUNDATION BANK

**18101 Von Karman Avenue**
**Suite 750**
**Irvine, CA 92612**

**ADDRESS SERVICE REQUESTED**

HAWTHORNE HANGAR OPERATIONS LP
MASTER FUEL ACCOUNT
909 E GREEN ST
PASADENA CA 91106-2906

## *Statement Ending 01/31/2023*

*Page 1 of 2*

### Managing Your Accounts

| | | |
|---|---|---|
| Toll-Free: | (888) 405-4332 | |
| Online: | www.firstfoundationinc.com | |
| Mailing: | 4A Peninsula Center Rolling Hills Estates, CA 90274 | |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Business Checking | XXXXXXXX0817 | $5,282.82 |

## Business Checking-XXXXXXXX0817

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 01/01/2023 | Beginning Balance | $5,282.82 | Earnings Balance | $0.00 |
| | 0 Credit(s) This Period | $0.00 | | |
| | 0 Debit(s) This Period | $0.00 | | |
| 01/31/2023 | Ending Balance | $5,282.82 | | |

### Daily Balances

| Date | Amount |
|---|---|
| 01/01/2023 | $5,282.82 |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date | Previous year-to-date |
|---|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 | $0.00 |



Member
**FDIC**


EQUAL HOUSING LENDER

| CHECKS OUTSTANDING – (CHECKS WRITTEN BUT NOT SHOWN) | | | |
|---|---|---|---|
| CHECK NO. | AMOUNT | CHECK NO. | AMOUNT |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | |
|---|---|
| BANK BALANCE SHOWN ON THIS STATEMENT | $_____ |
| **ADD +** DEPOSITS AND OTHER AMOUNTS NOT CREDITED ON THIS STATEMENT (IF ANY) | $_____ |
| | $_____ |
| **TOTAL** | $_____ |
| **SUBTRACT —** | $_____ |
| CHECKS OUTSTANDING | $_____ |
| **BALANCE ☆** | $_____ |

☆ SHOULD AGREE WITH YOUR CHECKBOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) ON THIS STATEMENT.

## DEPOSIT ACCOUNT INFORMATION

### (Disregard if you have a Commercial Account)

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Please call or write us at the phone number or address on the front side of this statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Tell us the dollar amount of the suspected error.
3. Describe the error or the transfer you are unsure about and explain, as clearly as you can, why you believe it is an error or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes to complete our investigation.

## LINE OF CREDIT INFORMATION

### (Disregard if you do not have a Line of Credit)

#### HOW INTEREST CHARGES ARE COMPUTED

DAILY BALANCE METHOD (including current transactions).
To get the daily balances we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid INTEREST CHARGES. This gives us the daily balance. Then, we multiply the daily balance each day of the statement period (excluding the last statement date but including the current statement date) by the appropriate daily periodic rates. We then add up all of these daily interest charges to get your total interest charge. Daily periodic rates may vary.

#### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, send your inquiry in writing, on a separate sheet, to the address shown on your statement as soon as possible. We must hear from you no later than 60 days after the bill was mailed to you. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error, and
3. A description of the error and why (to the extent you can explain) you believe it is an error. If you need more information, describe the item you are unsure about.

If you have authorized the Bank to automatically pay your bill from your checking or savings account, you can stop payment on any amount you think is wrong by mailing your notice so that the Bank receives it three (3) business days before the payment is scheduled to occur.

You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amount in dispute during the time the Bank is resolving the dispute. During that same time, the Bank may not take action to collect disputed amounts or report disputed amounts as delinquent.

# FIRST FOUNDATION BANK

*Statement Ending 02/28/2023*

*Page 1 of 2*

18101 Von Karman Avenue
Suite 750
Irvine, CA 92612

ADDRESS SERVICE REQUESTED

HAWTHORNE HANGAR OPERATIONS LP
MASTER FUEL ACCOUNT
909 E GREEN ST
PASADENA CA 91106-2906

## Managing Your Accounts

| | | |
|---|---|---|
| Toll-Free: | (888) 405-4332 | |
| Online: | www.firstfoundationinc.com | |
| Mailing: | 4A Peninsula Center Rolling Hills Estates,  CA 90274 | |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Business Checking | XXXXXXXX0817 | $5,282.82 |

## Business Checking-XXXXXXXX0817

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 02/01/2023 | Beginning Balance | $5,282.82 | Earnings Balance | $0.00 |
| | 0 Credit(s) This Period | $0.00 | | |
| | 0 Debit(s) This Period | $0.00 | | |
| 02/28/2023 | Ending Balance | $5,282.82 | | |

### Daily Balances

| Date | Amount |
|---|---|
| 02/01/2023 | $5,282.82 |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date | Previous year-to-date |
|---|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 | $0.00 |



Member
FDIC



| CHECKS OUTSTANDING –<br>(CHECKS WRITTEN BUT NOT SHOWN) | | | |
|---|---|---|---|
| CHECK NO. | AMOUNT | CHECK NO. | AMOUNT |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | |
|---|---|---|
| BANK BALANCE SHOWN ON THIS STATEMENT | $ | |
| **ADD +** DEPOSITS AND OTHER AMOUNTS NOT CREDITED ON THIS STATEMENT *(IF ANY)* | $ | |
| | $ | |
| **TOTAL** | $ | |
| **SUBTRACT —** CHECKS OUTSTANDING | $ | |
| | $ | |
| **BALANCE ☆** | $ | |

☆ SHOULD AGREE WITH YOUR CHECKBOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) ON THIS STATEMENT.

## DEPOSIT ACCOUNT INFORMATION

### (Disregard if you have a Commercial Account)

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Please call or write us at the phone number or address on the front side of this statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Tell us the dollar amount of the suspected error.
3. Describe the error or the transfer you are unsure about and explain, as clearly as you can, why you believe it is an error or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes to complete our investigation.

## LINE OF CREDIT INFORMATION

### (Disregard if you do not have a Line of Credit)

#### HOW INTEREST CHARGES ARE COMPUTED

DAILY BALANCE METHOD (including current transactions).
To get the daily balances we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid INTEREST CHARGES. This gives us the daily balance. Then, we multiply the daily balance each day of the statement period (excluding the last statement date but including the current statement date) by the appropriate daily periodic rates. We then add up all of these daily interest charges to get your total interest charge. Daily periodic rates may vary.

#### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, send your inquiry in writing, on a separate sheet, to the address shown on your statement as soon as possible. We must hear from you no later than 60 days after the bill was mailed to you. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error, and
3. A description of the error and why (to the extent you can explain) you believe it is an error. If you need more information, describe the item you are unsure about.

If you have authorized the Bank to automatically pay your bill from your checking or savings account, you can stop payment on any amount you think is wrong by mailing your notice so that the Bank receives it three (3) business days before the payment is scheduled to occur.

You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amount in dispute during the time the Bank is resolving the dispute. During that same time, the Bank may not take action to collect disputed amounts or report disputed amounts as delinquent.

# FIRST FOUNDATION BANK

18101 Von Karman Avenue
Suite 750
Irvine, CA 92612

**ADDRESS SERVICE REQUESTED**

HAWTHORNE HANGAR OPERATIONS LP
MASTER FUEL ACCOUNT
909 E GREEN ST
PASADENA CA 91106-2906

**Statement Ending 03/31/2023**

*Page 1 of 2*

### Managing Your Accounts

| | | |
|---|---|---|
| Toll-Free: | (888) 405-4332 | |
| Online: | www.firstfoundationinc.com | |
| Mailing: | 4A Peninsula Center Rolling Hills Estates, CA 90274 | |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Business Checking | XXXXXXXX0817 | $5,282.82 |

## Business Checking-XXXXXXXX0817

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 03/01/2023 | Beginning Balance | $5,282.82 | Earnings Balance | $0.00 |
| | 0 Credit(s) This Period | $0.00 | | |
| | 0 Debit(s) This Period | $0.00 | | |
| 03/31/2023 | Ending Balance | $5,282.82 | | |

### Daily Balances

| Date | Amount |
|---|---|
| 03/01/2023 | $5,282.82 |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

Member FDIC




<table>
<tr><th colspan="4">CHECKS OUTSTANDING –<br>(CHECKS WRITTEN BUT NOT SHOWN)</th></tr>
<tr><th>CHECK NO.</th><th>AMOUNT</th><th>CHECK NO.</th><th>AMOUNT</th></tr>
</table>

| | | | |
|---|---|---|---|
| CHECK NO. | AMOUNT | CHECK NO. | AMOUNT |
| | | | |

| | |
|---|---|
| BANK BALANCE SHOWN ON THIS STATEMENT | $_____ |
| **ADD +**<br>DEPOSITS AND OTHER AMOUNTS NOT CREDITED ON THIS STATEMENT *(IF ANY)* | $_____ |
| | $_____ |
| **TOTAL** | $_____ |
| **SUBTRACT —**<br>CHECKS OUTSTANDING | $_____ |
| **BALANCE ☆** | $_____ |

☆ SHOULD AGREE WITH YOUR CHECKBOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) ON THIS STATEMENT.

## DEPOSIT ACCOUNT INFORMATION

### (Disregard if you have a Commercial Account)

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Please call or write us at the phone number or address on the front side of this statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Tell us the dollar amount of the suspected error.
3. Describe the error or the transfer you are unsure about and explain, as clearly as you can, why you believe it is an error or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes to complete our investigation.

## LINE OF CREDIT INFORMATION

### (Disregard if you do not have a Line of Credit)

#### HOW INTEREST CHARGES ARE COMPUTED

DAILY BALANCE METHOD (including current transactions).
To get the daily balances we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid INTEREST CHARGES. This gives us the daily balance. Then, we multiply the daily balance each day of the statement period (excluding the last statement date but including the current statement date) by the appropriate daily periodic rates. We then add up all of these daily interest charges to get your total interest charge. Daily periodic rates may vary.

#### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, send your inquiry in writing, on a separate sheet, to the address shown on your statement as soon as possible. We must hear from you no later than 60 days after the bill was mailed to you. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error, and
3. A description of the error and why (to the extent you can explain) you believe it is an error. If you need more information, describe the item you are unsure about.

If you have authorized the Bank to automatically pay your bill from your checking or savings account, you can stop payment on any amount you think is wrong by mailing your notice so that the Bank receives it three (3) business days before the payment is scheduled to occur.

You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amount in dispute during the time the Bank is resolving the dispute. During that same time, the Bank may not take action to collect disputed amounts or report disputed amounts as delinquent.



## FIRST FOUNDATION
## BANK

18101 Von Karman Avenue
Suite 750
Irvine, CA 92612

ADDRESS SERVICE REQUESTED

HAWTHORNE HANGAR MANAGEMENT LLC
909 E GREEN ST
PASADENA CA 91106-2906

*Statement Ending 12/31/2022*

*Page 1 of 2*

### Managing Your Accounts

| | | |
|---|---|---|
| Toll-Free: | (888) 405-4332 | |
| Online: | www.firstfoundationinc.com | |
| Mailing: | 4A Peninsula Center | |
| | Rolling Hills Estates,  CA | |
| | 90274 | |

### Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Business Checking | XXXXXXXX9732 | $1,000.00 |

## Business Checking-XXXXXXXX9732

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 12/01/2022 | Beginning Balance | $1,000.00 | Earnings Balance | $0.00 |
| | 0 Credit(s) This Period | $0.00 | | |
| | 0 Debit(s) This Period | $0.00 | | |
| 12/31/2022 | Ending Balance | $1,000.00 | | |

### Daily Balances

| Date | Amount |
|---|---|
| 12/01/2022 | $1,000.00 |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

Member
FDIC





| CHECKS OUTSTANDING – (CHECKS WRITTEN BUT NOT SHOWN) | | | |
|---|---|---|---|
| CHECK NO. | AMOUNT | CHECK NO. | AMOUNT |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | |
|---|---|
| BANK BALANCE SHOWN ON THIS STATEMENT | $_____ |
| **ADD +** DEPOSITS AND OTHER AMOUNTS NOT CREDITED ON THIS STATEMENT *(IF ANY)* | $_____ $_____ |
| **TOTAL** | $_____ |
| **SUBTRACT –** CHECKS OUTSTANDING | $_____ $_____ |
| **BALANCE ☆** | $_____ |

☆ SHOULD AGREE WITH YOUR CHECKBOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) ON THIS STATEMENT.

## DEPOSIT ACCOUNT INFORMATION

### (Disregard if you have a Commercial Account)

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Please call or write us at the phone number or address on the front side of this statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Tell us the dollar amount of the suspected error.
3. Describe the error or the transfer you are unsure about and explain, as clearly as you can, why you believe it is an error or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes to complete our investigation.

## LINE OF CREDIT INFORMATION

### (Disregard if you do not have a Line of Credit)

#### HOW INTEREST CHARGES ARE COMPUTED

DAILY BALANCE METHOD (including current transactions).
To get the daily balances we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid INTEREST CHARGES. This gives us the daily balance. Then, we multiply the daily balance each day of the statement period (excluding the last statement date but including the current statement date) by the appropriate daily periodic rates. We then add up all of these daily interest charges to get your total interest charge. Daily periodic rates may vary.

#### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, send your inquiry in writing, on a separate sheet, to the address shown on your statement as soon as possible. We must hear from you no later than 60 days after the bill was mailed to you. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error, and
3. A description of the error and why (to the extent you can explain) you believe it is an error. If you need more information, describe the item you are unsure about.

If you have authorized the Bank to automatically pay your bill from your checking or savings account, you can stop payment on any amount you think is wrong by mailing your notice so that the Bank receives it three (3) business days before the payment is scheduled to occur.

You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amount in dispute during the time the Bank is resolving the dispute. During that same time, the Bank may not take action to collect disputed amounts or report disputed amounts as delinquent.

# FIRST FOUNDATION BANK

**18101 Von Karman Avenue**
**Suite 750**
**Irvine, CA 92612**

**ADDRESS SERVICE REQUESTED**

HAWTHORNE HANGAR MANAGEMENT LLC
909 E GREEN ST
PASADENA CA 91106-2906

## Statement Ending 01/31/2023

*Page 1 of 2*

### Managing Your Accounts

| | | |
|---|---|---|
| Toll-Free: | (888) 405-4332 | |
| Online: | www.firstfoundationinc.com | |
| Mailing: | 4A Peninsula Center Rolling Hills Estates, CA 90274 | |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Business Checking | XXXXXXXX9732 | $1,000.00 |

## Business Checking-XXXXXXXX9732

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 01/01/2023 | Beginning Balance | $1,000.00 | Earnings Balance | $0.00 |
| | 0 Credit(s) This Period | $0.00 | | |
| | 0 Debit(s) This Period | $0.00 | | |
| 01/31/2023 | Ending Balance | $1,000.00 | | |

### Daily Balances

| Date | Amount |
|---|---|
| 01/01/2023 | $1,000.00 |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date | Previous year-to-date |
|---|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 | $0.00 |



Member
**FDIC**



| CHECKS OUTSTANDING – (CHECKS WRITTEN BUT NOT SHOWN) | | | | | BANK BALANCE SHOWN ON THIS STATEMENT | $_____ |
|---|---|---|---|---|---|---|
| CHECK NO. | AMOUNT | CHECK NO. | AMOUNT | | ADD + DEPOSITS AND OTHER AMOUNTS NOT CREDITED ON THIS STATEMENT (IF ANY) | $_____ |
| | | | | | | $_____ |
| | | | | | TOTAL | $_____ |
| | | | | | SUBTRACT — CHECKS OUTSTANDING | $_____ |
| | | | | | | $_____ |
| | | | | | BALANCE ☆ | $_____ |

☆ SHOULD AGREE WITH YOUR CHECKBOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) ON THIS STATEMENT.

## DEPOSIT ACCOUNT INFORMATION

### (Disregard if you have a Commercial Account)

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Please call or write us at the phone number or address on the front side of this statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Tell us the dollar amount of the suspected error.
3. Describe the error or the transfer you are unsure about and explain, as clearly as you can, why you believe it is an error or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes to complete our investigation.

## LINE OF CREDIT INFORMATION

### (Disregard if you do not have a Line of Credit)

#### HOW INTEREST CHARGES ARE COMPUTED

DAILY BALANCE METHOD (including current transactions).
To get the daily balances we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid INTEREST CHARGES. This gives us the daily balance. Then, we multiply the daily balance each day of the statement period (excluding the last statement date but including the current statement date) by the appropriate daily periodic rates. We then add up all of these daily interest charges to get your total interest charge. Daily periodic rates may vary.

#### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, send your inquiry in writing, on a separate sheet, to the address shown on your statement as soon as possible. We must hear from you no later than 60 days after the bill was mailed to you. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error, and
3. A description of the error and why (to the extent you can explain) you believe it is an error. If you need more information, describe the item you are unsure about.

If you have authorized the Bank to automatically pay your bill from your checking or savings account, you can stop payment on any amount you think is wrong by mailing your notice so that the Bank receives it three (3) business days before the payment is scheduled to occur.

You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amount in dispute during the time the Bank is resolving the dispute. During that same time, the Bank may not take action to collect disputed amounts or report disputed amounts as delinquent.

# FIRST FOUNDATION BANK

18101 Von Karman Avenue
Suite 750
Irvine, CA 92612

**ADDRESS SERVICE REQUESTED**

HAWTHORNE HANGAR MANAGEMENT LLC
909 E GREEN ST
PASADENA CA 91106-2906

**Statement Ending 02/28/2023**

*Page 1 of 2*

## Managing Your Accounts

| | | |
|---|---|---|
| Toll-Free: | (888) 405-4332 | |
| Online: | www.firstfoundationinc.com | |
| Mailing: | 4A Peninsula Center Rolling Hills Estates,  CA 90274 | |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Business Checking | XXXXXXXX9732 | $1,000.00 |

## Business Checking-XXXXXXXX9732

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 02/01/2023 | Beginning Balance | $1,000.00 | Earnings Balance | $0.00 |
| | 0 Credit(s) This Period | $0.00 | | |
| | 0 Debit(s) This Period | $0.00 | | |
| 02/28/2023 | **Ending Balance** | **$1,000.00** | | |

### Daily Balances

| Date | Amount |
|---|---|
| 02/01/2023 | $1,000.00 |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date | Previous year-to-date |
|---|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 | $0.00 |



Member
FDIC



| CHECKS OUTSTANDING –<br>(CHECKS WRITTEN BUT NOT SHOWN) | | | | | BANK BALANCE SHOWN<br>ON THIS STATEMENT | $ |
|---|---|---|---|---|---|---|
| CHECK<br>NO. | AMOUNT | CHECK<br>NO. | AMOUNT | | ADD +<br>DEPOSITS AND OTHER<br>AMOUNTS NOT CREDITED<br>ON THIS STATEMENT<br>(IF ANY) | $ |
| | | | | | | $ |
| | | | | | TOTAL | $ |
| | | | | | SUBTRACT — | $ |
| | | | | | CHECKS<br>OUTSTANDING | $ |
| | | | | | BALANCE ☆ | $ |

☆ SHOULD AGREE WITH YOUR CHECKBOOK
BALANCE AFTER DEDUCTING SERVICE
CHARGE (IF ANY) ON THIS STATEMENT.

## DEPOSIT ACCOUNT INFORMATION

### (Disregard if you have a Commercial Account)

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Please call or write us at the phone number or address on the front side of this statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Tell us the dollar amount of the suspected error.
3. Describe the error or the transfer you are unsure about and explain, as clearly as you can, why you believe it is an error or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes to complete our investigation.

## LINE OF CREDIT INFORMATION

### (Disregard if you do not have a Line of Credit)

#### HOW INTEREST CHARGES ARE COMPUTED

DAILY BALANCE METHOD (Including current transactions).
To get the daily balances we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid INTEREST CHARGES. This gives us the daily balance. Then, we multiply the daily balance each day of the statement period (excluding the last statement date but including the current statement date) by the appropriate daily periodic rates. We then add up all of these daily interest charges to get your total interest charge. Daily periodic rates may vary.

#### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, send your inquiry in writing, on a separate sheet, to the address shown on your statement as soon as possible. We must hear from you no later than 60 days after the bill was mailed to you. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error, and
3. A description of the error and why (to the extent you can explain) you believe it is an error. If you need more information, describe the item you are unsure about.

If you have authorized the Bank to automatically pay your bill from your checking or savings account, you can stop payment on any amount you think is wrong by mailing your notice so that the Bank receives it three (3) business days before the payment is scheduled to occur.

You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amount in dispute during the time the Bank is resolving the dispute. During that same time, the Bank may not take action to collect disputed amounts or report disputed amounts as delinquent.



# FIRST FOUNDATION BANK

18101 Von Karman Avenue
Suite 750
Irvine, CA 92612

ADDRESS SERVICE REQUESTED

HAWTHORNE HANGAR MANAGEMENT LLC
909 E GREEN ST
PASADENA CA 91106-2906

**Statement Ending 03/31/2023**

Page 1 of 2

### Managing Your Accounts

| | | |
|---|---|---|
| Toll-Free: | (888) 405-4332 | |
| Online: | www.firstfoundationinc.com | |
| Mailing: | 4A Peninsula Center<br>Rolling Hills Estates,  CA<br>90274 | |

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| Business Checking | XXXXXXXX9732 | $1,000.00 |

## Business Checking-XXXXXXXX9732

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 03/01/2023 | Beginning Balance | $1,000.00 | Earnings Balance | $0.00 |
| | 0 Credit(s) This Period | $0.00 | | |
| | 0 Debit(s) This Period | $0.00 | | |
| 03/31/2023 | Ending Balance | $1,000.00 | | |

### Daily Balances

| Date | Amount |
|---|---|
| 03/01/2023 | $1,000.00 |

### Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |



Member
FDIC



EQUAL HOUSING
LENDER

| CHECKS OUTSTANDING – (CHECKS WRITTEN BUT NOT SHOWN) | | | | |
|---|---|---|---|---|
| CHECK NO. | AMOUNT | | CHECK NO. | AMOUNT |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | |
|---|---|
| BANK BALANCE SHOWN ON THIS STATEMENT | $_____ |
| ADD + DEPOSITS AND OTHER AMOUNTS NOT CREDITED ON THIS STATEMENT (IF ANY) | $_____ |
| | $_____ |
| TOTAL | $_____ |
| SUBTRACT — CHECKS OUTSTANDING | $_____ |
| | $_____ |
| BALANCE ☆ | $_____ |

☆ SHOULD AGREE WITH YOUR CHECKBOOK BALANCE AFTER DEDUCTING SERVICE CHARGE (IF ANY) ON THIS STATEMENT.

## DEPOSIT ACCOUNT INFORMATION

### (Disregard if you have a Commercial Account)

#### IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS

Please call or write us at the phone number or address on the front side of this statement as soon as you can if you think your statement or receipt is wrong or if you need more information about a transfer or receipt. We must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

1. Tell us your name and account number.
2. Tell us the dollar amount of the suspected error.
3. Describe the error or the transfer you are unsure about and explain, as clearly as you can, why you believe it is an error or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes to complete our investigation.

## LINE OF CREDIT INFORMATION

### (Disregard if you do not have a Line of Credit)

#### HOW INTEREST CHARGES ARE COMPUTED

DAILY BALANCE METHOD (including current transactions).
To get the daily balances we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid INTEREST CHARGES. This gives us the daily balance. Then, we multiply the daily balance each day of the statement period (excluding the last statement date but including the current statement date) by the appropriate daily periodic rates. We then add up all of these daily interest charges to get your total interest charge. Daily periodic rates may vary.

#### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, send your inquiry in writing, on a separate sheet, to the address shown on your statement as soon as possible. We must hear from you no later than 60 days after the bill was mailed to you. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error, and
3. A description of the error and why (to the extent you can explain) you believe it is an error. If you need more information, describe the item you are unsure about.

If you have authorized the Bank to automatically pay your bill from your checking or savings account, you can stop payment on any amount you think is wrong by mailing your notice so that the Bank receives it three (3) business days before the payment is scheduled to occur.

You remain obligated to pay the parts of your bill not in dispute, but you do not have to pay any amount in dispute during the time the Bank is resolving the dispute. During that same time, the Bank may not take action to collect disputed amounts or report disputed amounts as delinquent.

# ATTACHMENT NO. 2

Electronically FILED by Superior Court of California, County of Los Angeles on 07/21/2022 10:31 AM Sherri R. Carter, Executive Officer/Clerk of Court, by N. Alvarez,Deputy Clerk
22STCV23548

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Thomas Long

**PLD-C-001**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| MARTIN B. GREENBAUM          SBN: 45268<br>Greenbaum Law Group LLP<br>160 Newport Center Drive, Suite 110, Newport Beach, CA 92660<br>TELEPHONE NO: 949-760-1400    FAX NO. *(Optional):* 949-760-1300<br>E-MAIL ADDRESS *(Optional):* mgreenbaum@collectionlaw.com<br>ATTORNEY FOR *(Name):* MESSINA & HANKIN, LLP | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk Courthouse

PLAINTIFF: MESSINA & HANKIN, LLP

DEFENDANT: DAN WOLFE; DAN WOLFE, as Trustee of the Wolfe Family Trust of 1992;
WOLFE AIR AVIATION, LTD., a California Corporation; HAWTHORNE HANGAR OPERATIONS,
L.P. and
[X] DOES 1 TO 50, INCLUSIVE

| CONTRACT | |
|---|---|
| [X] COMPLAINT | [ ] AMENDED COMPLAINT *(Number):* |
| [ ] CROSS-COMPLAINT | [ ] AMENDED CROSS-COMPLAINT *(Number):* |

Jurisdiction *(check all that apply):*
[ ] ACTION IS A LIMITED CIVIL CASE
Amount demanded [ ] does not exceed $10,000
[ ] exceeds $10,000 but does not exceed $25,000
[X] ACTION IS AN UNLIMITED CIVIL CASE (exceeds $25,000)
[ ] ACTION IS RECLASSIFIED by this amended complaint or cross-complaint
[ ] from limited to unlimited
[ ] from unlimited to limited

CASE NUMBER:
22STCV23548

1. Plaintiff* *(name or names):* MESSINA & HANKIN, LLP

   alleges causes of action against defendant* *(name or names):* DAN WOLFE; DAN WOLFE, as Trustee of the Wolfe Family Trust of
   1992; WOLFE AIR AVIATION, LTD., a California Corporation; HAWTHORNE HANGAR OPERATIONS, L.P. and DOES
2. This pleading, including attachments and exhibits, consists of the following number of pages:
3. a. Each plaintiff named above is a competent adult
   [X] except plaintiff *(name):* MESSINA & HANKIN, LLP
     (1) [ ] a corporation qualified to do business in California
     (2) [ ] an unincorporated entity *(describe):*
     (3) [X] other *(specify):* a Limited Liability Partnership

   b. [ ] Plaintiff *(name):*
     a. [ ] has complied with the fictitious business name laws and is doing business under the fictitious name *(specify):*

     b. [ ] has complied with all licensing requirements as a licensed *(specify):*
   c. [ ] Information about additional plaintiffs who are not competent adults is shown in Attachment 3c.
4. a. Each defendant named above is a natural person
   [X] except defendant *(name):* WOLFE AIR AVIATION, LTD.    [X] except defendant *(name):* HAWTHORNE HANGAR
     (1) [ ] a business organization, form unknown      (1) [ ] a business organization, form unknown OPERATIONS, L.P.
     (2) [X] a corporation                (2) [ ] a corporation
     (3) [ ] an unincorporated entity *(describe):*        (3) [ ] an unincorporated entity *(describe):*
     (4) [ ] a public entity *(describe):*          (4) [ ] a public entity *(describe):*
     (5) [ ] other *(specify):*            (5) [X] other *(specify):* Limited Partnership

Form Approved for Optional Use<br>Judicial Council of California<br>PLD-C-001 [Rev. January 1, 2007]

* If this form is used as a cross-complaint, plaintiff means cross-complainant and defendant means cross-defendant.

**COMPLAINT—Contract**

Page 1 of 2

Code of Civil Procedure, § 425.12<br>Westlaw Doc & Form Builder

1   Guy E. Jamison, State Bar Number 183777
**THE JAMISON LAW FIRM, PC**
2   **A PROFESSIONAL LAW CORPORATION**
301 E. Colorado Blvd., Suite 510
3   Pasadena, California 91101
TELE (626) 356-7902
4   guyjamison@jamisonlaw.com

5   Attorneys for Plaintiffs Hawthorne Hangar Operations, L.P.,
Dan Wolfe, as an individual and as Trustee of the Wolfe Family Trust of 1992
6

7                  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                  **COUNTY OF LOS ANGELES – CENTRAL**

9

10  HAWTHORNE HANGAR OPERATIONS,      )   **CASE NO: 21STCV39700**
    L.P. a California Limited Partnership; DAN  )
    WOLFE, an individual; DAN WOLFE, Trustee  )
11  of the WOLFE FAMILY TRUST of 1992,   )   **[UNLIMITED OVER $25,000.00]**
                                         )
12                                       )
                                         )
13          Plaintiffs,                  )   **VERIFIED SECOND AMENDED**
                                         )   **COMPLAINT FOR:**
14      vs.                              )
                                         )   **1.  FRAUD AND DECEIT**
15  PRODUCTION CAPITAL, LLC, a California )   **2.  BREACH OF FIDUCIARY DUTY**
    Limited Liability Company; REMINGTON )   **3.  CONVERSION**
16  CHASE, an individual; KEVIN ROBL, an )   **4.  REFORMATION**
    individual; GRAND PACIFIC FINANCING  )   **5.  BREACH OF CONTRACT**
17  CORPORATION, INC., a California      )   **6.  VIOLATION OF BUSINESS AND**
    Corporation; FAISAL GILL, an individual; )       **PROFESSIONS CODE §17200 et seq.**
18  GILL LAW FIRM, an unknown business entity; )  **7.  DECLARATORY RELIEF**
    PAUL SALVAIL, an individual; ABID RAZA, )  **8.  PROFESSIONAL MALPRACTICE**
19  an individual; SCIMITAR CAPITAL      )   **9.  FRAUD AND DECEIT**
    PARTNERS, LLC, a Connecticut Limited )   **10. FRAUD AND DECEIT**
20  Liability Company; ALL PERSONS       )   **11. NEGLIGENT**
    UNKNOWN, CLAIMING ANY LEGAL OR       )   **MISREPRESENTATION**
21  EQUITABLE RIGHT, TITLE, ESTATE, LIEN )
    OR INTEREST IN THE HAWTHORNE         )
22  HANGAR PROPERTY OR ANY PORTION       )
    OF SAID REAL PROPERTY DESCRIBED      )
23  HEREIN ADVERSE TO PLAINTIFF'S TITLE  )
    OR ANY CLOUD ON PLAINTIFF'S TITLE    )
24  THERETO and DOES 1 through 10 inclusive, )
                                         )
25          Defendants.                  )
    _____ )
26

27  _____

28                  SECOND AMENDED COMPLAINT

1  RICHARD T. BAUM
   State Bar No. 80889
2  6627 Maryland Drive
   Los Angeles, California  90048
3
   Tel:   (310) 277-2040
4  Fax:   (310) 286-9525

5  [Proposed] Attorney for Debtor HAWTHORNE
   HANGAR OPERATIONS, L.P.
6

7              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                       **COUNTY OF LOS ANGELES**

9

10  DAVID WEHRLY,                    )    No.  21STCP00556
                                     )
11          Plaintiff,               )    **NOTICE OF FILING OF**
                                     )    **BANKRUPTCY BY HAWTHORNE**
12          v                        )    **HANGAR OPERATIONS, L.P.**
                                     )
13  HAWTHORNE HANGAR OPERATIONS,)
    L.P., et al.,                    )
14                                   )
                                     )
15          Defendants.              )
                                     )
16  _____)

17       **TO ALL PARTIES:**

18       **NOTICE IS HEREBY GIVEN** that on March 26, 2023, Defendant herein

19  HAWTHORNE HANGAR OPERATIONS, L.P. filed a petition for relief under Chapter 11

20  of the United States Bankruptcy Code in the United States Bankruptcy Court for the

21  Central District of California, Los Angeles Division, Case No. 2:23-bk-11789.  Pursuant to

22  Bankruptcy Code § 362(a) [11 USC § 362(a)], all actions to enforce a claim arising prior

23  to the petition date are automatically stayed.  Knowing violation of the Automatic Stay can

24  be punishable as a contempt of court and enforcement can include monetary and other

25  sanctions imposed by the Bankruptcy Court.

26  DATED: March 26, 2023          /s/ Richard T. Baum
                                   _____
27                                 RICHARD T. BAUM, [Proposed] Attorney for
                                   Debtor HAWTHORNE HANGAR
28                                 OPERATIONS, L.P.

_____
                       **NOTICE OF FILING OF BANKRUPTCY**

Electronically FILED by Superior Court of California, County of Los Angeles on 08/21/2020 06:20 PM Sherri R. Carter, Executive Officer/Clerk of Court, by N. Alvarez,Deputy Clerk
20STCV32017

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Susan Bryant-Deason

1    Ernest J. Franceschi, Jr. (State Bar No. 112893)
     FRANCESCHI LAW CORPORATION
2    4640 Admiralty Way, 5th Floor
     Marina del Rey, California 90292
3    Telephone: (213) 622-0835
     Facsimile: (213) 622-0837
4    Email: ejf@franceschilaw.com

5    Attorney for Plaintiff
     DAN WOLFE

6

7

8        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9       **FOR THE COUNTY OF LOS ANGELES–CENTRAL DISTRICT**

10

11    DAN WOLFE, an individual,     )    CASE NO.    20STCV32017

12            Plaintiff,           )

13       vs.                 )    **COMPLAINT FOR DAMAGES AND
                                )    DECLARATORY RELIEF [LEGAL
                                )    MALPRACTICE; BREACH OF**

14                                   )    **FIDUCIARY DUTY]**

15    S. KEVEN STEINBERG, an individual )
     dba STEINBERG LAW; and DOES 1    )    **DEMAND FOR TRIAL BY JURY**
     through 10, Inclusive,          )

16                                   )

17            Defendants.       )

18                                   )

19        COMES NOW Plaintiff DAN WOLFE  and for cause of action against

20    Defendants, and each of them, complains and alleges as follows:

21                       <u>**GENERAL ALLEGATION**</u>

22        1.     That at all times mentioned herein, Plaintiff DAN WOLFE  was and

23    now is an individual residing in the State of California in the County of Los Angeles.

24        2.     That at all times mentioned herein, Defendant S. KEVEN STEINBERG

25    was and now is an individual residing in the state of California, County of Los

26    Angeles and was and is now an attorney at law licensed to practice in the State of

27    California.

28        3.     That at all times mentioned herein, Defendant S. KEVEN STEINBERG

<div align="center">1</div>

<div align="center">COMPLAINT FOR DAMAGES  LEGAL MALPRACTICE BREACH OF FIDUCIARY DUTY</div>

MICHAEL McCARTHY(89588)
KENNY C. BROOKS (254842)
**NEMECEK & COLE**
A Professional Corporation
16255 Ventura Boulevard, Suite 300
Encino, California 91436-2300
Tel: (818) 788-9500 / Fax: (818) 501-0328

Attorneys for Plaintiff
STEINBERG LAW

NEMECEK & COLE
A PROFESSIONAL CORPORATION
16255 VENTURA BOULEVARD, SUITE 300, ENCINO, CALIFORNIA 91436-2300
TELEPHONE (818) 788-9500 FACSIMILE (818) 501-0328

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT**

DAN WOLFE, an individual,

Plaintiff,

v.

S. KEVEN STEINBERG, an individual, dba STEINBERG LAW; and DOES 1 through 10, inclusive,

Defendants.

---

STEINBERG LAW, a California corporation,

Plaintiff,

v.

DANIEL ELLIS WOLFE, an individual aka DANIEL E. WOLFE aka DAN WOLFE and aka DAN E. WOLFE; HAWTHORNE HANGAR OPERATIONS, L.P., a California limited partnership; WOLFE AIR AVIATION, LTD., a California corporation; FLEET UNLIMITED, INC., a California corporation; DANIEL ELLIS WOLFE, an individual aka DANIEL E. WOLFE aka DAN WOLFE aka DAN E. WOLFE, Trustee of the Wolfe Family Trust of 1992; and DOES 1 through 100, inclusive,

Defendants.

Case No. 20STCV32017 [Lead Case]
Related to Case No. 21GDCV00232

[Assigned to Hon. Armen Tamzarian; Dept. 52]

**NOTICE OF RULING RE: APPLICATIONS FOR RIGHT TO ATTACH ORDERS**

# ATTACHMENT NO. 3

# United States Bankruptcy Court
## Central District of California, Los Angeles Division

In re   Hawthorne Hangar Operations, L.P.

Debtor(s)

Case No.
Chapter   11

## LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with rule 1007(a)(3) for filing in this Chapter 11 Case

| Name and last known address or place of business of holder | Security Class | Number of Securities | Kind of Interest |
|---|---|---|---|
| Biron 2009 Trust<br>Linda Biron, Trustee<br>4316 Marina City Dr Unit 101<br>Marina del Rey, CA 90292-5832 | Limited Partner | 2.5 | |
| C. Anthony Phillips Trust<br>C. Anthony Phillips, Trustee<br>909 E Green St<br>Pasadena, CA 91106-2906 | Limited Partner | 6 | |
| Dan Wolfe<br>390 Patrician Way<br>Pasadena, CA 91105-1028 | Limited Partner | 29.5 | |
| E.A. Levi Family Trust<br>Alain Levi, Trustee<br>1724 Tangiers Dr<br>Henderson, NV 89012-7238 | Limited Partner | 2 | |
| Hawthorne Hangar Management, LLC<br>125 N Raymond Ave Unit 413<br>Pasadena, CA 91103-4537 | General Partner | 1 | |
| Star Helicopters, LLC<br>3670 W 120th St<br>Hawthorne, CA 90250-3245 | Limited Partner | 1 | |
| Stephen A. Forte<br>3410 Manhattan Ave<br>Manhattan Beach, CA 90266-3345 | Limited Partner | 4 | |
| Storm Bartling Trust<br>Storn Bartling, Trustee<br>909 E Green St<br>Pasadena, CA 91106-2906 | Limited Partner | 2 | |
| Top Gun, Ltd.,<br>4640 Admiralty Way Fl 5<br>Marina del Rey, CA 90292-6636 | Limited Partner | 4 | |
| Wolfe Family Trust<br>Dan Wolfe, Trustee<br>125 N Raymond Ave Unit 413<br>Pasadena, CA 91103-4537 | Limited Partner | 48 | |

Sheet 1 of 2 in List of Equity Security Holders

Software Copyright (c) 2023 CINGroup - www.cincompass.com

# ATTACHMENT NO. 4

## HAWTHORNE HANGAR OPERATIONS – LEASE AGREEMENT

THIS LEASE is entered into on June 15, 2017, by and between HAWTHORNE HANGAR OPERATIONS, LP, A California Limited Partnership, (referred to in this lease as "Landlord") and TESLA INC., a Delaware Corporation, (referred to in this lease as "Tenant").

Landlord hereby leases to Tenant on the terms and conditions set forth in this lease a portion of the Landlord's Hawthorne Hangar Operations, located at 3507 Jack Northrop Avenue, Hawthorne, California 90250 (the "Property"), which portion is described as follows: (a) the 10,000 square foot warehouse building located to the east of the Landlord's large hangar, to the south of the Landlord's Fuel Farm, (b) the entire parking lot adjacent to the 10,000 square foot building laid out with approximately 39 parking spaces, and (c) another blacktop area at the south perimeter of the building (1,017 square feet), connecting the premises to Century Business Park, currently laid out with 5 additional parking spaces, all three of which are referred to herein as the "Leased Premises" or the "Premises." The Leased area comprises 28.5% of the Landlord's overall deeded land footprint. The Premises are depicted on the survey attached as Exhibit C.

## TERM OF LEASE

### Term

Section 1.01. The term of this lease shall be for a period of Five years commencing at 12:01 A.M. on June 15, 2017, and ending at 12:01 A.M. on June 14, 2022, ("Lease Term") unless terminated sooner as provided in this lease.

### Holding Over

Section 1.02. If Tenant holds over and continues in possession of the Premises after termination of the term of this lease, including any extended term, Tenant's continued occupancy of the Premises shall be deemed a tenancy from month-to-month, subject to all the terms and conditions, contained in this lease.

## RENT AND TAXES

Section 2.01. (a) Tenant agrees to pay to Landlord rent in the following amounts:

### (1) Base Rent

Base rent in the amount of $16,000 per month in advance, on or before the first day of every calendar month during the Lease Term, without any prior demand, abatement, setoff, or deduction, except as expressly set forth in this Lease. Tenant shall pay all rent without deduction, except as expressly set forth in this Lease, to Landlord at the address set forth in this lease for mailing notices to Landlord, or at any other place or places that Landlord may from time to time designate by written notice given to Tenant not less than thirty (30) days in advance.

### (2) Annual CPI Adjustment

Beginning on the first anniversary of the lease commencement date set forth in Section 1.01, and on each successive anniversary thereafter during the Lease Term (Adjustment Date), Base Rent shall be increased by the lesser of (a) three (3%) and (b) one-hundred percent (100%) of the percentage of increase, if any, shown by the Consumer Price Index for All Urban Consumers U.S. City Average, All Items (base years 1982–1984 = 100) (Index), published by the United States Department of Labor, Bureau of Labor Statistics, for the month immediately preceding the Adjustment Date as compared with the Index for the

same month in the immediately preceding calendar year.    Landlord shall calculate the amount of this increase in Base Rent after the United States Department of Labor publishes the statistics on which the amount of the increase will be based. Landlord shall give written notice of the amount of the increase, multiplied by the number of installments of rent due under this Lease since the Adjustment Date. Tenant shall pay this amount, together with the monthly rent next becoming due under this Lease, and shall thereafter pay the monthly rent due under this Lease at this increased rate, which shall constitute Base Rent. Landlord's failure to make the required calculations promptly shall not be considered a waiver of Landlord's rights to adjust the monthly Base Rent due at some later point, nor shall it affect Tenant's obligations to pay the increased Base Rent once Landlord has calculate the amount and communicated the same to Tenant. If the Index is changed so that the base year differs from that in effect on the Lease Commencement Date, the Index shall be converted in accordance with the conversion factor published by the United States Department of Labor, Bureau of Labor Statistics. If the Index is discontinued or revised during the Lease Term, the government index or computation with which it is replaced shall be used to obtain substantially the same result as if the Index had not been discontinued or revised.  The base rent in effect before the adjustment shall not be decreased as a result of any adjustment.

## Initial Payment/Proration

Section 2.02  The Base Rent for the first full calendar month of the Lease Term shall be paid when Tenant executes this Lease. If any Rent payment is for a period shorter than one calendar month, the Rent for that fractional calendar month shall accrue on a daily basis for each day of that fractional month at a daily rate equal to 1/30 of the total monthly Rent. All other payments or adjustments that are required to be made under the terms of this Lease and that require proration on a time basis shall be prorated on the same basis.

## Real Property Taxes

Section 2.03.   (a) In addition to the rent specified in Section 2.01 of this Lease, Tenant shall pay all Real Property Taxes levied or assessed against the Leased Premises during the term of this lease. "Real Property Taxes" means real estate taxes on the Property, including general and special assessment imposed on the Property as a whole, but excluding any special assessment for the direct benefit of Landlord or any other portion of the Property not including the Lease Premises.
(b) Tenant's obligation to pay all Real Property Taxes on the Leased Premises shall also include the obligation to pay any increases in Real Property Taxes, whether the increase results from an increase in the property tax rate and/or increase in the valuation of the Leased Premises.
(c) The Leased Premises are assessed and taxed as part of a larger parcel of real property owned by Landlord (referred to in this Lease as the "Tax Parcel").  The amount payable under this section by Tenant shall be the portion of the tax bill for the Tax Parcel that bears the same ratio to the total tax bill for the Tax Parcel as the value of the Leased Premises bears to the value of the entire Tax Parcel.  Landlord and Tenant agree that the applicable ratio is 28.5 Percent and that Tenant shall pay 28.5 Percent of the tax bill for the Tax Parcel.
(d) The taxes and assessments levied against the Leased Premises during the first and last years of the term of this lease shall be prorated between Landlord and Tenant for purposes of this section as of 12:01 A.M. on date of commencement and termination respectively of this Lease.
(e)  Tenant shall not be required to pay any estate, gift, inheritance, succession, transfer, franchise, income, or other taxes of a similar nature that may be payable by Landlord or Landlord's legal representative, successors, or assigns. Tenant also shall not be required to pay any tax that might become due on account of Landlord's ownership of property other than the Leased Property, notwithstanding that tax may become a lien on the Leased Property or be collectible from it.

(f) Tenant shall have the right, at Tenant's sole cost and expense, to protest or contest in good faith the amount of any tax or assessment or to defer payment of the tax or assessment until final determination of the issue. On final determination, Tenant shall immediately pay the amount of the judgment rendered and all costs, charges, interest, and related penalties. The right granted to Tenant in this section is conditioned on the following: Before any contest and prior to any delinquency, Tenant shall deposit with Landlord the full amount of the tax or assessment, plus the amount of penalty that will be imposed on the Leased Premises for failure to pay the tax or assessment before it became delinquent.

## Security Deposit

Section 2.04    Concurrently with Tenant's execution of this Lease, Tenant shall deposit with Landlord a cash sum in the amount of $16,000 (Security Deposit).  Landlord shall hold the Security Deposit as security for the performance of Tenant's obligations under this Lease. The Security Deposit is not an advance payment of Rent or a measure or limit of Tenant's liability for damages. Landlord shall not be required to keep any cash Security Deposit separate from its other accounts. If Tenant defaults on any provision of this Lease beyond applicable notice and cure periods, Landlord may (but shall not be required to), without prejudice to any other remedy it has, apply all or part of the Security Deposit to:
   (a) Any Rent or other sum in default;

   (b) Any expense, loss, or damage that Landlord has suffered or may suffer because of Tenant's default.

   Tenant waives the provisions of California Civil Code §1950.7, and all other provisions of law now in force or that become in force after the date of execution of this Lease, that provide that Landlord may claim from a security deposit only those sums reasonably necessary to remedy defaults in the payment of accrued Rent, to repair damage caused by Tenant, or to clean the Premises. Landlord and Tenant agree that Landlord may, in addition, claim those sums reasonably necessary to compensate Landlord for any other foreseeable or unforeseeable loss or damage caused by the act or omission of Tenant or Tenant's officers, agents, employees, independent contractors, or invitees, including future rent payments.

## REPAIRS AND MAINTENANCE

### Present Condition of Premises

Section 3.01. Tenant has inspected the Premises and accepts the present condition of the Premises as is, subject only to the following representations and warranties: (i) Landlord owns the Premises in fee simple, and ii) to Landlord's knowledge, (a) the Premises is free and clear of hazardous materials, , (b) the Premises is structurally sound and watertight, (c) the roof is free of leaks, and (d) any HVAC systems, fire suppression systems, lighting systems, electrical systems, plumbing systems or other mechanical and building systems (collectively, "Building Systems") existing of the date of this Lease and serving the Leased Premises are in operable condition.    The bathrooms are partially operable, but are old and in need of replacement or upgrading.  There is no HVAC.

### Repairs by Landlord

Section 3.02. Landlord shall at Landlord's sole cost and expense, maintain, repair and, as necessary, replace, the structural elements of the Premises (including the structural elements of the roof, roof membrane, the slab, the foundation and the exterior walls of the Premises).
The Property is part of the Century Business Center, which maintains common area within the Center for common use by all owners and occupants of the Property.  Landlord will use commercially reasonable efforts to cause the Century Business Center to maintain and repair such common area.

Notwithstanding anything to the contrary contained in this Lease, Landlord shall not be liable to Tenant for failure to make repairs or replacements as herein specifically required unless Tenant has previously notified Landlord, in writing, of the need for such repairs or replacements and Landlord has failed to commence said repairs or replacements within five (5) days following receipt of Tenant's written notification and thereafter diligently pursue same to completion. In an emergency, Tenant may undertake immediate repairs which would be Landlord's responsibility and notify Landlord promptly after such repairs have been undertaken. If Landlord fails to perform its obligations within five (5) days after receiving such notice, or if Tenant undertakes emergency repairs, Tenant may perform the repairs or maintenance and Landlord shall reimburse Tenant for the costs so incurred within thirty (30) days after notice, which notice shall be accompanied by paid receipts. If Landlord fails to timely reimburse Tenant, then in addition to any other remedies available to Tenant, Tenant may offset the amount (together with interest at the highest interest rate permitted by law) against subsequent installments of Rent.

## Repairs by Tenant

Section 3.03. Tenant shall, at Tenant's own cost and expense, during the term of this lease or any extension of the term of this lease:

(a) Keep and maintain the Premises in good order, repair, and tenantable condition, including parking lot paving, building doors, and glazing in good order and repair, subject to reasonable wear and tear, damage from casualty and condemnation; and

(b) Regularly employ a heating and air conditioning maintenance firm to service and maintain, except for major repairs and replacements, the heating and air conditioning system on the Premises in good working order.

## Tenant Alterations

Section 3.04. Subject to the provisions of Section 3.06 of this lease, Tenant may make nonstructural alterations or improvements to the interior of the building deemed necessary by Tenant for Tenant's business without Landlord's approval, provided that Tenant notifies Landlord in writing at least three days before the date construction for alterations or improvements is to commence so that Landlord may post and record a notice of nonresponsibility, and further provided that all construction complies with the requirements of all appropriate government agencies. Before making any nonstructural alterations or improvements to the interior of the building that are estimated to exceed in cost the sum of $50,000 or any structural alterations or improvements to the interior of the building or any alterations or improvements to the exterior of the Building or before constructing any new improvements on the Premises, Tenant shall submit to and obtain Landlord's written approval on final construction plans and specifications for the alterations or improvements. Landlord shall not unreasonably withhold approval. Landlord shall respond to any request for approval from Tenant within ten (10) business days, and Landlord's failure to respond shall be deemed its approval of such alterations by Tenant. All improvements or alterations made by Tenant on the Premises shall comply with the requirements of any federal, state, or municipal authority having jurisdiction.

## Tenant Improvements and Trade Fixtures

Section 3.05. (a) Any alterations, improvements, or installations (other than Tenant's trade fixtures and personal property) made by Tenant to the Premises shall at the expiration or early termination of this Lease become a part of the realty and belong to Landlord. On expiration or earlier termination of this

lease, Tenant shall surrender the Premises and all improvements thereon (but expressly excluding Tenant's trade fixtures and personal property) to Landlord in good, sanitary, and neat order, condition, and repair, excluding ordinary wear and tear.

(b)  Tenant shall have the right to remove its trade fixtures from the Premises at any time provided that Tenant shall repair any damage to the Premises caused by that removal.

### Liens

Section 3.06. (a) Tenant agrees to keep all of the Premises and every part thereof and the building and other improvements at any time located on the Premises free and clear of any and all mechanics', materialmen's, and other liens for or arising out of or in connection with work or labor done, services performed, or materials or appliances used or furnished for or in connection with any operations of Tenant, any alteration, improvement, or repairs or additions that Tenant may make or permit or cause to be made, or any work or construction by, for, or permitted by Tenant on or about the premises, or any obligations of any kind incurred by Tenant. Tenant further agrees to pay promptly and fully and discharge any and all claims on which any such lien may or could be based, and to save and hold Landlord and all of the Premises and the building and any other improvements on the Premises free and harmless from any and all such liens and claims of liens and suits or other proceedings pertaining thereto.

(b)  If Tenant desires to contest any such lien, it shall notify Landlord of its intention so to do within 10 days after the filing of that lien. In such a case, and provided that Tenant on demand of Landlord protects Landlord by a good and sufficient surety bond against any such lien and any costs, liability, or damage arising out of that contest, Tenant shall not be in default hereunder until five days after the final determination of the validity thereof, within which time Tenant shall satisfy and discharge that lien to the extent held valid. The satisfaction and discharge of any such lien shall not, in any case, be delayed until execution is had on any judgment rendered on the lien, and that delay shall be a default of Tenant under this lease. In the event of any such contest Tenant shall protect and indemnify Landlord against all loss, cost, expense, and damage resulting from the contest.

### Landlord's Right of Inspection

Section 3.07. Landlord or Landlord's duly authorized agents may enter the Premises at any and all reasonable times during the term of this lease, including any extended term, upon not less than twenty-four (24) hours prior written notice to determine whether Tenant is complying with the terms and conditions of this lease or to perform any other acts authorized by this lease to be performed by Landlord or reasonably necessary to protect Landlord's rights under this lease. Landlord shall cause all such access to be at such times and for such periods as to limit interruption to Tenant's business. In connection with any entry by Landlord, (a) Landlord agrees to collect a duly executed non-disclosure agreement on Tenant's then-current form before permitting any third party (person or entity) to enter the Premises, (b) Tenant may deny access to the Premises to third parties if Tenant determines in its sole, but reasonable discretion that allowing the third party potential exposure to Tenant's proprietary and confidential information within the Premises would be detrimental to Tenant's business interests, and (c) Landlord and any other party will enter the Premises only when accompanied by a representative of Tenant and only in compliance with Tenant's security programs and confidentiality requirements.

### Surrender of Premises

Section 3.08. On expiration or earlier termination of this lease, Tenant shall promptly surrender possession of the Premises to Landlord in as good condition as the Premises are on the date of this lease, reasonable wear and tear, damage by casualty and condemnation excepted.

**USE OF PREMISES**

### Permitted and Prohibited Use of Premises

Section 4.01. Tenant shall use the Premises for any lawful use, including, for office uses and for the conduct of its design business and for no other purpose without the written consent of Landlord. Landlord shall not unreasonably withhold consent. Under no circumstances during the term of this lease shall Tenant use or cause to be used in the business operated on the Premises any hazardous or toxic substances or materials, or store or dispose of any such substances or materials on the Premises, provided, that the same shall not limit Tenant's right to use and manipulate its products.

### Compliance With Laws, Airport Rules and Landlord's TTF

Section 4.02. The Premises shall not be used or permitted by Tenant to be used in violation of any law, ordinance, covenant or rule applicable to the Premises.  Tenant shall maintain the Premises in a clean and sanitary manner and shall comply with:

(a)  All laws, ordinances, rules, and regulations related to Tenant's specific use of the Premises, now in effect or subsequently enacted or promulgated by any public or governmental authority or agency having jurisdiction over the Premises (and specifically excluding any such laws and requirements which would pertain to any lawful use and occupancy of the Premises in contrast to Tenant's specific use); and

(b)  Recorded restrictions governing the industrial park, Century Business Center, in which the Premises are located, as amended from time to time.

(c)  The Leased Premises is directly adjacent to Hawthorne Municipal Airport and the Landlord is an FAA Through the Fence operator. Tenant is not being granted airport rights by this Lease, but must be aware of and comply with all requirements of the Hawthorne Municipal Airport Rules and Regulations and Landlord's Through the Fence Agreement with the FAA and the City of Hawthorne.  Copies of the Rules and Regulations and the pertinent sections of the TTF are attached as Exhibits A and B.  The full TTF agreement is available upon request.

### Signs

Section 4.03. Tenant may erect and maintain any signs on the Premises relating to Tenant's business on the Premises, provided the signs so erected:

(a)  Comply with the rules and regulations of the architectural or other committee of the industrial park having jurisdiction over such matters in which the Premises are located;

(b)  Are removed at the sole cost and expenses of Tenant without damage to any building on the Premises or to the Premises on expiration or sooner termination of this lease;

(c)  Are erected by Tenant and not by some other person on space leased by Tenant without Landlord's written consent to some other person for advertising purposes; and

(d)  Comply with any law or ordinance of any governmental agency having jurisdiction over the Premises.

### Parking Lot and Landlord's Access to Fuel Farm

Section 4.04   (a)  Attached as Exhibit D is a depiction of the existing parking lot configuration, which is painted to accommodate approximately 39 automobile parking spaces.  Tenant shall not modify the

parking configuration of approximately 39 spaces on the west side of the building, as depicted on Exhibit D. The additional 5 parking configuration located to the south of the building can be modified by Tenant.

(b)   The parking lot is used by fuel tankers and others to access Landlord's Fuel Farm which is located adjacent to the parking lot.   Landlord expressly reserves the right, for itself and for those with Landlord's permission,  to use the parking lot to enter and exit the Fuel Farm and Landlord's storage/office building adjacent to the Fuel Farm using the path set forth in Exhibit D. Landlord, and any vendor that enters the parking lot with Landlord's permission, for the purposes of accessing the Fuel Farm shall carry general liability insurance with combined single limit coverage of not less than Five Million Dollars ($5,000,000.00) per occurrence for bodily injury and property damage occurring in, on or about the Leased Premises, including parking and landscaped areas. Landlord shall indemnify, defend and hold harmless Tenant against any claims, loss, expense, damage, reasonable attorneys' fees, or liability that may arise in connection with or as a result of Landlord, employee, agent or vendor of Landlord's entry onto the Leased Premises.     Tenant shall not obstruct access to the Fuel Farm and storage/office building and access must remain open and unobstructed at all times.

## INSURANCE

### Fire Insurance

Section 5.01. Tenant shall, at Tenant's own cost and expense, at all times during the full term of this lease and any extended term of this lease, keep any improvements on the Leased Premises made by or for Tenant, which are owned by Tenant (such improvement, "Tenant Property") insured for at least 90 percent of their full replacement cost against loss or destruction by fire and the perils, including vandalism and malicious mischief, commonly covered under the standard extended coverage endorsement in Los Angeles County, California. Any loss payable under any policy described in this section that is not to Tenant Property and that relates to an improvement made by or for Tenant to the Leased Premises, which is intended to remain at the Leased Premises at the expiration or sooner termination of this Lease pursuant to the terms of this (a "Permanent Improvement"), shall be used to fund the repair or replacement of the damaged Permanent Improvement pursuant to Section 6.01 of this Lease.  Landlord shall be named as an additional insured on the policies and the policies shall also contain cross-liability endorsements.

(b)   "Full replacement cost," as used in this section, shall mean the actual cost of replacement for the improvements on the Premises, as determined from time to time.

(c)  Landlord shall at all times during the full term of this lease and any extended term of this Lease, carry all risk (also known as "special form") property insurance covering the full replacement cost of the Building and the Premises (excluding any Tenant improvements) with building laws and ordinance endorsement. Tenant shall reimburse Landlord for 28% of the cost of such insurance.

### Liability Insurance

Section 5.02. Tenant shall, at Tenant's own cost and expense, secure and maintain during the entire term of this lease and any extended term of this lease, public liability, property damage, and products liability insurance, insuring Tenant and Tenant's employees against all bodily injury, property damage, personal injury, and other loss or liability caused by or connected with Tenant's occupation and use of the Premises under this lease in amounts not less than $10,000,000 Combined Single Limit Bodily Injury and Property Damage and an aggregate limit of not less than $10,000,000 as a result of any one accident or incident. Landlord shall be named as an **Additional Insured** and the policy or policies shall contain cross-liability endorsements.

In the event that Landlord determines, in Landlord's reasonable judgment, that the limits of the public liability, property damage, or products liability insurance then carried by Tenant are materially less than the amount or type of insurance typically carried by owners or tenants of properties located in the same county in which the Premises are located, which are similar to and operated for similar business purposes as the Premises, Landlord may elect to require Tenant to increase the amount of specific coverage, change the type of policy carried, or both. If Landlord so elects, Tenant shall be notified in writing of the specific change in policy amount or type required and shall have 30 days after the date of Landlord's notice to effect the change in amount or type of policy. Unless otherwise agreed by Landlord and Tenant, any adjustment under this section (a) shall not be made before the third (3) anniversary of the Commencement Date, and (b) may be made not more often than every two (2) years thereafter.

Notwithstanding any other provision of this Lease, neither party will be liable to the other party or to any insurance company (by way of subrogation or otherwise) for any loss of, or damage to, any of its property located within the Premises or upon, or constituting a part of, the Premises, which loss or damage arises from the perils that could be insured against under the ISO Causes of Loss-Special Form Coverage, including deductibles (whether or not the party suffering the loss or damage actually carries that insurance, recovers under that insurance, or self-insures the loss or damage). These mutual waivers are in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of, or damage to, property of Landlord and Tenant. These waivers apply whether or not the loss is due to the negligent acts or omissions of Landlord or Tenant, or their respective officers, directors, employees, agents, contractors, or invitees. If required, each party agrees immediately to give its insurance company(ies) written notice of the terms of these mutual waivers and to have its insurance policies properly endorsed, if necessary, to provide for a waiver of subrogation and to prevent the invalidation of any coverage by reason of these waivers.

### Business Interruption Insurance

Section 5.03. Loss of Rents Insurance. Landlord, at Tenant's cost, shall maintain loss of rents insurance insuring the Base Rent, and Real Property Taxes. Said insurance shall provide coverage for a period of up to two years if the Leased Premises are destroyed or rendered inaccessible by a risk insured against by the policy of standard fire and extended coverage insurance, with related endorsements.

### Tenant's Personal Property

Section 5.04. Tenant shall at all times during the term of this lease and at Tenant's sole expense, keep all of Tenant's personal property, including trade fixtures and equipment and all merchandise of Tenant that may be in the Premises from time to time, insured against loss or damage by fire and by any peril included within fire and extended coverage insurance for an amount that will insure the ability of Tenant to fully replace the trade fixtures, equipment, and merchandise.

### Workers' Compensation Insurance

Section 5.05. Tenant shall maintain in effect throughout the term of this lease, at Tenant's sole expense, Workers' Compensation insurance in accordance with the laws of California, and employers' liability insurance with a limit of not less than $1 million per employee and $1 million per occurrence.

### Cancellation Clause

Section 5.06. Any policy of insurance required under this Article shall be written by insurance companies authorized to do business in California. Each policy of insurance procured by Tenant pursuant to this Article shall expressly provide that it cannot be canceled for any reason or altered in any manner unless at

least 10 days' prior written notice has been given by the insurance company issuing the policy to Landlord in the manner specified in this lease for service of notices on Landlord by Tenant.

### Deposit of Insurance Policies With Landlord

Section 5.07. Promptly on the issuance, reissuance, or renewal of any insurance policy required by this lease, including fire and liability insurance policies, Tenant shall cause a certificate evidencing the policy to be given to Landlord.

### Blanket Insurance Policy

Section 5.08. To satisfy its obligations under this Article, Tenant may at any time during the term of this lease, have in full force and effect a "blanket" policy of insurance insuring the Premises as well as other property owned or occupied by Tenant, provided the blanket policy does not in any way diminish the amount or coverage of the insurance required under this Article, and further provided that the blanket policy otherwise meets all requirements of this Article.

### Landlord's Right to Procure Insurance

Section 5.09. If at any time Tenant fails to procure or maintain the insurance required by this Article, and such failure continue for a period of five (5) business days after notice from Landlord to Tenant of such failure, Landlord may obtain that insurance and pay the premiums on it for the benefit of Tenant. Any amounts paid by Landlord to procure or maintain insurance pursuant to this section shall be immediately due and repayable to Landlord by Tenant with the next then due installment of rent under this lease; failure to repay at that time any amount expended by Landlord shall be considered the same as a failure to pay rent and a default by Tenant under this lease.

## DESTRUCTION OF PREMISES

### Duty to Repair or Restore

Section 6.01. If any improvements, including buildings and other structures, located on the Premises are damaged or destroyed during the term of this lease or any renewal or extension thereof, the damage shall be repaired as follows:

(a)  If the damage or destruction is caused by a peril against which insurance is required to be carried by Landlord under Section 5.01 of this lease, then Landlord shall repair that damage as soon as reasonably possible and restore the Premises (excluding any Tenant Property, but including any Permanent Improvements) to substantially the same condition as existed before the damage or destruction, regardless of whether the insurance proceeds are sufficient to cover the actual cost of repair and restoration. If insurance required to be carried by Section 5.01 of this lease has lapsed or not been carried, Landlord shall be solely responsible for the full cost and expense of necessary repairs.

(b) If the damage or destruction is caused to any Permanent Improvements by a peril against which insurance is required to be carried by Tenant under Section 5.01 of this lease, then Tenant shall repair that damage to such Permanent Improvements only as soon as reasonably possible and restore the Permanent Improvements to substantially the same condition as existed before the damage or destruction, regardless of whether the insurance proceeds are sufficient to cover the actual cost of repair and restoration. If insurance required to be carried by Section 5.01 of this lease has lapsed or not been carried, Tenant shall be solely responsible for the full cost and expense of necessary repairs.

(c) If the damage to or destruction of the Premises (excluding Tenant Property, but including the Permanent Improvements) is caused by a peril against which insurance is not required to be carried by this Lease, Landlord, subject to its right to terminate this lease described in Section 6.02, shall repair that damage as soon as reasonably possible and restore the Premises to substantially the same condition as existed before the damage or destruction.

(d) If the damage or destruction is caused either by a peril against which fire and extended coverage insurance is required by this lease to be carried or by a peril against which insurance is not required to be carried by this lease, Tenant expressly waives any right under Civil Code Sections 1931–1933 to terminate this lease for damage or destruction to the Premises and instead shall rely on its rights and remedies as set forth in this Lease.

### Termination of Lease for Certain Losses

Section 6.02. (a) Notwithstanding any other provision of this lease, if the Premises are damaged or destroyed to such an extent it will cost more than $50,000 to repair or replace them, and the damage or destruction is caused by a peril against which insurance is not required to be carried by this lease, then Landlord may terminate this lease by giving Tenant written notice of the termination. The notice must be given within 45 days after occurrence of the damage or destruction.

(b)   Tenant or Landlord shall have the right to terminate this lease under either of the following circumstances:

(1) If the Premises are damaged or destroyed from any cause whatsoever, insured or uninsured, and the laws then in existence do not permit the repair or restoration of the Premises provided for in this Article;

(2) If the Premises are destroyed from any cause whatsoever, insured or uninsured, during the last two years of the term of this lease; or

(3) If the Premises are destroyed from any cause whatsoever, insured or uninsured, and Landlord estimates it will take more than ninety (90) days from the date of the destruction event to restore the Leased Premises, Tenant shall have the right to terminate this Lease; or

(4) If any Permanent Improvements are damaged or destroyed to the extent it will cost more than $50,000 to repair them, Tenant shall have the right to transfer the insurance proceeds, if any, to Landlord and terminate this Lease.

(c) Either party may terminate this lease by giving written notice of termination to the other not later than 14 days after occurrence of the event giving rise to terminate under this section, and termination shall be effective as of the date of the notice of termination. In the event of such a termination, Tenant shall not be entitled to collect any insurance proceeds attributable to insurance policies covering the Premises or improvements, except those proceeds attributable to Tenant's personal property and trade fixtures.

(d) If this lease is terminated as provided in this section, rent, taxes, assessments, and other sums payable by Tenant to Landlord under this lease shall be prorated as of the termination date. If any taxes, assessments, or rent has been paid in advance by Tenant, Landlord shall refund it to Tenant for the unexpired period for which the payment has been made.

### Time for Construction of Repairs

Section 6.03. Any and all repairs and restoration of improvements required by this Article shall be commenced by Landlord or Tenant, as the case may be, within a reasonable time after occurrence of the damage or destruction requiring the repairs or restoration; shall be diligently pursued after being commenced; and shall be completed within a reasonable time after the loss.

### Abatement of Rent

Section 6.04. Rent shall be abated only for the time and to the extent Tenant is prevented from occupying the Premises for the uses authorized in this lease.

### Payment of Insurance Proceeds

Section 6.05. For any damage to the Premises caused by a peril covered by insurance required under this lease to be carried and maintained by Tenant, the proceeds shall be paid directly to the Tenant for the purpose of making the necessary repairs to the Premises.

## CONDEMNATION

### Total Condemnation Defined

Section 7.01. The term "total condemnation" as used in this Article shall mean the taking by eminent domain ("condemnation") by a public or quasi-public agency or entity having the power of eminent domain ("condemnor") of

(a) More than 35 percent of the ground area of the Premises; or

(b) Less than 35 percent of the ground area of the Premises at a time when the remaining buildings or improvements on the Premises cannot reasonably be restored to a condition suitable for Tenant's occupancy for the uses permitted by this lease within 90 normal eight-hour working days under all laws and regulations then applicable; or

(c) Less than 35 percent of the ground area of the Premises in such a manner that Tenant is substantially prevented from carrying on operations of a permitted use under this lease on the remaining portion of the Premises.

### Partial Condemnation Defined

Section 7.02. The term "partial condemnation" as used in this Article shall mean any condemnation of a portion of the Premises that is not a total condemnation under Section 7.01 of this lease.

### Termination for Total Condemnation

Section 7.03. In the event of a total condemnation of the Premises during the term of this lease, this lease shall terminate without further notice as of 12:01 A.M. on the date actual physical possession of the condemned property is taken by the condemnor. All rent payable under this lease shall be prorated as of 12:01 A.M. on that date and a prompt refund or payment of rent for the unexpired period of this lease shall be made by Landlord to Tenant. On the making of that rent adjustment, both Landlord and Tenant will be released and discharged from any and all further obligations under this lease.

### Effect of Partial Condemnation

Section 7.04. In the event of a partial condemnation of the Premises, this lease shall terminate as to the portion of the Premises taken on the date actual physical possession of that portion is taken by the condemnor but shall remain in full force and effect as to the remainder of the Premises; provided, however, that promptly after the taking of actual physical possession by the condemnor of the portion taken by condemnation, Landlord shall restore, at Landlord's own cost and expense, the improvements on the remainder of the Premises to a condition making the Premises tenantable by Tenant for the uses permitted by this lease. Any rent payable under this lease after the date actual physical possession is taken by the condemnor of the portion of the Premises condemned shall be reduced by the percentage the ground area of the portion taken by eminent domain bears to the total ground area of the Premises on the date of this lease. In addition, the rent payable under this lease shall be further abated during the time and to the extent Tenant is prevented from occupying all of the remainder of the Premises by the work of restoration required by this section to be performed by Landlord.

### Landlord's Power to Sell in Lieu of Condemnation

Section 7.05. Landlord may, without any obligation or liability to Tenant and without affecting the validity or continuation of this lease other than as expressly provided in this Article, agree to sell or convey to the condemnor, without first requiring that an action or proceeding for condemnation be instituted or tried, the portion of the Premises sought by the condemnor free from this lease and the rights of Tenant in the Premises other than as provided in this Article.

### Condemnation Award

Section 7.06. All compensation and damages awarded or paid for the condemnation of the Premises or any portion of the Premises, or for any sale in lieu of condemnation as authorized by Section 7.05 of this lease, shall, except as otherwise expressly provided in this section, belong to and be the sole property of Landlord. Tenant is entitled to seek to recover from the condemnor, but not from Landlord:

(a) The cost of removing any trade fixtures, furniture, or equipment from the portion of the Premises taken by condemnation;

(b) The value of any improvements installed by Tenant on the portion of the Premises taken by condemnation that Tenant has a right to remove under this lease but that Tenant elects not to remove; and

(c) The then amortized value of all improvements made by Tenant on the portion of the Premises taken by condemnation that could not be removed by Tenant on expiration of this lease either because of provisions of this lease or because the improvements would have no economic value on removal from the Premises.

### INDEMNIFICATION

### Tenant's Hold-Harmless Clause

Section 8.01. Except as otherwise provided in Section 8.02, Tenant shall indemnify and hold Landlord and the property of Landlord, including the Premises, free and harmless from any and all liability, third-party claims, loss, damages, or expenses, including counsel fees and costs, arising by reason of the death or injury of any person, including Tenant or any person who is an employee or agent of Tenant, or by reason of damage to or destruction of any property, including property owned by Tenant or any person who is an employee or agent of Tenant, caused or allegedly caused by (1) any cause whatsoever while that person or property is in or on the Premises or in any way connected with the Premises or with any

improvements or personal property on the Premises; (2) some condition of the Premises or some building or improvement on the Premises, unless such condition is due to a failure of Landlord to maintain the Premises as required by this Lease; (3) the negligence or willful misconduct of Tenant, its employees, contractors, agents, sublessees or licensees; or (4) any matter connected with Tenant's occupation and use of the Premises.

### Landlord's Hold-Harmless Clause

Section 8.02. Notwithstanding the provisions of Section 8.01 of this lease, Tenant shall be under no duty to indemnify and hold Landlord harmless from any liability, claims, or damages arising because of any negligence or willful acts of misconduct by Landlord or by any person who is an agent or employee of Landlord. Landlord agrees to indemnify, defend, protect, and hold Tenant free and harmless from and against any liability, claims, or damages arising from or in connection with any negligence or willful acts of misconduct by Landlord or by any person who is an agent or employee of Landlord .

## DEFAULT AND REMEDIES

### Remedies on Tenant's Default

Section 9.01. If Tenant breaches this lease, Landlord, in addition to any other remedy given Landlord by law or equity, may

(a) Continue this lease in effect by not terminating Tenant's right to possession of the Premises, in which case Landlord shall be entitled to enforce all Landlord's rights and remedies under this lease, including the right to recover the rent specified in this lease as it becomes due under this lease;

(b) Terminate this lease and recover from Tenant

(1) The worth, at the time of award, of the unpaid rent that had been earned at the time of termination of the lease;

(2) The worth, at the time of award, of the amount by which the unpaid rent that would have been earned after termination of the lease until the time of award exceeds the amount of rental loss that Tenant proves could have been reasonably avoided;

(3) The worth, at the time of award, of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of rental loss that Tenant proves could be reasonably avoided; and

(4) Any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform the obligations under this lease; or

(c) Terminate the lease and, in addition to any recoveries Tenant may seek under subsection (b) of this section, bring an action to reenter and regain possession of the Premises in the manner provided by the laws of unlawful detainer then in effect in California.

### Termination by Landlord

Section 9.02. No act of Landlord, including but not limited to Landlord's entry on the Premises or efforts to relet the Premises, or the giving by Landlord to Tenant of a notice of default, shall be construed as an election to terminate this lease unless a written notice of the Landlord's election to terminate is given to Tenant or unless termination of this lease is decreed by a court of competent jurisdiction.

### Default by Tenant

**Section 9.03.** All covenants and agreements contained in this lease are declared to be conditions to this lease and to the term hereby leased to Tenant. The following constitute a material default and breach of this lease by Tenant:

(a) Any failure to pay rent when due when the failure continues for five (5) days after written notice to pay that rent or surrender possession of the Premises is served on Tenant by Landlord.

(b) Any failure to perform any other covenant, condition, or agreement contained in this lease when the failure is not cured within thirty (30) days after written notice of the specific failure is given by Landlord to Tenant, provided, that if such default is of a nature that it cannot be cured within thirty (30) days, Tenant shall have such reasonable period as is necessary provided it commences to cure within thirty (30) days and diligently pursues the cure thereafter.

(c) The bankruptcy or insolvency of Tenant, the making by Tenant of any general assignment for the benefit of creditors; the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt or of a petition for reorganization or arrangement under the Bankruptcy Act (unless, in the case of a petition filed against Tenant, it is dismissed within 60 days); the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this lease, if possession is not restored to Tenant within 30 days; or the attachment, execution, or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this lease, when that seizure is not discharged within 15 days.

(d) The abandonment or vacating of the Premises by Tenant (which, for purposes of this lease, shall mean Tenant's failure to occupy and operate the Premises for business for a period of at least 30 consecutive days together with Tenant's failure to properly secure the Premises in its absence).

The notices provided for in subsections (a) and (b) of this Section 9.03 are not intended to replace, but rather are in addition to, any required statutory notices for unlawful detainer proceedings under Code of Civil Procedure Section 1161, et seq.

### Cumulative Remedies

**Section 9.04.** The remedies granted to Landlord in this Article shall not be exclusive but shall be cumulative and in addition to all other remedies now or hereafter allowed by law or authorized in this lease.

### Waiver of Breach

**Section 9.05.** The waiver by Landlord of any breach by Tenant of any of the provisions of this lease shall not constitute a continuing waiver or a waiver of any subsequent default or breach by Tenant either of the same or a different provision of this lease.

### Landlord Default

**Section 9.06.** Landlord shall not be in default unless Landlord fails to perform obligations required of Landlord within a reasonable time, but in no event later than (30) days after written notice by Tenant to Landlord , specifying wherein Landlord has failed to perform such obligations; provided, however, that if the nature of Landlord's obligations is such that more than thirty (30) days are required for performance, then Landlord shall not be in default if Landlord commences performance within such thirty (30) day

period and thereafter diligently prosecutes the same to completion within a reasonable period of time, not to exceed ninety (90) days in the aggregate.

## ARTICLE 10 MISCELLANEOUS

### Assignment and Subletting

Section 10.01. Tenant shall not encumber, assign, sublet, or otherwise transfer this lease, any right or interest in this lease, or any right or interest in the Premises or any of the improvements that may now or hereafter be constructed or installed on the Premises without first obtaining the written consent of Landlord. Tenant shall not sublet the Premises or any part of the Premises nor allow any other person, other than Tenant's agents, servants, and employees, to occupy the Premises or any part of the Premises without the prior written consent of Landlord. Any encumbrance, assignment, transfer, or subletting without the prior written consent of Landlord, whether voluntary or involuntary, by operation of law or otherwise, is void and shall, at the option of Landlord, terminate this lease. The consent of Landlord to any assignment of Tenant's interest in this lease or the subletting by Tenant of the Premises or parts of the Premises shall not be unreasonably withheld. Landlord's consent shall not be required in the event of any sublease, assignment or transfer of this Lease by Tenant to (x) an affiliate, or (y) a successor to Tenant by merger, consolidation or acquisition of all or substantially all of the assets of Tenant or all or substantially all of the real estate holdings of Tenant provided that (i) the transferee has financial strength sufficient to perform the obligations of Tenant under this Lease in Landlord's reasonable discretion, (ii) Tenant provides Landlord notice of the Transfer at least fifteen (15) days prior to the effective date (or at such time as is permitted by Law or obligation of confidentiality), and (iii) in the case of an assignment or sublease, Tenant delivers to Landlord an assumption agreement or sublease reasonably acceptable to Landlord executed by Tenant and the transferee, together with a certificate of insurance evidencing the Affiliate's compliance with the insurance requirements of Tenant under this Lease (a "Permitted Transfer"):

### Pass Through Expenses

Section 10.01.  On a monthly basis, Landlord receives an invoice from the Century Business Center for common area maintenance and utility charges attributable to Landlord's deeded footprint within the Center.  Except for electricity charges (which are addressed below), Tenant shall pay to Landlord 28.5% of Landlord's monthly bill from the Century Business Center.

Section 10.02  All Tenant electrical use shall be metered through Tenant-installed meters and will be billed to Tenant and paid by Tenant to Landlord on a monthly basis.

### Notices

Section 10.03. Except as otherwise expressly provided by law, any and all notices or other communications required or permitted by this lease or by law to be served on or given to either party to this lease by the other party shall be in writing and shall be deemed duly served and given when personally delivered to the party to whom it is directed or to any managing employee or officer of that party or, in lieu of personal service, when deposited in the United States mail, first-class postage prepaid, addressed to Tenant at 901 Page Avenue, Fremont, CA 94358 Attn: Lease Administration; or to Landlord at 909 East Green Street, Attn: Kathleen Gregory, Pasadena, CA 91106.  Either party, Landlord or Tenant, may change its address for purposes of this Section by giving written notice of that change to the other party in the manner provided in this section.

### Attorneys' Fees

Section 10.04. If any litigation, including arbitration proceedings, is commenced between the parties to this lease concerning the Premises, this lease, or the rights and duties of either in relation to this lease, the party prevailing in that litigation shall be entitled, in addition to any other relief that may be granted in the litigation, to a reasonable sum as and for its attorneys' fees in the litigation, which shall be determined by the court in that litigation or in a separate action brought for that purpose.

### California Law

Section 10.05. This Lease will be governed by and construed in accordance with the laws of the State of California.

### Venue

Section 10.06. The venue for any legal action filed arising out of relating to this Lease shall be Los Angeles, California.

### Late Charges

Section 10.07. If any Rent payment is not received by Landlord or Landlord's designee within five (5) days after that Rent is due, Tenant shall pay to Landlord a late charge (Late Charge(s)) of Two Percent of the amount due as liquidated damages, in lieu of actual damages (other than interest and attorney fees and costs under section). Tenant shall pay this amount for each calendar month in which all or any part of any Rent payment remains delinquent for more than five (5) days after the due date. The parties agree that this late charge represents a reasonable estimate of the expenses that Landlord will incur because of any late payment of Rent (other than interest and attorney fees and costs). Landlord's acceptance of any liquidated damages shall not constitute a waiver of Tenant's default with respect to the overdue amount or prevent Landlord from exercising any of the rights and remedies available to Landlord under this Lease. Tenant shall pay the late charge as Additional Rent with the next installment of Rent.

### Binding on Heirs and Successors

Section 10.08. This lease shall be binding on and shall inure to the benefit of the heirs, executors, administrators, successors, and assigns of each Landlord and Tenant, but nothing contained in this section shall be construed as a consent by Landlord to any assignment of this lease or any interest in this lease by Tenant.

### Time of Essence

Section 10.09. Time is expressly declared to be of the essence in this lease.

### Sole and Only Agreement

Section 10.10. This instrument constitutes the sole and only full, final, and complete agreement between Landlord and Tenant respecting the Premises, the leasing of the Premises to Tenant, and the lease terms contained in this lease, and correctly sets forth the obligations of Landlord and Tenant to each other as of its date. Any agreements or representations respecting the Premises or their leasing by Landlord to Tenant not expressly set forth in this instrument are null and void. All prior negotiations between the parties are subsumed into this lease to the extent they have been agreed to, and if not agreed to by the parties such negotiations are not set forth in the terms and conditions of this lease. This lease may not be extended, amended, modified, altered, or changed, except in a writing signed by Landlord and Tenant.

### Confidentiality

Section 10.11.

A.  Landlord and Tenant agree that the terms of this Lease are confidential.  Subject to subsection B below, neither Landlord nor its Personnel shall: (1) make a public statement regarding Tenant's proposed or actual occupancy of the Premises prior to Tenant making a public announcement about its opening, (2) disclose the existence of, or any terms contained in this Lease, (3) disclose any information about Tenant's business operations or plans regarding the Premises, Tenant's Work (including the status thereof), Tenant's licensing (including the status thereof), or Tenant's sales; (4) use Confidential Information for any purpose other than to comply with the Lease or disclose confidential information to any individual or third party.

B.  Notwithstanding subsection A above, Landlord may disclose Confidential Information (X) as required to comply with binding orders of governmental entities that have jurisdiction over it, or as necessary to comply with its express obligations under this Lease, provided that Landlord (1) gives Tenant prior written notice sufficient to allow Tenant to seek a protective order or other appropriate remedy, (2) discloses only such information as is required, and (2) and uses commercially reasonable efforts to obtain confidential treatment for any Confidential Information so disclosed; (Y) to Landlord's Personnel who (1) have a need to know the Confidential Information in connection with the parties' business relationship, and (2) have executed Tenant's nondisclosure agreement, or a similar nondisclosure agreement obligating them to protect the Confidential Information; or (Z) related to the existence and terms of this Lease or related to the performance by Landlord and Tenant of their respective obligations under this Lease to current or future purchasers, partners or lenders, or prospective purchasers, partners or lenders, but only to the extent they have entered into a written agreement to become an owner, partner or lender, and, in each case, a potential purchaser or lender provided that the recipient agrees (1) to use the disclosed information only for the purpose of the proposed transaction with Landlord, (2) to return or destroy the information immediately following the termination of negotiations regarding the proposed transaction, and (3) not to disclose the information to any third-party except as provided in this subsection B.  Nothing in the foregoing shall preclude the Landlord from disclosing to prospective tenants the end date of the Lease.

C.  Definitions

"Confidential Information" means all information set forth in Section 1.1, and any information specifically labeled as "confidential" or that would reasonably be presumed to be confidential, including without limitation all nonpublic information relating to Tenant's technology, operations, customers, business plans, promotional and marketing activities, finances and other business affairs that is learned by or disclosed to Landlord with respect to Tenant's business in connection with this leasing transaction. Confidential Information shall not include any information that Landlord can know is or was: (a) already known to Landlord or its Personnel at the time of disclosure without obligation of confidentiality to Tenant, (b) publicly known through no wrongful act or omission of Landlord or its Personnel, (c) rightfully received by Landlord or its Personnel from a third party without obligation of confidentiality, or (d) approved for release by Tenant's written authorization.

"*Personnel*" means legal representatives, successors, assigns, employees, brokers, developers, contractors, subcontractors, agents and consultants.

### Consequential Damages

Section 10.12. Neither Landlord nor Tenant shall be liable to the other for any special, indirect or consequential damages, such as lost profits or interruption of either party's business. Nothing in the foregoing shall relieve the applicable party seeking any such consequential damages of the obligation to

prove that such party actually incurred such damages solely as a result of actions or omissions described above.   This section shall not affect Landlord's rights to submit for payment under the business interruption insurance provided for in Section 5.03 of this lease.

**Accessibility**

Section 10.13.   The Premises have <u>not</u> undergone inspection by a Certified Access Specialist (CASp) (as defined in California Civil Code Section 1938).   A CASp can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.   Tenant will ensure that all tenant improvements comply with applicable accessibility standards.

EXECUTED June 27, 2017 at Hawthorne, California.

"LANDLORD"
Hawthorne Hangar Operation, LP
A California Limited Partnership
By Hawthorne Hangar Management, LLC
Its General Partner by its General Manager:
Wolfe Air Aviation, Ltd.
A California Corporation


By: Dan Wolfe
Title: President


"TENANT"
Tesla, Inc., a Delaware Corporation

By: Jonathan Chang
Title: Assistant Secretary

Hawthorne Municipal Airport
Exhibit "A"
Airport Rules & Regulations

10.80.010 Definitions.

The following words and phrases, whenever used in this chapter or in rules and
regulations established by the airport manager and approved by the city council, shall be
construed as defined in this section unless from the context it is apparent a different
meaning is intended, or unless a different meaning is specifically defined and more
particularly described:

A.     "Aerobatic" means maneuvers intentionally performed by an aircraft
involving an abrupt change in it altitude, an abnormal attitude, and an abnormal
acceleration.

B.     "Airport" means and has reference to all of the area comprising the
Hawthorne Municipal Airport as now existing or as the same may hereafter be expanded
and developed and shall include all of its facilities.

C.     "Air traffic" means aircraft in operation anywhere in the airspace and on that
part of the airport normally used for the movement of aircraft.

D.     "Commercial vehicle" means a vehicle used or maintained for the
transportation of persons or property for hire, compensation or profit.

E.     "Doping" means application of a preparation to strengthen and tighten
aircraft fabric.

F.     "Driveway" or "roadway" means any street or strip improved or unimproved
within the boundaries of the airport set aside or designated for use by vehicle and not for
aircraft.

G.     "Loading zone" means that space adjacent to a curb reserved for the
exclusive use of vehicles during the loading or unloading of passengers or materials.

H.     "Load ramp" means that space reserved for the loading and unloading of
aircraft.

I.     "Manager" means the manager of the department of aviation.

J.     "Motor vehicle" is a vehicle which is self-propelled.

K.     "Parking area" means and includes any portion of the airport which is set
aside for the parking of vehicles in an area that is restricted to vehicles only (and not

aircraft) and which may be marked by traffic cones or delineators. "Aircraft parking area" means the area set aside for the parking of aircraft and not any vehicles.

L.    "Passenger ramp" means equipment used to aid in the loading and unloading of aircraft.

M.    "Pedestrian" means any person afoot.

N.    "Traffic" means pedestrians and vehicles, either singly or together while using any driveway.

O.    "Vehicle" means a device in, upon, or by which any person or property is or may be propelled, moved or drawn upon a highway. (Ord. 1845 §§ 2, 3, 2006; prior code § 14-200.)

10.80.015 Airport rules and regulations.

Any violation of any provision of Chapter 10.80 of the Hawthorne Municipal Code may be prosecuted as a misdemeanor, as an infraction or as a civil administrative action in the discretion of the city attorney or city prosecutor. The airport manager or his/her designee is authorized to issue an administrative citation for violation of Chapter 10.80 pursuant to Chapter 1.23A and Chapter 1.23B of the Hawthorne Municipal Code.

A.    Airport Access Permit. No person, firm, corporation, nonprofit entity, or other business or agency operating on Hawthorne Municipal Airport under a valid agreement or lease with the city of Hawthorne or airport manager, may obtain vehicle access on Hawthorne Municipal Airport except in accordance with the following:

1.    Each vehicle operated on Hawthorne Municipal airport shall possess a valid airport access permit issued by the airport manager.

2.    An airport access permit shall be clearly displayed in the front window of any vehicle at all times it is within the secured perimeter of the airport, so as to be visible to airport staff and/or Hawthorne police department personnel.

3.    Prior to obtaining an airport access permit, each vehicle to be operated on Hawthorne Municipal Airport shall have a current state of California Vehicle Registration, a copy of which shall be on file with the airport manager.

4.    Prior to obtaining an airport access permit, each vehicle to be on Hawthorne Municipal Airport shall have current and valid insurance, a copy of which shall be on file with the airport manager.

B.    Vehicle Operations. No person, firm, corporation, nonprofit entity, lessee or other business or agency operating on Hawthorne Municipal Airport under a valid lease

or agreement with the city or the airport manager, may operate a motor vehicle on
Hawthorne Municipal Airport except in accordance with the following:

    1.    Each person intending to operate a motor vehicle on Hawthorne Municipal
Airport shall submit a signed agreement of compliance to the airport manager, verifying
his/her understanding and agreement to comply with the Hawthorne Municipal Airport
vehicle and driver operation rules and regulations.

    2.    Each person intending to operate a motor vehicle on the Hawthorne
Municipal Airport shall review these Hawthorne Municipal Airport vehicles and driver
operation rules and regulations.

    3.    Each person intending to operate a motor vehicle on Hawthorne Municipal
Airport shall possess a valid state of California driver's license, a copy of which shall be
on file with the airport manager.

    4.    Each person intending to operate a motor vehicle on Hawthorne Municipal
Airport shall maintain the vehicle in good operating condition.

    5.    No person shall clean or make any repairs to a motor vehicle anywhere on
the airport, except repairs authorized by the airport manager necessary for its removal.

    6.    No person shall operate any vehicle on the airport while it is constructed,
equipped, or loaded so as to endanger persons or property.

    7.    Any person who operates a motor vehicle at any place on the airport shall
notify the Hawthorne police department when such vehicle collides with and damages
any aircraft, any other motor vehicle, or any property, or injures or causes a fatality as a
result of that person's operation of a motor vehicle at the airport. In addition to notifying
the Hawthorne police department, that person shall complete and file with the airport
manager or his/her representative, before leaving the airport after such occurrence, a full
written report containing the information required by the Hawthorne police department,
the Federal Aviation Administration, and the National Transportation Safety Board. If the
person operating the motor vehicle is unable to file the report due to injury, such person
shall file such report within five days after becoming physically able to do so.

    8.    Each person intending to operate a motor vehicle on the Hawthorne
Municipal Airport shall not operate the motor vehicle in excess of fifteen miles per hour
within the airport boundaries.

    9.    No person shall permit any vehicle at the airport under his control to enter or
be upon any aircraft taxiway or aircraft operation areas without the permission of the
airport manager or his/her designee unless otherwise directed by the control tower.

10.    No person while operating a vehicle on the field area at the airport shall fail to yield the right-of-way to any landing, taking-off, or taxiing aircraft, or operate such vehicle thirty feet in front of any aircraft whose engines are running.

11.    No person shall back a gasoline tender unless he/she remains in the vehicle, and no person shall stand on the running board or fender of a gasoline tender that he/she is backing. No person shall position a gasoline tender so as to prevent its rapid removal.

12.    Vehicles shall be operated within designated vehicle traffic areas only.

13.    Vehicles shall not be operated upon the restricted service road, beginning at the windsock east of the control tower, easterly along the north airport boundary, then southerly along the east airport boundary to the south end of the Runway 25 blast fence without airport manager approval.

14.    Vehicles shall not be operated across the Northrop/Grumman ramp, except within the designated service road.

15.    Vehicles shall not be operated across the double yellow line into the run-up area east of the south side tee hangars, or adjacent to the south side of Runway 7 at intersection Golf.

C.    Parking.

1.    No person shall park a vehicle in a restricted or reserved area on the airport unless he displays, in a manner prescribed by the airport manager, a parking permit issued by the airport manager for that area, which permit is hereby authorized to be issued and such areas are hereby authorized to be restricted or reserved by the airport manager to aid in the efficient operation of the airport.

2.    No person shall abandon a motor vehicle on the airport.

3.    No person shall leave a motor vehicle standing unattended or parked on the airport with a key in the ignition switch, the motor running, a key in the door lock, or an open door.

4.    No person shall park or stand a motor vehicle at any place on the airport in violation of any sign posted by the airport manager.

5.    No person shall park or stand a motor vehicle within fifteen feet of a fire hydrant on the airport, or park in such a manner as to block any fire gate or entrance or obstruct any aircraft on the taxi way.

6.    The airport manager or his designee may cause the removal of, at the owner's expense, any motor vehicle that is parked on the airport in violation of this

section. Such vehicle shall be impounded, and the airport manager is hereby authorized to impound such vehicle, subject to a lien for the cost of such removal.

7.    The storage or parking of recreational vehicles, trucks, trailers, or other non-motorized vehicles and/or equipment is prohibited.

8.    No city employee shall use the municipal airport property, including but not limited to the public parking lot, for personal gain such as car repairs, car washes, private car storage or car detailing. No city contractor shall use the municipal airport property in any manner not authorized by the airport manager. (Ord. 1845 § 5, 2006.)


10.80.016 Airport guests.

All individuals who have been granted access to the airport by the airport manager or his/her designee are responsible for the action/s of any and all their guests. The individual who has been granted access to the airport by issuance of an airport gate pass or verbal agreement with the airport manager of his/her designee is liable for any violation of the airport rules and regulation by any of their guests. (Ord. 1845 § 6, 2006.)


10.80.017 Fixed based operator responsibility.

Any fixed based operator or any other business that has access to the airport runways and or taxiways through their business is responsible for properly securing such access to the runways and taxiways. The fixed based operator or business will be held liable for any violations committed by person(s) who gained access to the airport through said business. (Ord. 1845 § 7, 2006.)


10.80.018 Escorting of vehicles upon airport property.

The escorting of vehicles onto airport property shall be conducted on a very limited basis to allow access to the airport by those individuals who have been granted permission to do so by the airport manager. Escorting of vehicles will only be conducted by person(s) who have prior authorization to enter the airport (e.g., airport gate card) on file with the Hawthorne airport manager. The person conducting the escort is responsible for the actions of the person being escorted. No one who lets another vehicle/person onto airport property shall allow that person to drive upon any portion of the airport without being escorted. The person(s) conducting the escort shall be responsible for assuring the vehicle being escorted meets all the requirements for vehicles set forth by the airport rules and regulations. Violation of any of these conditions shall be deemed sufficient

cause for the airport director or designee to deny or prohibit access to or use of the airport by the violator. (Ord. 1845 § 8, 2006.)

10.80.020 Compliance with regulations.

Any permission granted by the city or airport manager thereof directly or indirectly, expressly or by implication, to enter upon or use the airport or any part thereof (including aircraft operators, crew members and passengers, spectators, sightseers, pleasure and commercial vehicles, officers and employees of airlines, lessees and other persons occupying space at such airport, persons doing business with Hawthorne Municipal Airport, its lessees, sublessees and permittees, and all other persons whatsoever whether or not the type indicated), is conditioned upon compliance with Hawthorne Municipal Airport rules and regulations, and entry upon or into the airport by any person shall be deemed to constitute an agreement by such person to comply with said rules and regulations. (Prior code § 14-201.)

10.80.025 Vehicle Code provisions adopted.

The Vehicle Code of the state of California regulating traffic and vehicles upon the highways is hereby adopted for, and shall apply to the Hawthorne Municipal Airport as provided in Sections 21113(a), (b) and (c) of the State Vehicle Code with certain additional regulations as set forth in this chapter. (Ord. 1845 § 9, 2006.)

10.80.030 Commercial use.

No person shall utilize the airport for revenue-producing commercial activities or any other purpose without first procuring a permit from the airport manager and paying the rates and charges established for such use. The city reserves the right of all aviation fuel and lubricant sales on the airport. The city further reserves the exclusive right of operating all vending and amusement machines on the airport. (Prior code § 14-202.)

10.80.040 Solicitation.

No persons shall solicit funds for any purpose or business of any nature without (1) complying with the provisions of Chapter 5.56 and (2) obtaining the permission of the

airport manager. This section does not apply to charitable solicitations governed by the provisions of Chapter 9.66. (Ord. 1845 § 4. 2006: prior code § 14-203.)

### 10.80.045 Restricted areas.

A. When the airport manager determines that public safety is required, he/she may designate any area on the airport as a restricted area and post appropriate signs and notices indicating such area.

B. No person shall enter any restricted area so posted except those who may be authorized to do so by the airport manager. (Ord. 1845 § 10, 2006.)

### 10.80.046 Authorization to erect signs.

The airport manager is hereby authorized to erect and install any signs or notices which he may deem necessary or advisable in connection with the operation and enforcement of the provisions of this chapter. (Ord. 1845 § 11, 2006.)

### 10.80.050 Signs.

No person shall post, distribute or display signs, advertisements, circulars, printed or written matter at the airport without written permission of the airport manager. (Prior code § 14-204.)

### 10.80.060 Photography.

No person shall take still, motion or sound pictures of or at the airport for commercial or private purposes without permission of the airport manager. (Prior code § 14-205.)

### 10.80.070 Designated traffic areas.

No person shall travel on any portion of the airport except upon the roads, walks or places provided for the particular class of traffic, nor occupy the roads or walks in such a manner as to hinder or obstruct their proper use. (Prior code § 14-206.)

10.80.075 Rubbish.

Rubbish or trash shall not be thrown, deposited, or allowed to be scattered on the airport. Rubbish and trash shall be deposited in waste receptacles provided for that purpose. (Ord. 1845 § 12, 2006.)

10.80.080 Animals.

Dogs and other animals are not permitted on the airport except if on a leash or confined in such a manner as to be under control. (Prior code § 14-207.)

10.80.090 Indemnification for damaged property.

Every user of the airport agrees to indemnify the city for any and all property of Hawthorne Municipal Airport destroyed, injured or damaged by accident or otherwise. The party or parties responsible for such destruction, injury or damage thereto shall immediately make a report to the airport manager and arrange for payment or rehabilitation of damaged property. (Prior code § 14-208.)

10.80.100 Intoxicated or drugged condition.

No pilot or other member of the crew of an aircraft in operation or any person attending or assisting in said operation shall be under the influence of intoxicating liquor or habit-forming drugs, nor shall any person obviously under the influence of intoxicating liquor or habit-forming drugs be permitted to board any aircraft except a medical patient under proper care, or in case of emergency. (Prior code § 14-209.)

10.80.110 Unauthorized use of aircraft and equipment.

No person shall take or use any aircraft, aircraft parts, instruments or tools pertaining thereto owned, controlled or operated by any other person while such aircraft, aircraft parts, instruments or tools are stored, housed or otherwise left on Hawthorne Municipal Airport or within its hangars without the written consent of the owner thereof, except upon satisfactory evidence of the right to do so duly presented to the airport manager. (Prior code § 14-210.)

**10.80.115 Repairs.**

No aircraft shall be repaired at the airport except in authorized areas designated for such use by the airport manager and/or lessee or areas under the control of lessee. (Ord. 1845 § 13, 2006.)

**10.80.120 Fees and impounding.**

The airport manager shall establish fees, rates and charges for the use of airport and aviation facilities as part of the rules and regulations of said airport. Any aircraft owner or agent failing to pay any fee duly charged for aircraft owned or controlled by him shall have said aircraft subject to impounding until such fees are paid or said aircraft sold for charges. (Prior code § 14-211.)

**10.80.130 Exemptions.**

The schedule of charges for the use of airport or aviation facilities at the Hawthorne Municipal Airport shall not apply to the following aircraft or activities:

A.    Aircraft owned or leased by the federal government or its agencies. This is not meant to include aircraft being overhauled, modified or manufactured by a private concern for any branch of Department of Defense prior to delivery or being commissioned;

B.    Official aircraft of any state or its agencies;

C.    Official aircraft of any foreign government;

D.    If the use by any of the above-mentioned is substantial, a reasonable share, proportional to such use, of the cost of operating and maintaining facilities so used, will be charged. The amount of use to be considered "substantial" and the charges to be made therefore shall be determined by the airport manager;

E.    When fees, rates or charges are established by contract or lease. (Prior code § 14-212.)

<u>10.80.140 Credit.</u>

All charges under this schedule shall be payable in cash as they are received unless credit arrangements satisfactory to the manager have been made in advance. (Prior code § 14-213.)

<u>10.80.150 Intoxicating liquors.</u>

No person shall drink any intoxicating liquors upon any portion of the airport open to the public, except in such restaurant or other place as shall be properly designated and licensed for on-sale liquor dispensing. No person shall become intoxicated on any portion of the airport, nor shall any intoxicated person enter upon or loiter on or about the airport or any of its facilities. (Prior code § 14-215.)

<u>10.80.160 Destructive nuisances and waste disposal.</u>

No person shall conduct on or at the airport, activities that are injurious, detrimental or damaging to airport property or to activities and business of the airport. No person shall destroy, injure, deface or disturb in any way any building, sign, equipment, market, or other structure, tree, shrub, lawn or seeded area on the airport. Garbage, papers and refuse or other waste material shall be placed in receptacles provided for that purpose and emptied at regular intervals by the lessee. (Prior code § 14-216.)

<u>10.80.165 Fire regulations.</u>

A.    Smoking or lighting of open flames shall be prohibited in the following locations:

1.    Places with posted signs;

2.    On ramps or aprons;

3.    Within fifty feet of hangars, fuel trucks or fuel loading stations.

B.    No person shall start an open fire on the airport without permission of the airport manager.

C.    No person shall stock or store any material or equipment in such a manner as to constitute a fire hazard.

D.    Except for oil in sealed containers, no inflammable liquids or gases, including but not limited to, gasoline, solvent and thinner, shall be stored in any facility housing aircraft in quantities greater than one gallon. A separate building for such use may be required by the airport manager.

E.    Except for oil in sealed containers or in drums equipped with hand operated dispensing pumps, no inflammable liquids or gases, as aforesaid, shall be stored in any maintenance hangar in quantities aggregating more than thirty-five gallons and such storage shall be in metal cabinets. Quantities in excess of thirty-five gallons shall be stored in a separate building or within a four hour fire-resistive room, especially constructed for such storage.

F.    No person shall use volatile inflammable liquids or gases for cleaning purposes inside any hangar or building.

G.    Oily waste rags and other similar inflammable material shall be stored in self-closing metal containers.

H.    Hangar floors, gasoline pits and trucks shall be kept clean and free of excess gasoline, grease and other inflammable liquids, solids or gases.

I.    Paint, varnish, paper, boxes and other litter or rubbish shall not be accumulated in any hangar or building.

J.    Aircraft engines shall not be run, nor shall aircraft electrical or radio equipment be operated in any hangar.

K.    Aircraft or aircraft engines shall not be cleaned or degreased unless such operations are done in a maintenance station properly equipped to handle such work, or in a space designated for such purpose by the airport manager. (Ord. 1845 § 14, 2006.)


10.80.170 Firearms and explosives.

No person except authorized peace officers, airport guards, post office, customs, express and air carrier employees or members of the armed forces of the United States on official duty, shall carry any firearms or explosives on the airport. All persons other than those in the excepted classes shall, while on the airport, surrender all such objects in their possession to an officer or guard on the airport. (Prior code § 14-217.)


10.80.175 Pedestrians on airport.

No pedestrian shall be upon any landing area, taxiing way or movement area of the airport without first having obtained a signed permit from the airport manager, except persons engaged as mechanics. (Ord. 1845 § 15, 2006.)

10.80.180 Motor vehicles.

Motor vehicles shall be operated on the airport in strict accordance with the motor vehicle laws of the state and the city, and in addition thereto, all motor vehicles shall comply with rules and regulations as established by the airport manager. (Prior code § 14-218.)

10.80.190 Assumption of risk.

The privilege of using the airport and its facilities shall be conditioned on the assumption of full responsibility and risk by the user thereof, and by such use he thereby releases, holds harmless and indemnifies the city, its officers and employees, from any liability or loss resulting from such use. (Prior code § 14-219.)

10.80.200 Insurance.

All aircraft owners and operators shall be covered by appropriate public liability and property damage insurance at their own expense to assure payment of damage caused by owner's aircraft. The city, its agents or employees, shall not be liable for loss, damage or injury to persons or property arising out of any accident, incident or mishap of any nature whatsoever and/or from any cause whatsoever to any individual, aircraft or property occurring on the airport or in the use of any of the facilities of the airport. (Prior code § 14-220.)

10.80.205 Parking of aircraft.

A.    No person or lessee shall park or cause to be parked any aircraft, helicopter or vehicle on any portion of the airport leased from the city of Hawthorne or controlled by the city in such a manner that it would obstruct the safe movement of aircraft or in a manner that would encroach into the runway or taxiway object-free areas.

B.    At the direction of the airport manager, the operator, owner or pilot of any aircraft on the airport shall move the aircraft from the place where it is parked or stored to any other place designated on the airport. If the operator refuses to comply with the directions, the airport manager may tow the aircraft to such place at the operator's expense and without liability for damage that may result from such moving. (Ord. 1845 § 16, 2006.)

10.80.206 Starting of aircraft engines.

No person shall attempt to crank or start an airplane unless a licensed pilot or mechanic is at the controls of said airplane. (Ord. 1845 § 17, 2006.)

10.80.207 Aircraft taxiing.

A.    Pilots shall taxi their aircraft slowly on the taxi strips and display extreme caution at all times.

B.    Pilots shall not taxi their aircraft at a higher engine speed than necessary for the movement of the aircraft.

C.    Aircraft shall not be taxied into or out of a hangar. (Ord. 1845 § 18, 2006.)

10.80.208 Negligent operation.

No aircraft shall be operated on the surface of a landing area, ramp and apron area, or aircraft parking or storage area at a speed or in a manner which unreasonably endangers persons or property. (Ord. 1845 § 19, 2006.)

10.80.210 Removal of disabled aircraft.

The operator and/or owner of aircraft shall be responsible for the prompt disposal of disabled aircraft and parts thereof unless required or directed to delay such action pending an investigation of the accident. In the event it becomes necessary for Hawthorne Municipal Airport to remove such disabled aircraft and parts thereof, such removal shall be at the operator's expense and without liability to the airport for damage which may result from or in the course of such moving. (Prior code § 14-221.)

10.80.220 Aviation gasoline and fuel inspections.

The airport manager is designated as fuel inspector of the city with powers of supervising and inspecting and dispensing of aviation gasoline and fuel within the city. He shall establish his inspection program to insure against unsafe and dangerous utilization of aviation gasoline. There is imposed an inspection fee upon the dispenser of

aviation gasoline and fuel within the city at the rate of twelve and five tenths cents per gallon of aviation gasoline and fuel effective January 1, 1980. The fee shall be adjusted upward or downward as of January 1st of each year (the adjustment date), beginning in the year 1981, according to the following computation: The base for computing the adjustment is the index figure for the month of January, 1980 (the index date), as shown in the Consumer Price Index for All Items—Los Angeles—Long Beach, based on the period 1967 = 100, as published by the U.S. Department of Labor's Bureau of Labor Statistics. The base figure for the index date is 140.6. The index for the adjustment date shall be computed as a percentage of the base figure. For example, assuming the base figure on the index date is 110, the index figure on the adjustment date is 121, the percentage to be applied is 121/100 = 1.10 percent. That percentage shall be applied to the dispenser's fee for aviation gasoline and fuel for the period beginning on the adjustment date. The index for the adjustment date shall be the one reported in the U.S. Department of Labor's most comprehensive official index then in use and most nearly answering the foregoing description of the index to be used. If it is calculated from a base different from the base period 1967 = 100 used for the base figure above, the base figure used for calculating the adjustment percentage shall first be converted under a formula supplied by the Bureau. If the described index shall no longer be published, another generally recognized as authoritative shall be substituted by agreement of the parties. No person shall dispense aviation gasoline and fuel without first procuring clearance from the airport manager or his designated agent. No clearance shall be granted until the required inspection fee is paid. Gasoline dispensed by the city and its employees or the city's concessionaires and their employees is exempted from the provisions of this section. (Ord. 1200 § 2. 1980.)

10.80.240 Special events at the Hawthorne airport—Purpose.

It is the purpose of this chapter to establish a process for permitting special events to occur at the airport, airport terminal building or adjunct airport public facilities in accordance with the special event policy established by Section 10.80.240. The city recognizes the substantial community benefits that may result from special events. The purpose of this chapter is to provide a coordinated process for managing special events to ensure the health and safety of event patrons, residents, workers, and other visitors, to prohibit illegal activities from occurring at the special events, to protect the rights of special event permit holders and to promote the security of the airport. It is also the intent of the council to protect the rights of people to engage in expressive activities in the city's public places and to establish the least restrictive and reasonable time, place and manner regulation of these activities. It is further intended to create mechanisms for cost recovery and use charges, to the extent authorized by law, while not unduly impacting the viability of events. (Ord. 1881 § 1, 2007.)

10.80.241 Community events coordinator.

There is created a community events coordinator to carry out the provisions of this chapter. This coordinator is the director of licensing and code enforcement or his or her designee. In the event the director of licensing and code enforcement is not available, the city manager may appoint the chief of general services, the director of planning, the director of finance or the chief of police as the community events coordinator. (Ord. 1881 § 1, 2007.)

10.80.242 Powers of the community events coordinator.

The community events coordinator shall have the power to:

A.    Administer and apply this chapter;

B.    Represent the city, under the authority of the city manager, in discussions and in establishing agreements with the person(s) who represent the event;

C.    Coordinate with city departments and with other governmental agencies for the provision of governmental services for such special events at the airport;

D.    Establish the terms and conditions, insurance requirements, security requirements, crowd control safeguards, appropriate fees, and the time(s), place and manner of the special event consistent with this chapter, any implementing regulations/guidelines, and other provisions of the municipal code applicable to the special event at the airport defined as including but not limited to the airport terminal building, runways and all structures within the geographical bounds of the airport;

E.    Establish whether security measures will require the attendance of Hawthorne police officers or a privately licensed security firm pre-approved by the Hawthorne police department. (Ord. 1881 § 1, 2007.)

10.80.243 Airport special event permit required.

Except as otherwise provided by this chapter or other applicable law, rule or regulation or any permit or license issued hereunder or pursuant to the terms of a permit, lease, or contract which has been specifically authorized by the city council, an airport special event permit shall be required to be obtained from the community events coordinator for the following activities:

A.    An assembly consisting of persons who assemble in the airport which may impede, obstruct, impair or interfere with the use of the airport or appurtenant airport access area owned, controlled, or maintained by the city or any airport area where the city retains a reversionary interest;

B.    Any activity or event involving fifty or more persons in the Hawthorne airport terminal building. (Ord. 1881 § 1, 2007.)

**10.80.244 Application for airport special event permit.**

A.    To receive an airport special events permit, a person must complete and file a special events application with the community events coordinator, or a designated representative, on a form approved by the city. The applicant must provide the following information:

1.    A description of the proposed use, event, or activity;

2.    The part of the airport which will be utilized in connection with the proposed use, event, or activity;

3.    The manner in which the airport property will be utilized;

4.    The date or dates and the specific times thereof, including set-up and tear-down, that the airport is to be utilized for the described use, event, or activity;

5.    The name, address and telephone number of the person, entity or organization sponsoring or conducting the proposed event;

6.    The name, address and telephone number of the person or persons to be contacted regarding the application or permit;

7.    A written security plan designed to prevent patrons of the special events from accessing the airport runway zone or the airport terminal building having access to the runway.

B.    The community events coordinator may refer the application to such city departments or personnel as he or she deems necessary from the nature of the application for review, evaluation, investigation and recommendations regarding approval or disapproval of the application.

C.    An application must be submitted a minimum of fifteen business days prior to the event and reviewed in accordance with the time limits established in administrative regulations. Application shall be submitted with application fee and deposit for estimated fees to cover any and all city fees including, but not limited to, police officers, licensed security personnel pre-approved by the Hawthorne police department, city personnel, rental fees and/or equipment. (Ord. 1881 § 1, 2007.)

**10.80.245 Review process for airport special event permit application.**

Subject also to Section 10.80.246, the community events coordinator shall issue a permit, if it is determined that all of the following criteria have been met:

A.    The proposed use of the property is not governed by or subject to any other permit procedures provided elsewhere in this code or other applicable laws, rules, or regulations;

B.    The preparation for or the conduct of the proposed use, event or activity will not unreasonably or unfeasibly burden airport resources necessary to preserve the security of the airport or the public's use of the airport;

C.    The preparation for or the conduct of the proposed use, event or activity will not unduly impede, obstruct, or interfere with airport operations or adversely affect the security of the airport;

D.    The proposed use, event, or activity does not otherwise present a substantial or unwarranted safety, noise, or traffic hazard at the airport;

E.    The proposed event will be of a nature and size appropriate to the proposed venue, location, or site, will occur during a time period approved for that venue, location, or site, and will fall within the frequency limitations established by any administrative guidelines adopted pursuant to this chapter;

F.    The proposed event will not include live animals;

G.    The proposed event will not cause other adverse impacts on health or safety to surrounding residential or commercial uses, which cannot be effectively mitigated.

In deciding whether to approve an application, no consideration may be given to the message of the event, the content of speech, the identity or associational relationships of the applicant, or to any assumptions or predictions as to the amount of hostility which may be aroused in the public by the content of speech or message conveyed by the event. (Ord. 1881 § 1, 2007.)

**10.80.246 Denial/revocation of airport special event permit.**

The community events coordinator shall deny an application for an airport special events permit or revoke a permit if he or she finds any of the following:

A.    One or more of the approval criteria specified in Section 10.80.245 is not met;

B.    The applicant has knowingly made a false, misleading or fraudulent statement of fact to the city in the application process;

C.    The application does not contain the information required by this chapter;

D.    The application does not satisfy the requirements of this chapter or the administrative regulations adopted thereto;

E.    The applicant fails to comply with any conditions of approval, including, but not limited to:

1.    Remittance of fees, charges or deposits;

2.    Submittal of an indemnification agreement and/or proof of insurance to the extent required;

3.    Timely receipt of all required approvals;

F.    The applicant fails to agree as a condition of permit issuance that if airport property is destroyed or damaged by reason of permittee's use, event or activity and the damage or destruction is directly attributable to the permittee, the permittee shall reimburse the city for the actual replacement or repair cost of the destroyed or damaged property;

G.    Any illegal activity or more than twenty-five people attend event that exceeds the estimate stated in the application;

H.    Any activity occurs that was not specifically stated in the application.

I.    The application does not contain required information concerning the security measures that will be undertaken to ensure the health, safety and welfare of event patrons, residents, workers and other visitors, to protect airport property, to prevent event patrons from accessing the airport runway zone, to deter the occurrence of illegal activity from occurring at airport special events and to protect the special event permit holders. (Ord. 1881 § 1, 2007.)

10.80.247 Airport special event permit fees.

Except as otherwise provided by this code or any other applicable law, rule or regulation, or by the terms of a permit, license, lease or contract which has been specifically authorized by the city council, the permit application fees and other additional fees and charges for the special events at the airport, airport terminal building or adjacent airport public facilities, or any airport area where the city retains a

reversionary interest shall be established by the city council by resolution and shall be paid at the time of submission of application. (Ord. 1881 § 1, 2007.)

### 10.80.248 Appeals of denial of application by airport special event coordinator.

Any applicant aggrieved by an adverse decision under Sections 10.80.240 through 10.80.254 may appeal such decision of the community events coordinator by filing a written notice of such appeal with the city manager within five business days of the decision. The city manager shall decide the appeal within one working day. The city manager's decision shall be final except for judicial review. (Ord. 1881 § 1, 2007.)

### 10.80.249 Hold harmless for airport special event permit.

Each permittee shall execute a hold harmless agreement in a form approved by the city agreeing to defend, indemnify, and hold harmless the city against losses and liabilities incurred from the conduct of the permittee or its officers, employees, and agents. (Ord. 1881 § 1, 2007.)

### 10.80.250 Insurance requirements for airport special event permit.

A.    Except as otherwise prohibited by law or an exemption is obtained as provided by this chapter and the implementing regulations, the permittee shall procure and maintain in full force and effect during the term of the permit a policy of insurance from a reliable insurance company authorized to do business in the state, which policy includes the city, its boards, officers, agents, employees, and volunteers as named insureds or additional named insureds and which provides the coverage that the city attorney determines to be necessary and adequate under the circumstances. Proof of insurance shall be submitted to the city prior to issuance of the permit and maintenance of this insurance shall be a condition of the permit.

B.    If the risk manager determines that a particular use, event, or activity which is for a permit period of no more than one day does not present a substantial or significant public liability or property damage exposure for the city or its officers, agents, employees, or volunteers, the risk manager may give a written waiver of the insurance requirements of this section. (Ord. 1881 § 1, 2007.)

10.80.251 Departmental service charge for airport special event permit.

A.    In addition to the payment of the non-refundable permit application fee and as detailed in the administrative guidelines adopted pursuant to this chapter, a permittee shall pay the city for departmental service charges incurred in connection with or due to the permittee's activities under the permit unless the event was city-produced or city co-produced. Deposit for police officers, other personnel or any other fees shall be remitted prior to the event, with final invoices and/or credits being settled at the end.

B.    The community events coordinator shall submit the final invoices and billings for department charges to the permittee no later than ten working days after the expiration date of the permit.

C.    Permittee shall be required to reimburse the city for its actual cost of providing Hawthorne police officers, licensed security personnel pre-approved by the Hawthorne police department, and/or any other city personnel as deemed necessary by the community events coordinator (depending on the nature of the event and the number of people expected) to protect against intrusion into the airport runway zone or the airport terminal building areas which have access to the runway, to ensure the health, safety and welfare of event patrons, residents, workers and other visitors, to protect airport property, to deter the occurrence of illegal activity from occurring at airport special events and to protect the airport special event permit holders. (Ord. 1881 § 1, 2007.)

10.80.252 Administrative regulations for airport special events.

The city manager, or her or his designee, shall adopt administrative regulations that are consistent with and that further the terms and requirements set forth within Section 10.80.240 through 10.80.253 of this chapter. All such administrative regulations must be in writing. (Ord. 1881 § 1, 2007.)

10.80.253 Other permits and licenses relative to airport special events.

The issuance of an airport special events permit does not relieve any person from the obligation to obtain any other permit or license required pursuant to this code. (Ord. 1881 § 1, 2007.)

10.80.254 Penalties.

Any person who intentionally violates any of the provisions of this chapter shall be guilty of a misdemeanor or shall be subject to the administrative remedies contained in Chapters 1.23A and/or 1.23B of the Hawthorne Municipal Code. (Ord. 1881 § 1, 2007.)

HAWTHORNE HANGER OPERATIONS
EXHIBIT "B"
RELEVANT TENANT REGULATIONS FROM
THROUGH-THE-FENCE AGREEMENT

8.  <u>AIRCRAFT OPERATION</u>

8.1   Qualifications to operate aircraft

Only HHO and its visitors operating aircraft in compliance with this Agreement shall operate said aircraft upon a Taxilane Safety Area, and/or conduct Airport Access.

8.2   Disabled aircraft

HHO shall be responsible for the prompt removal of disabled aircraft and parts thereof from a Taxilane Safety Area, unless required or directed by the Airport Manager or the FAA to delay such action pending an investigation of an accident. In the event of failure to promptly remove such disabled aircraft, the Airport Manager may cause the aircraft to be removed and bill the owners thereof for all charges incurred in the removal of same. The City shall not be responsible for damage to disabled aircraft removed by the owner, the pilot, the City or other persons.

8.3   Running of aircraft engines

Aircraft engines shall only be run at idle except as may be necessary for safe taxiing operations or minimal preflight testing. All engine run-ups for maintenance testing purposes shall be performed in accordance with the Airport Rules and Regulations (Chapter 10.80 of the Hawthorne Municipal Code.)

8.4   Exhaust and propeller blast

No aircraft engine shall be started or aircraft taxied in a Taxilane Safety Area or at any location where the exhaust or propeller blast may cause injury to persons or do damage to property or spread debris on a Taxilane Safety Area, aircraft parking and/or staging area.

8.5   Taxiing of aircraft

HHO shall not taxi without first taking all necessary precautions to prevent a collision with other aircraft, persons or objects. Aircraft shall not be taxied into or out of any hangar, shade, or other

support vehicles and vehicles registered as per city rules and
regulations for tenant access onto airport property.

10.    FUELING, FLAMMABLE FLUIDS, AND SAFETY

10.1    Fuel safety

Any transportation handling of aircraft and vehicle fuel shall
comply with the Uniform Fire Code, as amended, the National Fire
Protection Association's codes and standards, as amended, FAA
Advisory Circular 150/5230-4, as amended, all requirements of
these provisions, and all other applicable laws.

10.2    Removal of gas, oil, grease, aircraft washing effluent

In the event of spillage or dripping of gasoline, oil, grease, aircraft
washing effluent or any material which may be unsightly or
detrimental to a Taxilane Safety Area by Registered Aircraft, the
same shall be removed immediately. The responsibility for the
immediate removal of such gasoline, oil, grease, aircraft washing
effluent or other material shall be assumed by the operator or
owner of the equipment causing the same or HHO.

11.    GENERAL USE OF THE SUBJECT PROPERTY

11.1    Gate access code

HHO agrees (i) that the security perimeter for gate guarded access
(the "Airport Gate Access System") to those portions of the Airport
which are adjacent to our property will be established at, and
limited to, the vehicle and pedestrian openings on the south side of
the main HHO hangar and for the east and west parking lots
serving the main hho hangar as shown on the attached (Exhibit
"C") Facility Access Conceptual Site Plan and (ii) to pay the costs
of installation, maintenance and monthly operations fee for the
Airport Gate Access System on the HHO Property.

11.2    Taxilane wingspan restrictions and indemnification

The City's Airport Manager recommends that HHO only operate
aircraft in areas of the Taxilanes consistent with the wingspan
restrictions as defined in applicable Taxilane standards. The City
assumes no liability for any damage or loss resulting from aircraft
operation in areas where aircraft wingspan exceeds the
recommended maximum wingspan. Any such operation or
resulting damage is solely at the risk of HHO, and HHO, as a

condition of Airport Access, shall defend, indemnify and hold harmless the City from any damages or losses resulting from said operation.

11.3    Smoking areas

No smoking shall be permitted:

(a)    Within fifty (50) feet of aircraft, fuel trucks, and/or fuel storage areas.

(b)    Where specifically prohibited by the City.

11.4    Firearms, explosives, etc.

(a)    No person, except a sworn law enforcement officer, member of the Armed Forces of the United States on official duty, or persons holding a valid concealed carry weapons permit, shall possess any firearms in a Taxilane Safety Area, except firearms that do not contain live ammunition, are in an enclosed case, and are intended for immediate transport out of the Taxilane Safety Area.

(b)    No person, except a sworn law enforcement officer or member of the Armed Forces of the United States on official duty, shall possess any explosives in a Taxilane Safety Area.

(c)    No person other than those in the above excepted classes, shall store, keep, handle, use, dispense or transport, at, in, or upon a Taxilane Safety Area any class A or class B explosives, any radioactive substance or material (except for minimum amounts of radioactive substances, such as radioactive paint illuminating instrument dials), without prior written authorization from the Airport Manager.

11.5 Waste containers and disposal

HHO, and its employees and visitors, shall dispose of all waste in the appropriate waste containers. Wastewater shall not be disposed of in storm water drainage or dirt/grass areas under any circumstances. Wastewater may be disposed of in sanitary sewer or sink drains, unless the wastewater contains petroleum or hazardous materials or hazardous waste. No petroleum products, industrial waste matter, batteries, or other hazardous material shall be dumped or otherwise disposed of except in accordance with local, county, state and federal law, including but not limited to, 42 U.S.C. § 6901, et seq., the Toxic Substances Control Act, 15

U.S.C. § 2601, et seq., and the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq. Any hazardous waste shall be the responsibility of the originator under all applicable law.

11.6    Maintenance of property

(a)    HHO shall maintain the Subject Property in a condition of repair, cleanliness and general maintenance equal to or greater than the level of maintenance maintained by the City in comparable areas; at a minimum free of pavement lips or obstacles, vehicle ruts, excessive standing water, trees and other vegetation exceeding twelve (12) inches in height, and free from any and all conditions hazardous or potentially hazardous to aircraft.

(b)    Except in accordance with subsection (a), HHO shall not make any alterations to any Taxilane Safety Area or other property located in, on, under or about any Taxilane Safety Area without prior notification to the Airport Manager and obtaining any other required City permits.

(c)    HHO agrees to maintain the designated tarmac area (formerly Northrop) - see Exhibit "E" – adjacent and north of the HHO facility to correct any normal wear and tear issues for a period of ten (10) years. HHO will pay a fixed monthly rental fee of $1,500 per month ($18,000 annually) for ongoing rent to maintain control of that space. Access to the tarmac/ramp area will be limited by HHO, only allowing personnel necessary for flight and maintenance/movement operations. Security per Section 11.13 (c).

11.7    Property damage, injurious or detrimental activities

HHO, and its employees or visitors, shall not destroy, deface, injure or disturb in any way a Taxilane Safety Area or conduct any activities that are injurious, detrimental or damaging to a Taxilane Safety Area.

11.8    Disorderly conduct, intoxicating liquors, etc.

HHO shall not commit, or nor cause to be committed, any disorderly, obscene or unlawful act or any nuisance in a Taxilane Safety Area. Nor shall any employee or visitor of HHO:

(a) Drink any intoxicating liquor upon any portion of a Taxilane Safety Area.

(b) Become intoxicated on any portion of a Taxilane Safety Area.

(c) Loiter on or about a Taxilane Safety Area.

11.9 Commercial photography

HHO shall not take still, motion or sound pictures of or on a Taxilane Safety Area for commercial purposes without first receiving written approval from the Airport Manager.

11.10 Advertisements

HHO shall not post, distribute or display signs, advertisements, circulars, printed or written matter on a Taxilane Safety Area without written permission from the Airport Manager.

11.11 Animals.

HHO shall not allow its employees or visitors to enter a Taxilane Safety Area with a dog or other animal unless restrained by a leash or properly confined as determined by the Airport Manager.

11.12 Obstacles

(a) With the exception of (b) below, no aircraft or other objects may be parked, temporarily stored or left standing on a Taxilane Safety Area.

(b) If there is no staging area other than that located within a Taxilane Safety Area, aircraft may be temporarily stopped in the Taxilane Safety Area for no more than five (5) minutes (unless otherwise approved by the Airport Manager), if located as close to the building as safely possible, attended at all times and able to be immediately moved, and moved when necessary to allow aircraft to safely pass.

11.13 Airport security

(a) HHO shall at all times maintain and comply with an airport facility security plan that has been approved by the Airport Manager.

(b)  HHO shall immediately report to the Airport Manager any operational failure of any of its access gates, or failure of any of the access gates to fully close.

(c)  HHO shall be responsible for its actions and all actions of any person to whom it provides access to the Subject Property, whether directly or indirectly, and HHO shall defend, indemnify and hold harmless the City from any damages or losses resulting there from, including any fines levied against the City by the FAA.

11.14  Access codes/devices

The Airport Manager shall provide the access code utilized by HHO for Airport Access. Only HHO shall use said code/device and shall not divulge, duplicate or otherwise distribute the same to any other person, unless said persons are authorized by HHO to operate the Based Aircraft, or are visitors operating aircraft in compliance with these provisions. Violation of this provision may result in the loss of access privileges.

11.15  Subject Property

HHO shall limit access from their property to the Taxilane Safety Area to Registered Aircraft, visiting aircraft and approved service vehicles.

11.16  Maintenance

Maintenance of aircraft on the Subject Property shall only be conducted by licensed and qualified service providers.

# EXHIBIT C



# EXHIBIT D



# FIRST AMENDMENT TO LEASE AGREEMENT

This First Amendment to Lease Agreement (hereafter referred as "First Amendment") is made and entered into effective November 17, 2020, by and between Hawthorne Hangar Operations, LP, a California Limited Partnership ("Landlord") and Tesla Inc., a Delaware Corporation ("Tenant") and is based upon the following terms and conditions:

## RECITALS

WHEREAS Landlord and Tenant are parties to the Hawthorne Hangar Operations – Lease Agreement dated June 15, 2017 ("Lease"); and

WHEREAS the term of the Lease is scheduled to expire on June 14, 2022; and

WHEREAS, effective January 1, 2021, the Base Rent under the Lease shall be adjusted to $17,536.43 per month; and

WHEREAS Landlord and Tenant (collectively, the "Parties") desire to extend the term of the Lease, modify certain terms and conditions thereof, and incorporate the terms and conditions of this First Amendment into the Lease.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged, the parties agree as follows:

## AGREEMENT

1.  **Meaning of Terms; Effective Date.** Except as otherwise stated in this First Amendment (a) all initially capitalized terms in this amendment will have the respective defined meanings stated in the Lease, and (b) the terms and provisions of this amendment will be considered to be effective as of the date of this amendment, as set forth above in the first paragraph of this First Amendment.

2.  **Revised Lease Expiration Date; Extended Term.** The Lease Term (Lease Section 1.01) is currently scheduled to expire on June 14, 2022 ("Lease Expiration Date"). The term of this Lease is hereby extended to December 31, 2025 ("Revised Lease Expiration Date") and, unless terminated earlier under the terms of the Lease, the Lease will terminate and expire on the Revised Lease Expiration Date.

3.  **Base Rent.** From January 1, 2021 through December 31, 2021, Base Rent shall be $17,536.43 per month.  Commencing January 1, 2022, Base Rent shall be increased annually by three percent as follows:

    3.1   Effective January 1, 2022, Base Rent shall be $18,062.52 per month.

    3.2   Effective January 1, 2023, Base Rent shall be $18,604.40 per month.

1

T E S L A

3.3    Effective January 1, 2024, **Base Rent shall be** $19,192.53 per month.

3.4    Effective January 1, 2025, **Base Rent shall be** $19,768.31 per month subject to Base Rent abatement for the month of February, 2025. Tenant shall not pay any Base Rent in February 2025.

4.    **Annual CPI Adjustment.** Section 2.01(a)(2) of the Lease, titled "Annual CPI Adjustment," is deleted. Annual adjustments to Base Rent shall be three percent as provided above.

5.    **Pass Through Expenses.** Section 10.02 of the Lease is deleted and replaced with the following:

10.02. Landlord is billed by Southern California Edison Company ("SCE") for all electricity consumed at the Hawthorne Hangar Operations (referred to as "Landlord's Property"). The electricity bill from SCE is delivered to Landlord monthly and typically reflects charges incurred from about the 15th day of the prior month to about the 15th day of the current month. Tenant leases a portion of Landlord's Property (referred to as the "Leased Premises"). As required by the Lease, Tenant has installed a meter which records all the electricity, measured in Kilowatt Hours ("kWh"), consumed by the Leased Premises.

The Parties agree that Tenant will pay its share of Landlord's electricity bills based upon the electricity consumed by the Leased Premises. Thus, Tenant's allocable portion of Landlord's SCE bill (including all electrical, transmission, access, taxes, and related fees) will be a fraction comprised of the Tenant's kWh, for a given period, as the numerator and the Landlord's kWh as the denominator. Tenant's allocable share of the SCE bill will be the resulting fraction multiplied by the total SCE bill for the same period. This fraction will be referred to as "Tenant's Allocable Portion."

Electricity charges incurred after September 16, 2020, will be calculated and billed as follows: Beginning October 16, 2020, and on or about the 16th day of each successive month, Tenant will notify Landlord of the number of kWh then registered on the meter. Unless an alternate method is agreed to by Landlord and Tenant in writing, Tenant will photograph the meter to clearly show the kWh (with date and time) and will email the photograph to Jim Schulte (jim@danwolfe.com) or to such other person as Landlord may in writing direct. Landlord will then calculate Tenant's Allocable Portion of Landlord's SCE bill for that period and bill Tenant.

Charges billed under this section shall be paid by Tenant to Landlord within 30 days after Landlord's transmittal of the bill to Tenant. Tenant shall pay said charges monthly together with rent.

The Parties recognize that the meter was installed on May 26, 2020 and that, prior to September 16, 2020, Tenant paid for electricity based on the square footage of the Leased Premises rather than the actual electricity consumed by the Leased Premises resulting in

2

TESLA

an underpayment for electricity. Tenant agrees to pay to Landlord the Tenant's Allocable Portion of the electricity charges for the period May 26, 2020 to September 16, 2020 (the "Prior Period") and Landlord agrees to credit Tenant for amounts Tenant has paid for electricity for said Prior Period.

6.   **Conflict; Ratification.** If this First Amendment conflicts with the terms of the Lease, this First Amendment shall control to the extent of the conflict. Except as expressly modified herein, all terms and conditions contained in the Lease shall remain in full force and effect.

7.   **Counterparts.** This First Amendment may be signed in any number of counterparts, each of which shall be deemed an original, but all together shall constitute one and the same document.

8.   **Brokers.** Landlord and Tenant each represents to the other that it has had no dealings with any real estate broker, agent, or finder in connection with the negotiation of this First Amendment and that they know of no other real estate broker, agent, or finder who is entitled to a commission or finder's fee in connection with this First Amendment. Each party agrees to indemnify, protect, defend, and hold harmless the other party against all claims, demands, losses, liabilities, lawsuits, judgments, and costs and expenses (including reasonable attorney fees) for any leasing commission, finder's fee, or equivalent compensation alleged to be owing on account of the indemnifying party's dealings with any real estate broker, agent, or finder other than the Brokers.

9.   **Miscellaneous.** The Lease and this First Amendment, which is hereby incorporated into the Lease, constitute the entire agreement between the Parties and will be deemed to supersede and cancel any and all prior discussions, negotiations, proposals, understandings and agreements, whether written or oral relating to the Lease and this First Amendment. None of the previous or contemporaneous negotiations, drafts or previous versions of the First Amendment leading up to its execution and not set forth in the First Amendment will be used by any party to construe or effect the validity thereof. Each party acknowledges that no representation, inducement, or condition not set forth in the Lease or the First Amendment has been made or relied upon by either party. To be effective, all modifications, revisions, or amendments to the Lease or this First Amendment must be in writing and signed by the Parties. As a material inducement to enter into this First Amendment, the Parties hereby represent and warrant to each other that, as of the date each party signed this First Amendment, to the best of their knowledge and belief, the Parties are not presently in default in any respect under the Lease.

T E S L A

EXECUTED February 2, 2021

**"LANDLORD"**
Hawthorne Hangar Operation, LP
A California Limited Partnership
By Hawthorne Hangar Management, LLC
Its General Partner by its General Manager
Wolfe Air Aviation, Ltd.
A California Corporation

By: Dan Wolfe
Title: President


**"TENANT"**
Tesla, Inc., a Delaware Corporation

By:    Al Prescott
Title:   Secretary

4

T E S L A

## HAWTHORNE HANGAR OPERATIONS, LP
## LICENSE AGREEMENT FOR RAMP AND HANGAR SPACE

This License is made and entered into by and between Hawthorne Hangar Operations, LP ("Operator" or "Licensor") and Jaggers LLC ("User/Licensee"), who agree as follows:

### SUMMARY OF BASIC TERMS

The basic terms of this License are:

1. *Operator/Licensor*:  Hawthorne Hangar Operations, a California Limited Partnership

   Contact:
   Kathleen Gregory
   909 East Green Street
   Pasadena, CA 91106

2. *Licensee/User*:   Jaggers LLC

   Contact:
   Kramer LaPlante
   10345 Wilkins Ave #401, LA, CA, 90024
   Phone: 760-845-8806
   Fax:
   Email: kramer12212@gmail.com

   Aircraft:  Citation Mustang, N700YY
   Owner:        Kramer LaPlante
   Address:  Same as Above

3. *Premises*:    HHO Facility
   Hawthorne Airport (KHHR)

4. *Use*:   Storage of the following described aircraft:

   Citation Mustang, (CE-510), N700YY and/or
   ANY UPGRADE SUBSITUTE AIRCRAFT AT CONTRACT RATE PER SQ. FT. (#9 a)

5. *Description of Space*:  Ramp and Hangar Space
   For airplane with footprint of 1758.24 square feet
   (L (40.7) x W (43.2)

6. *Space Used*:  1758.24 square feet, "As Is-Where Is"

7. *Effective Date*:  January 22, 2021

1

8. *Term*:  12 months Initial Term from the Effective Date, with One (1), Twelve (12) Month Renewal. First Month of Rent Waived, First Date of Rent Due is February 22, 2021

    A.    Operator is authorized to park aircraft on ramp 5 days per year for special events in the hangar, which 5 days are at the sole discretion of the Operator, Weather Permitting.  HHO, LP will reflect compensation on the monthly invoice statement to the User, Daily Rate of Compensation not to exceed $150.00 per occurrence. This does not extend to cleaning of the hangar or hangar floors which HHO, LP maintains.  HHO, LP will be prudent as to not abuse this for extended hours out on our ramp.

9. *User Fees:*

    A.    Hangar Space: $2,300.00 Per Month, Daily Rate of $77.00

            Calculated at $1.308 x Aircraft Spec Footprint
            $1.308 x 1,758.24= $2,300.00

    B.    Ramp Space: Included for this aircraft

    C.    Office Space: N/A-Not Included however Common Area Office Space is available at no additional charge

    D.    No Charge for GPU, LAV Services or Utilities.

10. *Security Deposit*: $2,300.00 due at signing

11. *Fuel:*  TBD Cost ++ and/or CAA and/or Contract Fuel Provided by HHO, LP.

The Hawthorne Hangar Operations, LP License Agreement ('Agreement") consists of the foregoing Summary of Basic Terms, the HHO License Agreement Terms and Conditions and all Exhibits attached thereto, including but not limited to Hawthorne Municipal Airport Rules and Regulations and Hawthorne Hangar Operations Through the Fence Agreement.

**"OPERATOR/LICENSOR"**
Hawthorne Hangar Operation, LP
A California Limited Partnership
By Hawthorne Hangar Management, LLC
Its General Partner by its General Manager:
Wolfe Air Aviation, Ltd.
A California Corporation

By: Dan Wolfe
Title: President

**"USER/LICENSEE"**
Jaggers LLC

By: Kramer LaPlante
Title:  Owner

2

# HHO LICENSE AGREEMENT FOR RAMP AND HANGAR SPACE

## TERMS AND CONDITIONS

1.    **Description of Operator's Property**

Operator is the owner of the airplane hangar, ramp and associated real property known as the Hawthorne Hangar Operations located at 3507 Jack Northrop Avenue, Hawthorne, California 90250.

2.    **Grant of License**

Operator grants User a temporary license to use and occupy the Space described in the Summary of Terms.  User shall only use the Space for the purpose set forth in the Summary of Terms and for no other purpose.    Nothing in this Agreement shall be deemed to construe a grant of an interest in real property or to convey any estate or to vest property rights in the User.

3.    **Term**

3.1    **Initial Term**

The Initial Term of this Agreement shall be for the period stated in the Summary of Terms commencing on the Effective Date stated in the Summary of Terms, unless sooner terminated as provided in this Agreement.

3.2    **Renewal Term(s)**

Unless terminated as provided herein, following the Initial Term, this Agreement shall continue in effect from year to year, being automatically renewed after each year. Each renewed term shall be subject to all of the terms and conditions of this Agreement.

This Agreement will automatically renew, as provided above, unless either party gives written notice of termination to the other party at least Thirty (30) days prior to the end of the applicable Initial Term or Renewal Term.  In the event of such written notice, the Agreement will end at the conclusion of the Initial or Renewal Term.

The Initial Term together with each Renewal Term is referred to herein as the Term.

4.    **User Fees**

User agrees to pay to Operator the User Fees set forth in the Summary of Terms. Such User Fees shall be paid in advance on the first day of each month during the Term in consideration of User's use and occupancy of the Space for the Term.  User Fees shall

3

be prorated on a daily rate basis for any partial month during the Term. Following the Initial Term, Operator may increase User Fees by giving not less than sixty (60) days written notice to User. User Fees shall be paid to Operator at the address set forth in the Summary of Terms.

5.    **Late Charges**

If User fails to pay any User Fee or any other amount due under this Agreement within ten (10) days after the same becomes due, then User shall be obligated to pay a late charge equate to five (5) percent of the amount not so paid when due.

6.    **Security Deposit**

Concurrently with User's execution of this Agreement, User shall deposit with Operator the Security Deposit as provided in the Summary of Terms. Operator shall not be required to maintain the Security Deposit separate from its other accounts. If User defaults on any provision of this Agreement, Operator may (but shall not be required to), without prejudice to any other remedy it has, apply all or part of the Security Deposit to: (a) Any User Fees or other sum in default; (b) Any expense, loss, or damage that Operator has suffered or may suffer because of User's default; or (c) Any sums necessary to compensate Operator for loss or damage caused by User's acts or omission.

7.    **Maintenance**

8.1    **User's Obligation to Keep and Maintain**

User has inspected the Space and accepts the Space in its as-is condition. User shall keep and maintain the Space and every part thereof in good and clean condition and in accordance with the reasonable rules or regulations established by the Operator or the Airport from time to time during the Term. This provision is not intended to impose an obligation on User to repair the Space unless such repair is necessitated by the fault or neglect of User. User shall not make any alternations or additions to the Space without obtaining Operator's prior written permission, which permission may be refused at Operator's absolute discretion. User shall return occupancy at the termination of this Agreement in the same and in as good condition as exists on the Effective Date, reasonable wear and tear, damage by fire or casualty through no fault of the User and modifications expressly approved by the Operator excepted.

7.2    **Liens**

User agrees to promptly pay and discharge any claim of lien that may arise from any alteration, improvement or repair that User may make with respect to the Space and to hold Operator and Operator's property free harmless from any such liens and suits relating to such liens.

4

### 7.3    Operator Access

Operator reserves the right to enter the Space at all reasonable times for the purpose of making any inspection it may deem appropriate for the proper enforcement of any of the covenants and conditions of this Agreement or to undertake repairs, additions or alterations to the Space.

### 7.4    Taxes on User's Property

User shall be liable for all taxes and fees owed with respect to User's personal business and personal property. Under no circumstances shall Operator be liable for or required to pay any tax or fee owed by User.

## 8.    Use of Space

### 8.1    Compliance with Airport Rules, HHO TTF and All Laws

The Space shall not be used or permitted to be used in violation of any applicable law, ordinance, covenant or regulation.   User shall maintain the Space in a clean and orderly manner.

User is required to comply with requirements of the Hawthorne Municipal Airport Rules and Regulations and Operator's Through the Fence Agreement with the FAA and the City of Hawthorne.  Copies of the Airport Rules and Regulations and the pertinent sections of the Through the Fence Agreement are attached hereto as Exhibits A and B, respectfully, and incorporated herein by reference.   The full Through the Fence Agreement is available upon request.

### 8.2    Signs

User may not install or affix any signs without Operator's prior written consent.

### 8.3    Authority to Move Aircraft

User agrees that Operator's employees and agents are authorized to move and stage the aircraft described in the Summary of Terms.

## 9.    Early Termination and Default

### 9.1    Termination by Operator or User on Notice

Operator or User may terminate this Agreement at any time upon Thirty (30) days prior written notice from Operator to User or User to Operator.

5

## 9.2    Default

Operator may terminate this Agreement immediately upon User's default as provided herein. All covenants and agreements contained in this lease are declared to be conditions to this Agreement.   Without limitation, the following constitute a material default and breach of this Agreement by User:

(a)   Any failure to pay fees or any other amounts when due when the failure continues for five (5) days after Operator provides written notice to pay the amount due.

(b)   Any failure to perform any other covenant, condition, or agreement contained in this Agreement when the failure is not cured within five (5) days after written notice of the specific failure is given by Operator to User.

(c)   The bankruptcy or insolvency of User, the making by User of any general assignment for the benefit of creditors; the filing by or against User of a petition to have User adjudged a bankrupt or of a petition for reorganization or arrangement under the Bankruptcy Act (unless, in the case of a petition filed against User, it is dismissed within 60 days); the appointment of a trustee or receiver to take possession of substantially all of User's assets located at the Space, if possession is not restored to User within 30 days; or the attachment, execution, or other judicial seizure of substantially all of User's assets located at the Space, when that seizure is not discharged within 15 days.

## 9.3    Disposition of User's Property Upon Default

In the event of any default by User, Operator may terminate this Agreement upon prior written notice to User.  User shall remove all of User's property from the Space and pay to Operator all outstanding User Fees and other charges due and owing Operator under this Agreement as promptly as practicable under after the effective date of termination, but in all cases within five (5) business days of the effective date of termination.  If User should fail to vacate the Space within such period, User shall be deemed to be a trespasser and Operator may peaceably enter upon the Space and remove User's property without further notice, demand or court proceeding and without further notice, demand or court proceeding and without liability to User.  Operator shall be under no duty or obligation to store or maintain any of User's property at any time and shall not be liable to User for any damage to or destruction of such property.  If Operator stores the property, User shall be liable to Operator for the cost of transportation and storage.  The remedies granted to Landlord in this Article shall not be exclusive but shall be cumulative and in addition to all other remedies now or hereafter allowed by law or authorized in this lease.

## 9.4    No Waiver

The delay, waiver, omission, or forbearance on the part of Operator to exercise any right or power arising from any breach or default by User shall be deemed to

6

constitute a waiver by Operator of any such right or power, including, without limitation the right to declare User in default.

**10.     No Assignment or Transfer**

User shall not assign or otherwise transfer this Agreement or its rights or obligations hereunder or permit occupancy or use of the Space, in whole or in part, by another party.

**11.     Insurance**

**11.1    Liability Insurance**

User shall, at User's own cost and expense, secure and maintain during the entire term of this Agreement and any extended term of this Agreement, Aircraft Hull & Liability, public liability, and property damage liability insurance, insuring User and User's agents and employees against all bodily injury, property damage, personal injury, and other loss or liability caused by or connected with User's occupation and use of the Space under this Agreement in amounts not less than $10,000,000 Combined Single Limit Bodily Injury and Property Damage and an aggregate limit of not less than $10,000,000 as a result of any one accident or incident.  Operator shall be named as an **Additional Insured** and the policy or policies shall contain cross-liability endorsements.

In the event that Operator determines, in Operator's reasonable judgment, that the limits of the Aircraft Hull & liability, public liability, property damage, then carried by User are materially less than the amount or type of insurance typically carried by owners or users of properties located in Los Angeles County, which are similar to and operated for similar business purposes as the Space, Operator may elect to require User to increase the amount of specific coverage, change the type of policy carried, or both. If Operator so elects, User shall be notified in writing of the specific change in policy amount or type required and shall have 30 days after the date of Operator's notice to effect the change in amount or type of policy. Unless otherwise agreed by Operator and User, any adjustment under this section may be made not more often than every two (2) years.

Notwithstanding any other provision of this Agreement, neither party will be liable to the other party or to any insurance company (by way of subrogation or otherwise) for any loss of, or damage to, any of its property located within the Space or upon, or constituting a part of, the Space, which loss or damage arises from the perils that could be insured against under the ISO Causes of Loss-Special Form Coverage, including deductibles (whether or not the party suffering the loss or damage actually carries that insurance, recovers under that insurance, or self-insures the loss or damage).  These mutual waivers are in addition to, and not in limitation or derogation of, any other waiver or release contained in this Agreement with respect to any loss of, or damage to, property of Operator and User.    These waivers apply whether or not the loss is due to the negligent acts or omissions of Operator or User, or their respective officers, directors, employees, agents, contractors, or invitees. If required, each party agrees immediately to give its insurance company(ies) written notice of the terms of these mutual waivers and to

7

have its insurance policies properly endorsed, if necessary, to provide for a waiver of subrogation and to prevent the invalidation of any coverage by reason of these waivers.

## 11.2    User's Personal Property

User shall at all times during the term of this Agreement and at User's sole expense, keep all of User's personal property, including trade fixtures and equipment and all merchandise of User that may be in the Space from time to time, insured against loss or damage by fire and by any peril included within fire and extended coverage insurance for an amount that will insure the ability of User to fully replace the trade fixtures, equipment, and merchandise.

## 11.3    Workers' Compensation Insurance

User shall maintain in effect throughout the term of this Agreement, at User's sole expense, Workers' Compensation insurance in accordance with the laws of the State of California, and employers' liability insurance with a limit of not less than $1 million per employee and $1 million per occurrence.

## 11.4    Cancellation Clause

Any policy of insurance required under this Agreement shall be written by insurance companies authorized to do business in California. Each policy of insurance procured by User pursuant to this Article shall expressly provide that it cannot be canceled for any reason or altered in any manner unless at least 10 days' prior written notice has been given by the insurance company issuing the policy to Operator directed to the contact person listed in the Summary of Terms, or to a different person as Operator may direct in writing delivered to User.

## 11.5    Deposit of Insurance Policies With Operator

Promptly on the issuance, reissuance, or renewal of any insurance policy required by this Agreement, including fire and liability insurance policies, User shall cause a certificate evidencing the policy to be given to Operator.

## 11.6    Operator's Right to Procure Insurance

If at any time User fails to procure or maintain the insurance required by this Article, and such failure continue for a period of five (5) business days after notice from Operator to User, then Operator may obtain that insurance and pay the premiums on it for the benefit of User. Any amounts paid by Operator to procure or maintain insurance pursuant to this Article shall be immediately due and repayable to Operator by User with the next then due installment of User's Fees under this Agreement; failure to repay at that time any amount expended by Operator shall be considered the same as a failure to pay User's Fees and a default by User under this Agreement.

8

## 12.    Indemnity

Any and all injury, breakage or damage to the Space or the real property of which the Space is a part, arising from any cause, done by User or its agents, contractors, servants, invitees or employees, is the responsibility of User and may be repaired by Operator at the sole expense of User.

User agrees to indemnify, save and hold harmless the Operator, its partners, general partner, members, managers, officers, directors, employees and agents (collectively the "Indemnitees"), from any and all liabilities, damages, and claims of any sort, including expenses and reasonable attorney's fees resulting from or arising out of any of User's business operations, occupancy or use of the Space or from any act or omission of User's agents, contractors, servants, invitees or employees. This indemnity shall apply and protect the Indemnitees whether or not they were negligent or their actions or failures to act contributed to such liability, expense, cause of action or damage.

## 13.    Disclaimer of Liability

All personal property of User, its agents, contractors, servants, invitees or employees, in and on the Space or any part of the real property on which the Space is located, shall be and remain therein under any and all circumstances at the sole risk of said parties and Operator shall in no event be liable to any such person or party of any damage to or loss thereof.

Operator shall not be liable for any personal injury to User, User's agents, contractors, servants, invitees or employees arising from the use and condition of the Space or any part of the real property on which the Space is located.

The parties agree that under no circumstances shall Operator or Airport be liable to User or any of the User's agents, contractors, servants, invitees or employees for indirect incidental, consequential special, punitive or exemplary damages whether in contract or tort (including strict liability and negligence) including but not limited to, damages for diminution in value, loss of use, lost profits or lost opportunity. Operator shall have no obligation to keep, maintain or secure User's property, and User assumes all risk of loss or damage to its property located in the Space.

## 14.    Miscellaneous

### 14.1    Notices

Except as otherwise expressly provided by law, any and all notices or other communications required or permitted by this lease or by law to be served on or given to either party to this lease by the other party shall be in writing and shall be deemed duly served and given when personally delivered to the party to whom it is directed or to any managing employee or officer of that party or, in lieu of personal service, when deposited in the United States mail, first-class postage prepaid, addressed to User and Operator and

9

directed to their respective Contact person(s) listed in the Summary of Terms. Either party may change its address for purposes of this Section by giving written notice of that change to the other party in the manner provided in this section.

### 14.2    Attorneys' Fees

If any litigation, including arbitration proceedings, is commenced between the parties to this Agreement concerning this Agreement or the rights and duties of either in relation to this Agreement, the party prevailing in that litigation shall be entitled, in addition to any other relief that may be granted in the litigation, to a reasonable sum as and for its attorneys' fees in the litigation, which shall be determined by the court in that litigation or in a separate action brought for that purpose.

### 14.3    California Law

This Agreement will be governed by and construed in accordance with the laws of the State of California.

### 14.4    Venue

The venue for any legal action filed arising out of relating to this Agreement shall be Los Angeles, California.

### 14.5    Binding on Successors

This Agreement shall be binding on and shall inure to the successors, and assigns of the User and Operator, respectively, provided that nothing contained in this section shall be construed as consent by Operator to any assignment of this Agreement or any interest in this Agreement by User.

### 14.6    Sole and Only Agreement

This Agreement constitutes the sole and only full, final, and complete agreement between Operator and User respecting the subject matter of this Agreement and this Agreement correctly sets forth the obligations of Operator and User to each other as of its date. Any agreements or representations respecting the subject matter of this Agreement not expressly set forth in this document are null and void. All prior negotiations between the parties are subsumed into this Agreement to the extent they have been agreed to, and if not agreed to by the parties such negotiations are not set forth in the terms and conditions of this Agreement. This Agreement may not be extended, amended, modified, altered, or changed, except in a writing signed by Operator and User.

### 14.7   Representation and Warranty of Authority

If User is a corporation, limited liability company, partnership or any other entity, then each individual executing this Agreement on behalf of User represents and warrants to Operator that User is a duly formed and legally valid entity and that the individual executing this Agreement on behalf of User has full power and authority to bind the User to this Agreement and to cause User to perform its obligations under this Agreement.

EXECUTED _____ at Hawthorne, California.

**"OPERATOR/LICENSOR"**
Hawthorne Hangar Operation, LP
A California Limited Partnership
By Hawthorne Hangar Management, LLC
Its General Partner by its General Manager:
Wolfe Air Aviation, Ltd.
A California Corporation

By: Dan Wolfe, President

**"USER/LICENSEE"**
Jaggers LLC

By:  Kramer LaPlante
Title: Owner



# HAWTHORNE HANGAR OPERATIONS, LP
## LICENSE AGREEMENT FOR RAMP AND HANGAR SPACE

This License is made and entered into by and between Hawthorne Hangar Operations, LP
("Operator" or "Licensor") and Big Wednesday Air, a California Limited Liability Company
("User/Licensee"), who agree as follows:

### SUMMARY OF BASIC TERMS

The basic terms of this License are:

1.  *Operator/Licensor:*  Hawthorne Hangar Operations, a California Limited Partnership

> Contact:
> Kathleen Gregory
> 909 East Green Street
> Pasadena, CA 91106

2.  *Licensee/User:*  Big Wednesday Air, a California Limited Liability Company

> Contact:
> Steve B Rapp
> Manager
> 4250 Wilshire Blvd.
> Los Angeles, CA 90010
> sbrflyer@icloud.com
> 951-314-5996

3.  *Premises:*    HHO Facility
Hawthorne Airport (KHHR)

4.  *Use:*    Storage of the following described aircraft:

N288SE, 2017 PILATUS AIRCRAFT

5.  *Description of Space:*  Ramp and Hangar Space
For airplane with footprint of 2,525.82 square feet
(L (47.3) x W (53.4)

6.  *Space Used:*  2,525.82 square feet

7.  *Effective Date:*  SEPTEMBER 1, 2019

8.  *Term:*  24 months from the Effective Date



9.  *User Fees:*

    A.    Hangar Space: $3,536.15 /month due on first of month

        Calculated at $1.40 x Space Used
        $1.40 x 2,525.82 = $3,536.15

    B.    Ramp Space: Included for this aircraft

    C.    Office Space: N/A

10.  *Security Deposit*: $ WAIVED due at signing

11.  *Fuel:*  TBD Cost ++

The Hawthorne Hangar Operations, LP License Agreement ('Agreement") consists of the foregoing Summary of Basic Terms, the HHO License Agreement Terms and Conditions and all Exhibits attached thereto, including but not limited to Hawthorne Municipal Airport Rules and Regulations and Hawthorne Hangar Operations Through the Fence Agreement.

**"OPERATOR/LICENSOR"**
Hawthorne Hangar Operation, LP
A California Limited Partnership
By Hawthorne Hangar Management, LLC
Its General Partner by its General Manager:
Wolfe Air Aviation, Ltd.
A California Corporation

By: Dan Wolfe
Title: President

**"USER/LICENSEE"**
Big Wednesday Air, LLC

By: Steve B. Rapp
Title:  Manager



## HHO LICENSE AGREEMENT FOR RAMP AND HANGAR SPACE

### TERMS AND CONDITIONS

**1.    Description of Operator's Property**

Operator is the owner of the airplane hangar, ramp and associated real property known as the Hawthorne Hangar Operations located at 3507 Jack Northrop Avenue, Hawthorne, California 90250.

**2.    Grant of License**

Operator grants User a temporary license to use and occupy the Space described in the Summary of Terms.  User shall only use the Space for the purpose set forth in the Summary of Terms and for no other purpose.  Nothing in this Agreement shall be deemed to construe a grant of an interest in real property or to convey any estate or to vest property rights in the User.

**3.    Term**

**3.1    Initial Term**

The Initial Term of this Agreement shall be for the period stated in the Summary of Terms commencing on the Effective Date stated in the Summary of Terms, unless sooner terminated as provided in this Agreement.

**3.2    Renewal Term(s)**

Unless terminated as provided herein, following the Initial Term, this Agreement shall continue in effect from year to year, being automatically renewed after each year. Each renewed term shall be subject to all of the terms and conditions of this Agreement.

This Agreement will automatically renew, as provided above, unless either party gives written notice of termination to the other party at least sixty (60) days prior to the end of the applicable Initial Term or Renewal Term.  In the event of such written notice, the Agreement will end at the conclusion of the Initial or Renewal Term.

The Initial Term together with each Renewal Term is referred to herein as the Term.

**4.    User Fees**

User agrees to pay to Operator the User Fees set forth in the Summary of Terms. Such User Fees shall be paid in advance on the first day of each month during the Term in consideration of User's use and occupancy of the Space for the Term. User Fees shall be prorated on a daily rate basis for any partial month during the Term. Following the Initial Term, Operator may increase User Fees by giving not less than sixty (60) days written notice to User.  User Fees shall be paid to Operator at the address set forth in the Summary of Terms.

### 5. Late Charges

If User fails to pay any User Fee or any other amount due under this Agreement within ten (10) days after the same becomes due, then User shall be obligated to pay a late charge equate to five (5) percent of the amount not so paid when due.

### 6. Security Deposit

Concurrently with User's execution of this Agreement, User shall deposit with Operator the Security Deposit as provided in the Summary of Terms. Operator shall not be required to maintain the Security Deposit separate from its other accounts. If User defaults on any provision of this Agreement, Operator may (but shall not be required to), without prejudice to any other remedy it has, apply all or part of the Security Deposit to: (a) Any User Fees or other sum in default; (b) Any expense, loss, or damage that Operator has suffered or may suffer because of User's default; or (c) Any sums necessary to compensate Operator for loss or damage caused by User's acts or omission.

### 7. Maintenance

#### 8.1 User's Obligation to Keep and Maintain

User has inspected the Space and accepts the Space in its as-is condition. User shall keep and maintain the Space and every part thereof in good and clean condition and in accordance with the reasonable rules or regulations established by the Operator or the Airport from time to time during the Term. This provision is not intended to impose an obligation on User to repair the Space unless such repair is necessitated by the fault or neglect of User. User shall not make any alternations or additions to the Space without obtaining Operator's prior written permission, which permission may be refused at Operator's absolute discretion. User shall return occupancy at the termination of this Agreement in the same and in as good condition as exists on the Effective Date, reasonable wear and tear, damage by fire or casualty through no fault of the User and modifications expressly approved by the Operator excepted.

#### 7.2 Liens

User agrees to promptly pay and discharge any claim of lien that may arise from any alteration, improvement or repair that User may make with respect to the Space and to hold Operator and Operator's property free harmless from any such liens and suits relating to such liens.

#### 7.3 Operator Access

Operator reserves the right to enter the Space at all reasonable times for the purpose of making any inspection it may deem appropriate for the proper enforcement of any of the covenants and conditions of this Agreement or to undertake repairs, additions or alterations to the Space.

### 7.4    Taxes on User's Property

User shall be liable for all taxes and fees owed with respect to User's personal business and personal property. Under no circumstances shall Operator be liable for or required to pay any tax or fee owed by User.

## 8.    Use of Space

### 8.1    Compliance with Airport Rules, HHO TTF and All Laws

The Space shall not be used or permitted to be used in violation of any applicable law, ordinance, covenant or regulation.    User shall maintain the Space in a clean and orderly manner.

User is required to comply with requirements of the Hawthorne Municipal Airport Rules and Regulations and Operator's Through the Fence Agreement with the FAA and the City of Hawthorne.  Copies of the Airport Rules and Regulations and the pertinent sections of the Through the Fence Agreement are attached hereto as Exhibits A and B, respectfully, and incorporated herein by reference. The full Through the Fence Agreement is available upon request.

### 8.2    Signs

User may not install or affix any signs without Operator's prior written consent.

### 8.3    Authority to Move Aircraft

User agrees that Operator's employees and agents are authorized to move and stage the aircraft described in the Summary of Terms.

## 9.    Early Termination and Default

### 9.1    Termination by Operator on Notice

Operator may terminate this Agreement at any time upon Sixty (60) days prior written notice to User.

### 9.2    Default

Operator may terminate this Agreement immediately upon User's default as provided herein.  All covenants and agreements contained in this lease are declared to be conditions to this Agreement.    Without limitation, the following constitute a material default and breach of this Agreement by User:

(a)  Any failure to pay fees or any other amounts when due when the failure continues for five (5) days after Operator provides written notice to pay the amount due.

(b)  Any failure to perform any other covenant, condition, or agreement contained in this Agreement when the failure is not cured within five (5) days after written notice of the specific failure is given by Operator to User.

(c)  The bankruptcy or insolvency of User, the making by User of any general assignment for the benefit of creditors; the filing by or against User of a petition to have User adjudged a bankrupt or of a petition for reorganization or arrangement under the Bankruptcy Act (unless, in the case of a petition filed against User, it is dismissed within 60 days); the appointment of a trustee or receiver to take possession of substantially all of User's assets located at the Space, if possession is not restored to User within 30 days; or the attachment, execution, or other judicial seizure of substantially all of User's assets located at the Space, when that seizure is not discharged within 15 days.

### 9.3    Disposition of User's Property Upon Default

In the event of any default by User, Operator may terminate this Agreement upon prior written notice to User.  User shall remove all of User's property from the Space and pay to Operator all outstanding User Fees and other charges due and owing Operator under this Agreement as promptly as practicable under after the effective date of termination, but in all cases within five (5) business days of the effective date of termination. If User should fail to vacate the Space within such period, User shall be deemed to be a trespasser and Operator may peaceably enter upon the Space and remove User's property without further notice, demand or court proceeding and without further notice, demand or court proceeding and without liability to User.  Operator shall be under no duty or obligation to store or maintain any of User's property at any time and shall not be liable to User for any damage to or destruction of such property.  If Operator stores the property, User shall be liable to Operator for the cost of transportation and storage.  The remedies granted to Landlord in this Article shall not be exclusive but shall be cumulative and in addition to all other remedies now or hereafter allowed by law or authorized in this lease.

### 9.4    No Waiver

The delay, waiver, omission, or forbearance on the part of Operator to exercise any right or power arising from any breach or default by User shall be deemed to constitute a waiver by Operator of any such right or power, including, without limitation the right to declare User in default.

## 10.    No Assignment or Transfer

User shall not assign or otherwise transfer this Agreement or its rights or obligations hereunder or permit occupancy or use of the Space, in whole or in part, by another party.

## 11.    Insurance

### 11.1    Liability Insurance

User shall, at User's own cost and expense, secure and maintain during the entire term of this Agreement and any extended term of this Agreement, Aircraft Hull & Liability,

6

public liability, and property damage liability insurance, insuring User and User's agents and employees against all bodily injury, property damage, personal injury, and other loss or liability caused by or connected with User's occupation and use of the Space under this Agreement in amounts not less than $10,000,000 Combined Single Limit Bodily Injury and Property Damage and an aggregate limit of not less than $10,000,000 as a result of any one accident or incident.   Operator shall be named as an **Additional Insured** and the policy or policies shall contain cross-liability endorsements.

In the event that Operator determines, in Operator's reasonable judgment, that the limits of the Aircraft Hull & liability, public liability, property damage, then carried by User are materially less than the amount or type of insurance typically carried by owners or users of properties located in Los Angeles County, which are similar to and operated for similar business purposes as the Space, Operator may elect to require User to increase the amount of specific coverage, change the type of policy carried, or both. If Operator so elects, User shall be notified in writing of the specific change in policy amount or type required and shall have 30 days after the date of Operator's notice to effect the change in amount or type of policy. Unless otherwise agreed by Operator and User, any adjustment under this section may be made not more often than every two (2) years.

Notwithstanding any other provision of this Agreement, neither party will be liable to the other party or to any insurance company (by way of subrogation or otherwise) for any loss of, or damage to, any of its property located within the Space or upon, or constituting a part of, the Space, which loss or damage arises from the perils that could be insured against under the ISO Causes of Loss-Special Form Coverage, including deductibles (whether or not the party suffering the loss or damage actually carries that insurance, recovers under that insurance, or self-insures the loss or damage). These mutual waivers are in addition to, and not in limitation or derogation of, any other waiver or release contained in this Agreement with respect to any loss of, or damage to, property of Operator and User.   These waivers apply whether or not the loss is due to the negligent acts or omissions of Operator or User, or their respective officers, directors, employees, agents, contractors, or invitees. If required, each party agrees immediately to give its insurance company(ies) written notice of the terms of these mutual waivers and to have its insurance policies properly endorsed, if necessary, to provide for a waiver of subrogation and to prevent the invalidation of any coverage by reason of these waivers.

## 11.2   User's Personal Property

User shall at all times during the term of this Agreement and at User's sole expense, keep all of User's personal property, including trade fixtures and equipment and all merchandise of User that may be in the Space from time to time, insured against loss or damage by fire and by any peril included within fire and extended coverage insurance for an amount that will insure the ability of User to fully replace the trade fixtures, equipment, and merchandise.

## 11.3   Workers' Compensation Insurance

User shall maintain in effect throughout the term of this Agreement, at User's sole expense, Workers' Compensation insurance in accordance with the laws of the State of

California, and employers' liability insurance with a limit of not less than $1 million per employee and $1 million per occurrence.

### 11.4    Cancellation Clause

Any policy of insurance required under this Agreement shall be written by insurance companies authorized to do business in California. Each policy of insurance procured by User pursuant to this Article shall expressly provide that it cannot be canceled for any reason or altered in any manner unless at least 10 days' prior written notice has been given by the insurance company issuing the policy to Operator directed to the contact person listed in the Summary of Terms, or to a different person as Operator may direct in writing delivered to User.

### 11.5    Deposit of Insurance Policies With Operator

Promptly on the issuance, reissuance, or renewal of any insurance policy required by this Agreement, including fire and liability insurance policies, User shall cause a certificate evidencing the policy to be given to Operator.

### 11.6    Operator's Right to Procure Insurance

If at any time User fails to procure or maintain the insurance required by this Article, and such failure continue for a period of five (5) business days after notice from Operator to User, then Operator may obtain that insurance and pay the premiums on it for the benefit of User. Any amounts paid by Operator to procure or maintain insurance pursuant to this Article shall be immediately due and repayable to Operator by User with the next then due installment of User's Fees under this Agreement; failure to repay at that time any amount expended by Operator shall be considered the same as a failure to pay User's Fees and a default by User under this Agreement.

### 12.    Indemnity

Any and all injury, breakage or damage to the Space or the real property of which the Space is a part, arising from any cause, done by User or its agents, contractors, servants, invitees or employees, is the responsibility of User and may be repaired by Operator at the sole expense of User.

User agrees to indemnify, save and hold harmless the Operator, its partners, general partner, members, managers, officers, directors, employees and agents (collectively the "Indemnitees"), from any and all liabilities, damages, and claims of any sort, including expenses and reasonable attorney's fees resulting from or arising out of any of User's business operations, occupancy or use of the Space or from any act or omission of User's agents, contractors, servants, invitees or employees. This indemnity shall apply and protect the Indemnitees whether or not they were negligent or their actions or failures to act contributed to such liability, expense, cause of action or damage.

### 13.    Disclaimer of Liability

8

All personal property of User, its agents, contractors, servants, invitees or employees, in and on the Space or any part of the real property on which the Space is located, shall be and remain therein under any and all circumstances at the sole risk of said parties and Operator shall in no event be liable to any such person or party of any damage to or loss thereof.

Operator shall not be liable for any personal injury to User, User's agents, contractors, servants, invitees or employees arising from the use and condition of the Space or any part of the real property on which the Space is located.

The parties agree that under no circumstances shall Operator or Airport be liable to User or any of the User's agents, contractors, servants, invitees or employees for indirect incidental, consequential special, punitive or exemplary damages whether in contract or tort (including strict liability and negligence) including but not limited to, damages for diminution in value, loss of use, lost profits or lost opportunity. Operator shall have no obligation to keep, maintain or secure User's property, and User assumes all risk of loss or damage to its property located in the Space.

## 14. Miscellaneous

### 14.1 Notices

Except as otherwise expressly provided by law, any and all notices or other communications required or permitted by this lease or by law to be served on or given to either party to this lease by the other party shall be in writing and shall be deemed duly served and given when personally delivered to the party to whom it is directed or to any managing employee or officer of that party or, in lieu of personal service, when deposited in the United States mail, first-class postage prepaid, addressed to User and Operator and directed to their respective Contact person(s) listed in the Summary of Terms. Either party may change its address for purposes of this Section by giving written notice of that change to the other party in the manner provided in this section.

### 14.2 Attorneys' Fees

If any litigation, including arbitration proceedings, is commenced between the parties to this Agreement concerning this Agreement or the rights and duties of either in relation to this Agreement, the party prevailing in that litigation shall be entitled, in addition to any other relief that may be granted in the litigation, to a reasonable sum as and for its attorneys' fees in the litigation, which shall be determined by the court in that litigation or in a separate action brought for that purpose.

### 14.3 California Law

This Agreement will be governed by and construed in accordance with the laws of the State of California.

### 14.4 Venue

9

The venue for any legal action filed arising out of relating to this Agreement shall be Los Angeles, California.

### 14.5    Binding on Successors

This Agreement shall be binding on and shall inure to the successors, and assigns of the User and Operator, respectively, provided that nothing contained in this section shall be construed as consent by Operator to any assignment of this Agreement or any interest in this Agreement by User.

### 14.6    Sole and Only Agreement

This Agreement constitutes the sole and only full, final, and complete agreement between Operator and User respecting the subject matter of this Agreement and this Agreement correctly sets forth the obligations of Operator and User to each other as of its date.  Any agreements or representations respecting the subject matter of this Agreement not expressly set forth in this document are null and void.  All prior negotiations between the parties are subsumed into this Agreement to the extent they have been agreed to, and if not agreed to by the parties such negotiations are not set forth in the terms and conditions of this Agreement.   This Agreement may not be extended, amended, modified, altered, or changed, except in a writing signed by Operator and User.

### 14.7    Representation and Warranty of Authority

If User is a corporation, limited liability company, partnership or any other entity, then each individual executing this Agreement on behalf of User represents and warrants to Operator that User is a duly formed and legally valid entity and that the individual executing this Agreement on behalf of User has full power and authority to bind the User to this Agreement and to cause User to perform its obligations under this Agreement.

EXECUTED _____8-26-19_____ at Hawthorne, California.

**"OPERATOR/LICENSOR"**
Hawthorne Hangar Operation, LP
A California Limited Partnership
By Hawthorne Hangar Management, LLC
Its General Partner by its General Manager:
Wolfe Air Aviation, Ltd.
A California Corporation

By: Dan Wolfe, President

**"USER/LICENSEE"**
Big Wednesday Air, LLC

By:  Steve B. Rapp
Title: Manager

10

## HAWTHORNE HANGAR OPERATIONS, LP
## LICENSE AGREEMENT FOR RAMP AND HANGAR SPACE

This License is made and entered into by and between Hawthorne Hangar Operations, LP ("Operator" or "Licensor") and AMPAIRE, Inc. ("User/Licensee"), who agree as follows:

### SUMMARY OF BASIC TERMS

The basic terms of this License are:

1. *Operator/Licensor*:  Hawthorne Hangar Operations, a California Limited Partnership

   Contact:
   Kathleen Gregory
   909 East Green Street
   Pasadena, CA 91106
   klgregory@phillipsco.com

2. *Licensee/User*:      AMPAIRE INC

   Contact:  *Administration Manager*
   Lucenda De Leon
   3507 Jack Northrop Ave.
   Hawthorne, CA., 90205
   lucenda@ampaire.com
   Cell 213-510-6257

3. *Premises*:   HHO Facility
   Hawthorne Airport (KHHR)

4. *Use*:   Storage of the following described aircraft:

   N405GV, 2001 CESSNA 208B-0892

5. *Description of Space:* Hangar or Ramp
   For airplane with footprint of 2428.4 Square Feet
   L (41.7) x W (52.00)
   AND INDUSTRIAL CURTAIN 5FT X 52FT

6. *Space Used*:  2428.4 Square Feet

7. *Effective Date:*  JANUARY 1, 2022

8. *Term*:  12 months from the Effective Date

1

9.   *User Fees:*

   A.   Hangar Space:

        Calculated at $1.65 x Space Used
        $1.65 x 2428.40 = $4,006.84

   B.   HANGAR Space: $4,006.84 Per Month Due the 1st of each month

   C.   Office Space: N/A

10.   *Security Deposit*: $ 4,006.84 due at signing


11.   *Fuel:*   TBD

The Hawthorne Hangar Operations, LP License Agreement ('Agreement') consists of the
foregoing Summary of Basic Terms, the HHO License Agreement Terms and Conditions and all
Exhibits attached thereto, including but not limited to Hawthorne Municipal Airport Rules and
Regulations and Hawthorne Hangar Operations Through the Fence Agreement.


**"OPERATOR/LICENSOR"**                        **"USER/LICENSEE"**
Hawthorne Hangar Operation, LP                 AMPAIRE, Inc
A California Limited Partnership
By Hawthorne Hangar Management, LLC
Its General Partner by its General Manager:
Wolfe Air Aviation, Ltd.                        By: Kevin Noertker,
A California Corporation                         Title:  CEO of AMPAIRE INC.



By: Dan Wolfe
Title: President


2

## HHO LICENSE AGREEMENT FOR RAMP AND HANGAR SPACE

## TERMS AND CONDITIONS

1. **Description of Operator's Property**

Operator is the owner of the airplane hangar, ramp and associated real property known as the Hawthorne Hangar Operations located at 3507 Jack Northrop Avenue, Hawthorne, California 90250.

2. **Grant of License**

Operator grants User a temporary license to use and occupy the Space described in the Summary of Terms. User shall only use the Space for the purpose set forth in the Summary of Terms and for no other purpose. Nothing in this Agreement shall be deemed to construe a grant of an interest in real property or to convey any estate or to vest property rights in the User.

3. **Term**

   3.1    **Initial Term**

The Initial Term of this Agreement shall be for the period stated in the Summary of Terms commencing on the Effective Date stated in the Summary of Terms, unless sooner terminated as provided in this Agreement.

   3.2    **Renewal Term(s)**

Unless terminated as provided herein, following the Initial Term, this Agreement shall continue in effect from year to year, being automatically renewed after each year. Each renewed term shall be subject to all of the terms and conditions of this Agreement.

This Agreement will automatically renew, as provided above, unless either party gives written notice of termination to the other party at least sixty (60) days prior to the end of the applicable Initial Term or Renewal Term. In the event of such written notice, the Agreement will end at the conclusion of the Initial or Renewal Term.

The Initial Term together with each Renewal Term is referred to herein as the Term.

4. **User Fees**

User agrees to pay to Operator the User Fees set forth in the Summary of Terms. Such User Fees shall be paid in advance on the first day of each month during the Term in consideration of User's use and occupancy of the Space for the Term. User Fees shall be prorated on a daily rate basis for any partial month during the Term. Following the Initial Term, Operator may increase User Fees by giving not less than sixty (60) days written notice to User. User Fees shall be paid to Operator at the address set forth in the Summary of Terms.

3

5.    **Late Charges**

If User fails to pay any User Fee or any other amount due under this Agreement within ten (10) days after the same becomes due, then User shall be obligated to pay a late charge equate to five (5) percent of the amount not so paid when due.

6.    **Security Deposit**

Concurrently with User's execution of this Agreement, User shall deposit with Operator the Security Deposit as provided in the Summary of Terms. Operator shall not be required to maintain the Security Deposit separate from its other accounts. If User defaults on any provision of this Agreement, Operator may (but shall not be required to), without prejudice to any other remedy it has, apply all or part of the Security Deposit to: (a) Any User Fees or other sum in default; (b) Any expense, loss, or damage that Operator has suffered or may suffer because of User's default; or (c) Any sums necessary to compensate Operator for loss or damage caused by User's acts or omission.

7.    **Maintenance**

8.1    **User's Obligation to Keep and Maintain**

User has inspected the Space and accepts the Space in its as-is condition. User shall keep and maintain the Space and every part thereof in good and clean condition and in accordance with the reasonable rules or regulations established by the Operator or the Airport from time to time during the Term. This provision is not intended to impose an obligation on User to repair the Space unless such repair is necessitated by the fault or neglect of User. User shall not make any alternations or additions to the Space without obtaining Operator's prior written permission, which permission may be refused at Operator's absolute discretion. User shall return occupancy at the termination of this Agreement in the same and in as good condition as exists on the Effective Date, reasonable wear and tear, damage by fire or casualty through no fault of the User and modifications expressly approved by the Operator excepted.

7.2    **Liens**

User agrees to promptly pay and discharge any claim of lien that may arise from any alteration, improvement or repair that User may make with respect to the Space and to hold Operator and Operator's property free harmless from any such liens and suits relating to such liens.

7.3    **Operator Access**

Operator reserves the right to enter the Space at all reasonable times for the purpose of making any inspection it may deem appropriate for the proper enforcement of any of the covenants and conditions of this Agreement or to undertake repairs, additions or alterations to the Space.

### 7.4    Taxes on User's Property

User shall be liable for all taxes and fees owed with respect to User's personal business and personal property. Under no circumstances shall Operator be liable for or required to pay any tax or fee owed by User.

## 8.    Use of Space

### 8.1    Compliance with Airport Rules, HHO TTF and All Laws

The Space shall not be used or permitted to be used in violation of any applicable law, ordinance, covenant, or regulation.    User shall maintain the Space in a clean and orderly manner.

User is required to comply with requirements of the Hawthorne Municipal Airport Rules and Regulations and Operator's Through the Fence Agreement with the FAA and the City of Hawthorne.  Copies of the Airport Rules and Regulations and the pertinent sections of the Through the Fence Agreement are attached hereto as Exhibits A and B, respectfully, and incorporated herein by reference. The full Through the Fence Agreement is available upon request.

### 8.2    Signs

User may not install or affix any signs without Operator's prior written consent.

### 8.3    Authority to Move Aircraft

User agrees that Operator's employees and agents are authorized to move and stage the aircraft described in the Summary of Terms.

## 9.    Early Termination and Default

### 9.1    Termination by Operator on Notice

Operator may terminate this Agreement at any time upon Sixty (60) days prior written notice to User.

### 9.2    Default

Operator may terminate this Agreement immediately upon User's default as provided herein. All covenants and agreements contained in this lease are declared to be conditions to this Agreement.   Without limitation, the following constitute a material default and breach of this Agreement by User:

(a)   Any failure to pay fees or any other amounts when due when the failure continues for five (5) days after Operator provides written notice to pay the amount due.

5

(b)  Any failure to perform any other covenant, condition, or agreement contained in this Agreement when the failure is not cured within five (5) days after written notice of the specific failure is given by Operator to User.

(c)  The bankruptcy or insolvency of User, the making by User of any general assignment for the benefit of creditors; the filing by or against User of a petition to have User adjudged a bankrupt or of a petition for reorganization or arrangement under the Bankruptcy Act (unless, in the case of a petition filed against User, it is dismissed within 60 days); the appointment of a trustee or receiver to take possession of substantially all of User's assets located at the Space, if possession is not restored to User within 30 days; or the attachment, execution, or other judicial seizure of substantially all of User's assets located at the Space, when that seizure is not discharged within 15 days.

### 9.3    Disposition of User's Property Upon Default

In the event of any default by User, Operator may terminate this Agreement upon prior written notice to User.  User shall remove all of User's property from the Space and pay to Operator all outstanding User Fees and other charges due and owing Operator under this Agreement as promptly as practicable under after the effective date of termination, but in all cases within five (5) business days of the effective date of termination. If User should fail to vacate the Space within such period, User shall be deemed to be a trespasser and Operator may peaceably enter upon the Space and remove User's property without further notice, demand or court proceeding and without further notice, demand or court proceeding and without liability to User.  Operator shall be under no duty or obligation to store or maintain any of User's property at any time and shall not be liable to User for any damage to or destruction of such property.  If Operator stores the property, User shall be liable to Operator for the cost of transportation and storage.  The remedies granted to Landlord in this Article shall not be exclusive but shall be cumulative and in addition to all other remedies now or hereafter allowed by law or authorized in this lease.

### 9.4    No Waiver

The delay, waiver, omission, or forbearance on the part of Operator to exercise any right or power arising from any breach or default by User shall be deemed to constitute a waiver by Operator of any such right or power, including, without limitation the right to declare User in default.

## 10.    No Assignment or Transfer

User shall not assign or otherwise transfer this Agreement or its rights or obligations hereunder or permit occupancy or use of the Space, in whole or in part, by another party.

## 11.    Insurance

### 11.1    Liability Insurance

User shall, at User's own cost and expense, secure and maintain during the entire term of this Agreement and any extended term of this Agreement, Aircraft Hull & Liability,

6

public liability, and property damage liability insurance, insuring User and User's agents and employees against all bodily injury, property damage, personal injury, and other loss or liability caused by or connected with User's occupation and use of the Space under this Agreement in amounts not less than $10,000,000 Combined Single Limit Bodily Injury and Property Damage and an aggregate limit of not less than $10,000,000 as a result of any one accident or incident.   Operator shall be named as an **Additional Insured** and the policy or policies shall contain cross-liability endorsements.

In the event that Operator determines, in Operator's reasonable judgment, that the limits of the Aircraft Hull & liability, public liability, property damage, then carried by User are materially less than the amount or type of insurance typically carried by owners or users of properties located in Los Angeles County, which are similar to and operated for similar business purposes as the Space, Operator may elect to require User to increase the amount of specific coverage, change the type of policy carried, or both. If Operator so elects, User shall be notified in writing of the specific change in policy amount or type required and shall have 30 days after the date of Operator's notice to effect the change in amount or type of policy. Unless otherwise agreed by Operator and User, any adjustment under this section may be made not more often than every two (2) years.

Notwithstanding any other provision of this Agreement, neither party will be liable to the other party or to any insurance company (by way of subrogation or otherwise) for any loss of, or damage to, any of its property located within the Space or upon, or constituting a part of, the Space, which loss or damage arises from the perils that could be insured against under the ISO Causes of Loss-Special Form Coverage, including deductibles (whether or not the party suffering the loss or damage actually carries that insurance, recovers under that insurance, or self-insures the loss or damage). These mutual waivers are in addition to, and not in limitation or derogation of, any other waiver or release contained in this Agreement with respect to any loss of, or damage to, property of Operator and User.   These waivers apply whether or not the loss is due to the negligent acts or omissions of Operator or User, or their respective officers, directors, employees, agents, contractors, or invitees.  If required, each party agrees immediately to give its insurance company(ies) written notice of the terms of these mutual waivers and to have its insurance policies properly endorsed, if necessary, to provide for a waiver of subrogation and to prevent the invalidation of any coverage by reason of these waivers.

### 11.2   User's Personal Property

User shall at all times during the term of this Agreement and at User's sole expense, keep all of User's personal property, including trade fixtures and equipment and all merchandise of User that may be in the Space from time to time, insured against loss or damage by fire and by any peril included within fire and extended coverage insurance for an amount that will insure the ability of User to fully replace the trade fixtures, equipment, and merchandise.

### 11.3   Workers' Compensation Insurance

User shall maintain in effect throughout the term of this Agreement, at User's sole expense, Workers' Compensation insurance in accordance with the laws of the State of

7

California, and employers' liability insurance with a limit of not less than $1 million per employee and $1 million per occurrence.

### 11.4   Cancellation Clause

Any policy of insurance required under this Agreement shall be written by insurance companies authorized to do business in California. Each policy of insurance procured by User pursuant to this Article shall expressly provide that it cannot be canceled for any reason or altered in any manner unless at least 10 days' prior written notice has been given by the insurance company issuing the policy to Operator directed to the contact person listed in the Summary of Terms, or to a different person as Operator may direct in writing delivered to User.

### 11.5   Deposit of Insurance Policies With Operator

Promptly on the issuance, reissuance, or renewal of any insurance policy required by this Agreement, including fire and liability insurance policies, User shall cause a certificate evidencing the policy to be given to Operator.

### 11.6   Operator's Right to Procure Insurance

If at any time User fails to procure or maintain the insurance required by this Article, and such failure continue for a period of five (5) business days after notice from Operator to User, then Operator may obtain that insurance and pay the premiums on it for the benefit of User. Any amounts paid by Operator to procure or maintain insurance pursuant to this Article shall be immediately due and repayable to Operator by User with the next then due installment of User's Fees under this Agreement; failure to repay at that time any amount expended by Operator shall be considered the same as a failure to pay User's Fees and a default by User under this Agreement.

## 12.   Indemnity

Any and all injury, breakage or damage to the Space or the real property of which the Space is a part, arising from any cause, done by User or its agents, contractors, servants, invitees or employees, is the responsibility of User and may be repaired by Operator at the sole expense of User.

User agrees to indemnify, save, and hold harmless the Operator, its partners, general partner, members, managers, officers, directors, employees and agents (collectively the "Indemnitees"), from any and all liabilities, damages, and claims of any sort, including expenses and reasonable attorney's fees resulting from or arising out of any of User's business operations, occupancy or use of the Space or from any act or omission of User's agents, contractors, servants, invitees or employees. This indemnity shall apply and protect the Indemnitees whether or not they were negligent or their actions or failures to act contributed to such liability, expense, cause of action or damage.

### 13.    Disclaimer of Liability

All personal property of User, its agents, contractors, servants, invitees or employees, in and on the Space or any part of the real property on which the Space is located, shall be and remain therein under any and all circumstances at the sole risk of said parties and Operator shall in no event be liable to any such person or party of any damage to or loss thereof.

Operator shall not be liable for any personal injury to User, User's agents, contractors, servants, invitees or employees arising from the use and condition of the Space or any part of the real property on which the Space is located.

The parties agree that under no circumstances shall Operator or Airport be liable to User or any of the User's agents, contractors, servants, invitees or employees for indirect incidental, consequential special, punitive or exemplary damages whether in contract or tort (including strict liability and negligence) including but not limited to, damages for diminution in value, loss of use, lost profits or lost opportunity.   Operator shall have no obligation to keep, maintain or secure User's property, and User assumes all risk of loss or damage to its property located in the Space.

### 14.    Miscellaneous

### 14.1    Notices

Except as otherwise expressly provided by law, any and all notices or other communications required or permitted by this lease or by law to be served on or given to either party to this lease by the other party shall be in writing and shall be deemed duly served and given when personally delivered to the party to whom it is directed or to any managing employee or officer of that party or, in lieu of personal service, when deposited in the United States mail, first-class postage prepaid, addressed to User and Operator and directed to their respective Contact person(s) listed in the Summary of Terms. Either party may change its address for purposes of this Section by giving written notice of that change to the other party in the manner provided in this section.

### 14.2    Attorneys' Fees

If any litigation, including arbitration proceedings, is commenced between the parties to this Agreement concerning this Agreement or the rights and duties of either in relation to this Agreement, the party prevailing in that litigation shall be entitled, in addition to any other relief that may be granted in the litigation, to a reasonable sum as and for its attorneys' fees in the litigation, which shall be determined by the court in that litigation or in a separate action brought for that purpose.

### 14.3    California Law

This Agreement will be governed by and construed in accordance with the laws of the State of California.

### 14.4    Venue

The venue for any legal action filed arising out of relating to this Agreement shall be Los Angeles, California.

### 14.5    Binding on Successors

This Agreement shall be binding on and shall inure to the successors, and assigns of the User and Operator, respectively, provided that nothing contained in this section shall be construed as consent by Operator to any assignment of this Agreement or any interest in this Agreement by User.

### 14.6    Sole and Only Agreement

This Agreement constitutes the sole and only full, final, and complete agreement between Operator and User respecting the subject matter of this Agreement and this Agreement correctly sets forth the obligations of Operator and User to each other as of its date. Any agreements or representations respecting the subject matter of this Agreement not expressly set forth in this document are null and void. All prior negotiations between the parties are subsumed into this Agreement to the extent they have been agreed to, and if not agreed to by the parties such negotiations are not set forth in the terms and conditions of this Agreement. This Agreement may not be extended, amended, modified, altered, or changed, except in a writing signed by Operator and User.

### 14.7    Representation and Warranty of Authority

If User is a corporation, limited liability company, partnership, or any other entity, then each individual executing this Agreement on behalf of User represents and warrants to Operator that User is a duly formed and legally valid entity and that the individual executing this Agreement on behalf of User has full power and authority to bind the User to this Agreement and to cause User to perform its obligations under this Agreement.

EXECUTED _____12/23/2021_____ at Hawthorne, California.

**"OPERATOR/LICENSOR"**
Hawthorne Hangar Operation, LP
A California Limited Partnership
By Hawthorne Hangar Management, LLC
Its General Partner by its General Manager:
Wolfe Air Aviation, Ltd.
A California Corporation

_____
By: Dan Wolfe, President

**"USER/LICENSEE"**
Ampaire, Inc.

_____
By:  Kevin Noertker
Title: CEO of AMPAIRE INC.

## 33. TIME

Time is of the essence of this Lease.

## 34. SEVERABILITY

The unenforceability, invalidity, or illegality of any provision, portion, word or phrase of this Lease shall not render the other provisions, portions, words or phrases herein unenforceable, invalid or illegal.

## 35. COVENANTS AND CONDITIONS

Each provision of this Lease performable by the Tenant shall be deemed both a covenant and a condition.

## 36. SINGULAR AND PLURAL

When required by the context of this Lease, the singular shall include the plural.

## 37. PARAGRAPH HEADINGS

The paragraph titles used herein are for the convenience of the Parties only and shall not be considered in construing the provisions of this Lease.

## 38. JOINT AND SEVERAL OBLIGATIONS

If more than one person or entity is or becomes the Landlord or the Tenant, the obligations imposed on that Party shall be joint and several.


The Parties hereto have executed this Lease on the date first above written.

"LANDLORD"            Hawthorne Hangar Operations, LP
                      A California Limited Partnership
                      By Hawthorne Hangar Management, LLC
                      Its General Partner by its General Manger:

                      Wolfe Air Aviation, Ltd.
                      A California Corporation

                      By _____    4-15-21
                          Dan Wolfe – President,            DATE

"LESSEE"
                      By _____    4/15/2021
                          Kevin Noertker-CEO               DATE

15